**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| L.J. ZUCCA, INC., | : |
| | : |
| Plaintiff, | : Civil Action No.: 1:07-cv-00002 |
| | : |
| v. | : |
| | : Removed from Chancery Court |
| ALLEN BROS. WHOLESALE | : New Castle County, Delaware |
| DISTRIBUTORS INC.; COOPER-BOOTH | : C.A. No. 2572-N |
| WHOLESALE COMPANY; EBY-BROWN | : |
| COMPANY LLC; and WESTERN SKIER, | : JURY TRIAL DEMANDED |
| LTD. F/K/A KLEIN CANDY CO. LP, | : Oral Argument Requested |
| | : |
| Defendants. | |

## PLAINTIFF L.J. ZUCCA, INC'S OPPOSITION TO COOPER-BOOTH WHOLESALE COMPANY'S MOTION FOR PARTIAL JUDGMENT ON THE PLEADINGS

Michael F. Bonkowski (DE Bar No. 2219)
Kimberly M. Large (DE Bar No. 4422)
Saul Ewing LLP
222 Delaware Avenue
Wilmington, DE 19899
(302) 421-6800
(302) 421-5883 Fax
mbonkowski@saul.com
klarge@saul.com
Attorneys for Plaintiff, L.J. Zucca, Inc.

and

Adrienne C. Rogove
Francis X. Riley III
Saul Ewing LLP
750 College Road East, Suite 100
Princeton, NJ 08540
(609) 452-3149

Dated: February 22, 2007

## TABLE OF CONTENTS

**Page**

NATURE AND STAGE OF THE PROCEEDINGS ..............................................................1

SUMMARY OF ARGUMENT .........................................................................................5

STATEMENT OF FACTS ................................................................................................6

ARGUMENT....................................................................................................................9

I.      THE DELAWARE UNFAIR CIGARETTE SALES ACT IS
        CONSTITUTIONALLY VALID AND ENFORCEABLE; THE
        SHERMAN ANTI-TRUST ACT DOES NOT PREEMPT IT ......................9

        A.      Legal Standard ...................................................................................9

        B.      Overview:  The Failure of Cooper-Booth's Motion. .........................9

        C.      Cooper-Booth Has Failed to Meet Its Heavy Burden of Proving
                That the Unfair Cigarette Sales Act is Unconstitutional...................11

        D.      The Unfair Cigarette Sales Act Does Not Constitute an
                Impermissible Resale Price Maintenance Statute and
                Accordingly Is Not a Per Se Violation of the Sherman Act ..............12

                1.      Legislative Purpose of the Unfair Cigarette Sales Acts.........12

                2.      The Judiciary has Found that the Unfair Cigarette
                        Sales Act Is Not a Price Fixing Statute..................................14

                3.      The Delaware UCSA Does Not Conflict with Federal
                        Antitrust Laws.......................................................................20

        E.      The Acts of the Legislature Are Prima Facie Immune from
                Attack As "Concerted Action" That Violates the Sherman
                Anti-trust Laws ................................................................................22

                1.      The Legislative Enactment Is Not A Hybrid Restraint..........22

                2.      Judicial Decisions Dictate the Finding that the
                        UCSA is a Unilateral Restraint...............................................24

        F.      The State Action Immunity Doctrine Applies to Exempt the
                Unfair Cigarette Sales Act from Preemption .....................................27

CONCLUSION................................................................................................................31

## TABLE OF CITATIONS

**Page**

### CASES

324 Liquor Corp. v. Duffy, 479 U.S. 335 (1987) ..............................................24, 27, 28, 29

Associated Wholesalers, Inc. v. Commonwealth of Pa., Dep't of Revenue,
    780 A.2d 759 (Pa. Commw. Ct. 2001),
    allocatur denied, 808 A.2d 573 (Pa. 2002) ......................................................18, 26, 29

Atlantic Richfield Co. v. Tribbitt, 399 A.2d 535 (Del. Ch. 1977)......................................17

Baseline Liquors v. Circle K Corp., 630 P.2d 38 cert. denied,
    454 U.S. 969 (1981)...............................................................................................19

C.I.C. Corp. v. Township of East Brunswick, 628 A.2d 753, aff'd,
    638 A.2d 812 (N.J. 1994)........................................................................................16

California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.,
    445 U.S. 97 (1980).........................................................................................20, 26, 28

Cardio-Medical Assocs., Ltd. v. Crozer-Chester Med. Ctr.,
    536 F. Supp. 1065 (E.D. Pa. 1982) ..............................................................................9

Coast Cigarette Sales, Inc., 297 A.2d 599 .............................................................................16

Fisher v. City of Berkeley, 475 U.S. 260 (1986) ..............................................11, 22, 24, 27

Freedom Holdings v. Spitzer, 357 F.3d 205 (2d Cir. 2004) ..............................................11

General Electric Co. v. Philip Klein, 106 A.2d 206 (Del. 1954) .......................................17

Gibson v. Keith, 492 A.2d 241 (Del. 1985)..........................................................................13

Hoover v. Ronwin, 466 U.S. 558 (1984) ....................................................................25, 26

Howard Hess Dental Labs., Inc. v. Dentsply Int'l, Inc.,
    424 F.3d 363 (3d Cir. 2005).......................................................................................14

Lane Distribs., Inc. v. Tilton., 81 A.2d 786 (N. J. 1951).....................14, 15, 16, 17, 19, 25

Lehman Bros. Bank, FSB v. State Bank Comm'r, 2006 Del. Super. LEXIS 473
    (Del. Super. Nov. 30, 2006)....................................................................................11, 12

<u>Magten Asset Mgmt. Corp. v. Paul Hastings Janofsky & Walker LLP</u>, 2007 U.S.
    Dist. LEXIS 2786 (D. Del. Jan. 12, 2007) ....................................................9

<u>Mayo v. Lakeland Highland Cannery Co.</u>, 309 U.S. 310, 60 S. Ct. 517,
    84 L. Ed. 774 (1940) .........................................................................................15

<u>McClelland v. Mayor and Council of Wilmington</u>, 159 A.2d 596 (Del. Ch. 1960)..........11

<u>Morgan v. Division of Liquor Control, Conn. Dept. of Business Regulation</u>, 664
    F.2d 353 (CA2 1981) ........................................................................................29

<u>United States v. National Dairy Prods. Corp.</u>, 372 U.S. 29 (1963) ...........................18, 26

<u>Nebbia v. New York</u>, 291 U.S. 502 (1934) .......................................................................17

<u>New Motor Vehicle Bd. v. Orrin W. Fox Co.</u>, 439 U.S. 96 (1978)..................................30

<u>Old Dearborn Distilling Co. v. Seagram Distillers Corp.</u>, 299 U.S. 183,
    57 S. Ct. 139, 81 L. Ed. 109 (1936) ................................................................16

<u>Parker v. Brown</u>, 317 U.S. 341 (1943) ............................................................5, 26, 27, 29

<u>Pell v. E.I. DuPont de Nemours & Co., Inc.</u>, 2003 U.S. Dist. LEXIS 19400
    (D. Del. Oct. 29, 2003) .......................................................................................9

<u>Rice v. Norman Williams Co</u>, 458 U.S. 654 (1982).....................................................20, 27

<u>Rust v. Griggs</u>, 113 S.W.2d 733 (Tenn. 1938) ...............................................................19

<u>Sanders v. Lockyer</u>, 365 F. Supp. 2d 1093 (N.D. Cal. 2005) .....................................25, 26

<u>State v. Wickenhoefer</u>, 64 A. 273 (Del. 1906)...............................................................12

<u>William Inglis & Sons Baking Co. v. ITT Continental Banking Co.</u>,
    668 F.2d 1014 (9th Cir. 1981), <u>cert.</u> denied, 459 U.S. 825 (1982).................18, 19, 22

## OPINIONS

<u>L.J. Zucca, Inc. v. Allen Bros. et. al.</u>,
    CUM-C-19-06, Letter Op. (Dec. 15, 2006) .................................................14

<u>L.J. Zucca, Inc. v. Allen Bros. et. al.</u>,
    CUM-C-19-06, Letter Op. (February 6, 2007) ...........................................24

## RULES AND STATUTES

6 Del. C. §§ 2601, et seq. ...............................................1, 5, 6, 9, 12, 13, 17, 19, 22, 23, 30

72 Pa. Stat. §§ 202-A, et seq. .............................................................9, 12, 18, 26

The New Jersey UCSA, N.J. Stat. Ann. §§ 56:7-18 - 56: 7-38 ..................................12, 13

Sherman Anti-Trust Act, 15 U.S.C. § 1 .........................................................9, 26

Sherman Anti-Trust Act and the Clayton Act,
   15 U.S.C.A. §§ 1-7, 15 note, 12 et seq. .....................................................15

## NATURE AND STAGE OF THE PROCEEDINGS

Plaintiff L.J. Zucca, Inc. (hereinafter "Plaintiff" or "Zucca") is a wholesale distributor of cigarettes and other products; Zucca conducts business in Delaware, as well as New Jersey and Pennsylvania. On November 22, 2006, Plaintiff filed a Verified Complaint in the Delaware Court of Chancery seeking relief against four named defendants for violations of the Delaware Unfair Cigarette Sales Act ("UCSA"),[1] as well as claims of tortious interference with existing contracts, tortious interference with prospective economic advantage, and unfair competition.[2] In addition to compensatory damages, the Complaint also seeks punitive damages, costs and attorney's fees, and an order permanently enjoining each defendant from continued violations of the UCSA.

The UCSA makes it unlawful for wholesale distributors to (a) sell cigarettes at a price that is less than the wholesalers' cost of acquisition or (b) offer rebates, concessions, credits or other incentives in connection with the sale of cigarettes, when those acts are done with the intent to injure competitors or competition in general. Further, the UCSA establishes minimum sales prices of cigarettes, and the sale of cigarettes by any wholesaler below that minimum price, alone or in combination with rebates, incentives, or concessions in any form which have the effect of lowering the amount paid below the minimum price, is seen as prima facie evidence of a statutory violation.

Defendants are all cigarette wholesalers doing business in Delaware. The gravamen of Plaintiff's Verified Complaint is that Defendants have undersold and continue to sell cigarettes below their cost and the established minimum sales prices under law by offering and paying

---

[1]     See 6 Del. C. §§ 2601, et seq. (2001).

[2]     As described below, the action was thereafter removed to this Court.

illegal rebates, all with the intent to remove or substantially lessen competition. As a result, as

full discovery and expert testimony will clearly articulate, Plaintiff has lost – and continues to

lose – existing and potential customers, seen its share of relevant markets decline and/or

stagnate, and thus lost revenue due to Defendants' practices. Plaintiff is accordingly entitled to

money damages, attorneys' fees, and injunctive relief compelling Defendants to comply with the

law and cease their unlawful rebating activities.

## *THE NEW JERSEY LITIGATION*

Plaintiff first initiated its case against 28 defendants in the Superior Court of New Jersey,

Law Division, Cumberland County, on November 15, 2005. The suit is now proceeding in the

Chancery Division. Zucca filed its claims pursuant to the New Jersey, Pennsylvania, and

Delaware Unfair Cigarette Sales Acts. Numerous defendants, 15 in total, filed various motions

against Zucca. In relevant part, Defendant Cooper-Booth filed a motion to dismiss the statutory

claims against it, alleging, as here, that they were preempted by the Sherman Act.[3]

On December 15, 2006, Judge Anne McDonnell, J.S.C., denied Cooper-Booth's motion

and held that "the UCSA is not a price fixing statute, but rather, a 'sales below cost' or

'minimum markup' statute." See Letter Opinion, at 5, attached hereto as Exhibit 1. The New

Jersey Court held that "the UCSA does not authorize or compel private parties to enter contracts

or combinations to fix prices in violation of § 1 of the Sherman Act," id. at 6, finding the New

Jersey UCSA to be a permissible unilateral restraint, and, therefore, not preempted by the

Sherman Act. However, despite its findings, the Court determined that a fact issued remained as

---

[3]     Cooper-Booth sought a judicial determination by the New Jersey court that the New Jersey,
Delaware and Pennsylvania UCSAs were each unconstitutional. The New Jersey court did not have
jurisdiction to determine the constitutionality of other states' statutes, and the Pennsylvania and Delaware
claims were dismissed on comity grounds. Zucca pursued its Delaware claims through the instant
Verified Complaint in the Delaware Court of Chancery.

to whether there was antitrust immunity under the state action doctrine. As a result, the Court permitted limited discovery into the question of whether New Jersey "actively supervises" the policy. Opinion, at 6-7 (permitting defendants to renew their motion at the close of discovery).

On January 8, 2007, Zucca filed a Motion for Reconsideration, seeking a ruling that the Court erred in finding that an issue of fact remained as to whether the state action doctrine applied. The gist of the argument was that because the Court held that the UCSA was not a price fixing statute or a hybrid restraint on trade in violation of § 1 of the Sherman Anti-Trust Act, there was no need to explore a question of immunity. The state action doctrine is a defense to a preemption argument under the Sherman Act; if there is no preemption, then consideration of the additional defenses is moot. On February 6, 2007, following briefing and oral argument on the Motion for Reconsideration, the New Jersey Court issued a Letter Opinion to "clarify" its earlier opinion. See Letter Opinion, attached hereto as Exhibit 2. The Court did not alter its conclusion that the New Jersey UCSA is not a price fixing statute. However, the Court seemingly reversed its prior holding that the New Jersey UCSA is a unilateral restraint by now stating that it is a hybrid restraint, and accordingly, it continued to permit the discovery on the issue of active supervision.

## *THE CURRENT STATUS OF THE DELAWARE ACTION*

On January 3, 2007, Defendant Cooper-Booth Wholesale Company ("Cooper-Booth") removed this matter from the Court of Chancery to the U.S. District Court for the District of Delaware. On January 8, 2007, Plaintiff filed its First Amended Verified Complaint in this Court. On January 23, 2007, Defendant Cooper-Booth filed its Motion for Partial Judgment on the Pleadings (the "Motion"), seeking to dismiss Count I of the Complaint on the grounds that the UCSA is preempted by the Sherman Anti-Trust Act, and therefore is unenforceable. On February 20, 2007, two days prior to the deadline for Zucca's Opposition, Defendant Allen Bros.

filed a statement that it joins Cooper-Booth's Motion; only Cooper-Booth filed a brief in support of its position, however.

As is articulated further herein Plaintiff's Opposition to Defendant's Motion, Defendant's argument is without merit and its Motion should be denied. As in New Jersey, this Court should find that the Delaware UCSA is not a price fixing statute. Further, this Court should follow the New Jersey Court's holding to find that the Delaware UCSA is a permissible unilateral restraint and not a hybrid restraint such that the state action immunity doctrine is triggered. The Delaware statute is not preempted by the Sherman Act.[4] Oral argument is requested.

---

[4]     The remaining three defendants have each filed Answers to the Verified Complaint.

## SUMMARY OF ARGUMENT

The Delaware UCSA, 6 Del. C. §§ 2601 – 2608, is a valid, constitutional statute that is not preempted by § 1 of the Sherman Act. Cooper-Booth must meet a heavy burden of proving that a state legislative enactment is unconstitutional "beyond all doubt." Specifically, Cooper-Booth must demonstrate that the state statute (1) is a "price fixing" statute, thus constituting a per se violation of the Sherman Act; or (2) authorizes or compels conduct that is a per se violation of the Sherman Act (i.e. constitutes a hybrid, rather than unilateral, restraint). Cooper-Booth fails to demonstrate that any of the pre-requisites for preemption are present for the reasons that follow:

1.    The UCSA is a "sales below cost" or a "minimum markup" statute; it is not a price-fixing statute and therefore it is not a per se violation of the Sherman Act;

    a.    The legislative purpose of the UCSA demonstrates that it is a sales below cost statute;

    b.    The judiciaries of sister jurisdictions are in accord that the UCSA is not a price-fixing statute;

    c.    The statute is not in conflict with federal antitrust laws.

2.    The UCSA does not authorize or compel conduct that is equivalent to a per se violation of the Sherman Act (i.e. it is a unilateral and not a hybrid restraint), such that there is no "concerted action;"

3.    Because the UCSA is not preempted by the Sherman Act under either test, there is no need to consider whether there is state action immunity from antitrust scrutiny under Parker v. Brown, 317 U.S. 341 (1943). However, even if the UCSA could be found to be per se violative of the Sherman Act, the state action immunity doctrine applies to exempt the Delaware statute from preemption.

## STATEMENT OF FACTS

The relevant facts are set forth in Plaintiff's First Amended Verified Complaint (the "Complaint") and also the Affidavit of Scott J. Zucca, sworn to on February 22, 2007, and are briefly summarized here.

Plaintiff is a wholesale distributor of cigarettes based in Vineland, New Jersey. See Compl. ¶ 1, 11; Zucca Aff. ¶ 2. Plaintiff has operations in several states including Delaware, New Jersey, and Pennsylvania. See Compl. ¶ 11. Like New Jersey and Pennsylvania, the Delaware legislature has promulgated legislation that is commonly referred to as an "Unfair Cigarette Sales Act" (hereafter, the "Act" or the "UCSA"), regulating the sales of cigarettes by wholesalers and retailers. See Compl. ¶ 8. The Act proscribes wholesalers from selling cigarettes below their cost, or giving rebates in connection with cigarette sales, where such acts are done with the intent to injure competition. See id. Based on cost surveys, the Act creates "Minimum Sales Prices" of cigarettes. See Compl. ¶ 9. Sales of cigarettes below these prices are considered to be prima facie evidence of violation of the Act.

The Act provides a private right of action to any injured competitor for damages, costs, and injunctive relief. See Compl. ¶ 10. Further, if a wholesale cigarette vendor is found to be in violation of the Delaware UCSA, then the vendor's license shall be suspended or revoked by the Secretary. 6 Del. C. § 2607(b).

Defendants are all wholesale distributors of cigarettes, as defined in the Act. Zucca Aff. ¶ 2. Each of the Defendants does business in Delaware, and may also do business in New Jersey and Pennsylvania. See Compl. ¶ 2-5. Plaintiff alleges that Defendants have undersold and continue to regularly sell cigarettes below their cost and the minimum prices prescribed by the Acts, with the intent to remove or substantially lessen competition in Delaware. See Compl. ¶ 12. Plaintiff alleges that Defendants have done so by, among other things, giving rebates in

connection with the sales of cigarettes, including delivering envelopes full of cash to retailers as purported rebates. See id. Plaintiff alleges that, because of Defendants' unlawful actions, and Plaintiff's unwillingness to participate in this unlawful activity, it has been damaged through the past and continuing loss of substantial business to Defendants in the form of existing and potential customers, the loss of market share, and ultimately the loss of revenue. See Compl. ¶ 14; see also Compl. ¶¶ 15-30 (for allegations against each defendant individually).

Plaintiff further alleges that it had existing contractual relations with numerous retail customers in Delaware. See Compl. ¶ 36. Plaintiff alleges that Defendants knew of those existing contractual relations and intentionally interfered with them, without privilege or justification, by wrongfully granting cash rebates, incentives, credits, or other monetary benefits and selling cigarettes below their own cost or the applicable regulated minimum price. See Compl. ¶ 37. Plaintiff contends that, in so doing, Defendants intended to limit competition within the markets in which they and Plaintiff did business and/or in retaliation for the fact that Plaintiff has not and will not also likewise sell cigarettes below cost or otherwise in violation of the statutes. See Compl. ¶ 38. As a result of Defendants' wrongful interference, Plaintiff has lost existing contractual relations with its customers. See Compl. ¶ 39. Plaintiff has suffered actual and substantial legal damages as a direct result of Defendants' tortious interference with its contracts. See Compl. ¶¶ 40-42.

Plaintiff likewise asserts that it has had prospective contractual relations with numerous customers in Delaware, as well as a reasonable expectation of economic advantage from those prospective contractual relations. See Compl. ¶¶ 44-45. All of the Defendants have intentionally interfered with Plaintiff's prospective economic advantage, without justification or excuse, by engaging in rebating and other activities violative of the Act, with intent to injure competition

and/or retaliate against Plaintiff because it refused to engage in conduct violative of the Act. <u>See</u> Compl. ¶ 46. But for Defendants' wrongful interference, Plaintiff would have received and continued to receive the anticipated economic benefits of its prospective contractual relations. <u>See</u> Compl. ¶ 47. Plaintiff has suffered actual legal damages as a direct result of Defendants' tortious interference. <u>See</u> Compl. ¶¶ 48-50. Finally, Plaintiff alleges that, by virtue of Defendants' misconduct, they have engaged in unfair competition. <u>See</u> Compl. ¶¶ 52-54; Zucca Aff. ¶¶ 17-18.

## ARGUMENT

**I.    THE DELAWARE UNFAIR CIGARETTE SALES ACT IS
CONSTITUTIONALLY VALID AND ENFORCEABLE;
THE SHERMAN ANTI-TRUST ACT DOES NOT PREEMPT IT**

### A.    Legal Standard

Defendant Cooper-Booth has moved for judgment on the pleadings on Count I of the

Complaint on the grounds that the Delaware Unfair Cigarette Sales Act, 6 Del. C. §§ 2601, et

seq.[5] constitutes resale price maintenance and price fixing in violation of Section 1 of the

Sherman Anti-Trust Act, 15 U.S.C. § 1.  A motion for judgment on the pleadings may only be

granted "if no relief could be granted under any set of facts that could be proved."  Pell v. E.I.

DuPont de Nemours & Co., Inc., 2003 U.S. Dist. LEXIS 19400, at *3 (D. Del. Oct. 29, 2003)

(attached hereto as Exhibit 3), citing Cardio-Medical Assocs., Ltd. v. Crozer-Chester Med. Ctr.,

536 F. Supp. 1065, 1072 (E.D. Pa. 1982) ("if a complaint contains even the most basic of

allegations that, when read with great liberality, could justify plaintiff's claim for relief, motions

for judgment on the pleadings should be denied.").  The movant bears the burden of proving that

"no material issue of fact remains to be resolved and judgment as a matter of law is appropriate."

Magten Asset Mgmt. Corp. v. Paul Hastings Janofsky & Walker LLP, 2007 U.S. Dist. LEXIS

2786, at *6 (D. Del. Jan. 12, 2007) (internal citations omitted) (attached hereto as Exhibit 4).

Defendant cannot meet its burden.

### B.    Overview:  The Failure of Cooper-Booth's Motion.

The Delaware UCSA does not violate the Sherman Act.  Statutes are presumed to be

constitutional, and Cooper-Booth's motion is without merit on both factual and legal grounds.

Other than the argument itself, the Cooper-Booth motion is devoid of any interpretation of the

---

[5]    See also the New Jersey Unfair Cigarette Sales Act, N.J.S.A. §§ 56:7-18, et seq. ("NJ UCSA")
and the Pennsylvania Cigarette Sales and Licensing Act, 72 Pa. Stat. §§ 202-A, et seq. ("PA UCSA").

statute it claims is unconstitutional and/or preempted by federal law. Instead, Cooper-Booth makes conclusory and superficial arguments about the facial invalidity of legislative enactments which have been in place for over fifty years. In so doing, Cooper-Booth uses "buzz words" from the federal antitrust case law in support of its argument of facial invalidity, such as "resale price maintenance," "hybrid restraint" and "per se" antitrust violation. However, these terms are not analyzed in any depth and/or applied to the statutes at issue. Finally, Cooper-Booth has failed to address relevant case law that has sustained below cost sales legislation as valid exercises of state legislative action. Cooper-Booth has failed to sustain its heavy burden to establish that the Legislature, which has already considered and examined the facts bearing on the necessity, and constitutionality, of its enactments, has acted in an unconstitutional manner in passing the subject legislation.

In relevant part, the Sherman Act attempts to restrict anticompetitive behavior.[6] Cooper-Booth argues that the Delaware UCSA violates Section 1 of the Sherman Act because, it alleges, the UCSA permits the cigarette manufacturer, rather than the free market, to "set and manipulate the wholesaler's minimum resale price." Motion, at 9. According to Cooper-Booth, this is "resale price maintenance" and it "result[s] in artificially high cigarette prices" for customers. Id. at 11. Cooper-Booth's arguments fail, as the legislative purpose of the UCSA is to prevent unfair competition, not to restrain it; nor does it "fix" prices or authorize conduct that violates the Sherman Act.

To meet its burden of proof that the UCSA is preempted by the Sherman Act, Cooper-Booth must demonstrate that the Act (1) is a "price fixing" statute, thus constituting a per se

---

[6]    "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal…" 15 U.S.C. § 1.

violation of the Sherman Act; or (2) authorizes or compels conduct that is a per se violation of the Sherman Act (i.e. constitutes a hybrid, rather than unilateral, restraint). See Fisher v. City of Berkeley, 475 U.S. 260, 267-8 (1986); Freedom Holdings v. Spitzer, 357 F.3d 205, 222-23 (2d Cir. 2004). Cooper-Booth cannot meet its burden of proof as to either test, and the Delaware UCSA is constitutional.

Here, Zucca first addresses Cooper-Booth's heavy burden in challenging the constitutionality of any statute, given the presumption that it is constitutional. Zucca then demonstrates that the UCSA is not a resale price maintenance statute by analyzing the Act's legislative purpose and relevant judicial decisions. Next, Zucca illustrates Cooper-Booth's failure to prove that the Act is a hybrid restraint, as it is not (and nor does it authorize) "concerted action." Finally, Zucca demonstrates that even if the UCSA were per se violative of the Sherman Act, the state action immunity doctrine applies to exempt the Delaware Act from preemption. Accordingly, Cooper-Booth's Motion for Partial Judgment on the Pleadings should be denied.

## C.    Cooper-Booth Has Failed to Meet Its Heavy Burden of Proving That the Unfair Cigarette Sales Act is Unconstitutional

A legislative enactment is presumed constitutional. The onus of proving a statute unconstitutional is on the party attacking the legislation. The burden of the challenging party is an exceptionally high one, as a statute is presumed to be valid "unless it clearly contravenes a constitutional provision." Lehman Bros. Bank, FSB v. State Bank Comm'r, 2006 Del. Super. LEXIS 473, at *23 (Del. Super. Nov. 30, 2006) (citations omitted) (attached hereto as Exhibit 5); see also McClelland v. Mayor and Council of Wilmington, 159 A.2d 596, 601 (Del. Ch. 1960) ("In approaching the constitutional question presented, the court has in mind the presumption of

constitutionality"). In reciting the "well-settled principles and rules of law," the Court stated as follows:

> It is hardly necessary for us to state that every statute is presumed to be constitutional, and that Courts should not declare one to be unconstitutional unless it is clear that it is so. If there is a doubt in the mind of the Court the expressed will of the Legislature should be sustained. Courts should be diligent to discover some ground upon which they can uphold the validity of the statute, and if upon a careful examination of the entire act such ground sufficiently appears, the law must be sustained. The party who wishes a Court to pronounce a law unconstitutional takes upon himself the burden of proving, beyond all doubt, that it is so.

State v. Wickenhoefer, 64 A. 273, 276-77 (Del. 1906). "It is to be presumed that governmental authority has been exercised correctly and in accordance with the law." Lehman Bros., 2006 Del. Super. LEXIS at *23-24. A party attacking the constitutionality of a statute has the burden of proving that the repugnancy of the legislative act is clear "beyond all doubt." Wickenhoefer, 64 A. at 276-77. As set forth below, the constitutional attack by Cooper-Booth on Delaware's Unfair Cigarette Sales Act does not meet the heavy burden of establishing that the Act is void beyond all doubt.

> **D.    The Unfair Cigarette Sales Act Does Not Constitute an Impermissible Resale Price Maintenance Statute and Accordingly Is Not a Per Se Violation of the Sherman Act**

Cooper-Booth fails to prove that the state statute is a "price fixing" statute; thus the UCSA does not constitute a per se violation of the Sherman Act.

> **1.    Legislative Purpose of the Unfair Cigarette Sales Acts**

As is made clear from the face of the Act, the Delaware UCSA[7] is designed to prevent unfair competition and unfair trade practices in the sale of cigarettes. 6 Del. C. § 2601 (its

---

[7]    The arguments raised herein apply equally to the New Jersey and Pennsylvania statutes. See N.J. Stat. Ann. §§ 56:7-18 - 56: 7-38.; 72 Pa. Stat. §§ 202-A, et seq.

purpose is to prohibit conduct that "injure[s] a competitor or competitors," or "destroy[s] or substantially lessen[s] competition" in the sale of cigarettes by wholesalers). Its provisions prohibit sales of cigarettes below cost, and protect and stabilize tax collection on the sale of cigarettes and revenues from the licensing of persons engaged in the sale of cigarettes. The Delaware UCSA also confers powers and imposes duties on the Secretary of Finance and on those who are engaged in the sale of cigarettes at the retail or wholesale level. 6 Del. C. §§ 2606, 2607. While there is no Delaware legislative history per se with respect to the Unfair Cigarette Sales Act, even the title of the Act establishes that it is designed to prevent "unfair" sales of cigarettes. Cooper-Booth even allows that statutes such as the UCSA have a public benefit, i.e. "they keep cigarette[s] . . out of underage hands." Motion, fn. 2.

Where a statute lacks legislative history other than its title and statement of purpose, it may be compared to like statutes of other jurisdictions. See, e.g., Gibson v. Keith, 492 A.2d 241, 247 (Del. 1985). The New Jersey UCSA, N.J. Stat. Ann. §§ 56:7-18 - 56: 7-38, is very similar in substance to the Delaware Act[8] and the holdings of the New Jersey courts are relevant here to demonstrate that the Delaware UCSA does not fix prices.

---

[8]     As but one example, the definitions of "basic cost of cigarettes" are very similar. Cf. 6 Del. C. § 2602(1) and N.J. Stat. Ann. § 56:7-19(h). See also definition of "cost to the wholesaler" (6 Del. C. § 2602(4): presumption is 5% of basic cost of cigarettes) and "cost to the wholesaler" (N.J. Stat. Ann. § 56:7-22: presumption is 5.25% of the basic cost of cigarettes). However, the individual factors that bear on the cost of cigarettes to a retailer vary by state.

In Delaware, the cost to the retailer is the list price of the cigarettes (i.e. the price at which the manufacturer sells the cigarettes to a wholesaler), less a 2% cash discount, plus the State excise tax, and a 5% presumed cost of doing business (also known as a "markup"). The presumed cost may be changed by application to the State by an individual wholesaler. Zucca Aff. ¶ 4-6. In New Jersey, the factors determined by the State do not include a 2% cash discount and the presumed cost of doing business differs.

-13-

### 2. The Judiciary has Found that the Unfair Cigarette Sales Act Is Not a Price Fixing Statute

Cooper-Booth's argument is based on a faulty premise—that is, that the Act compels the fixing of minimum resale cigarette prices, which unconstitutionally encroach on the federal anti-trust laws (see Cooper-Booth Motion at 8-11). Contrary to Cooper-Booth's argument, the Act does not constitute resale price maintenance that is a per se violation of the Sherman Act. In the simplest of terms, resale price maintenance means that the initial seller dictates the dealer's resale price. See Howard Hess Dental Labs., Inc. v. Dentsply Int'l, Inc., 424 F.3d 363, 376 (3d Cir. 2005), pet. for cert. filed (Feb. 21, 2006). The Delaware UCSA is not a price fixing statute because wholesalers and retailers are permitted to, among other things, sell cigarettes above their own actual cost, even if this is below a minimum sales price. See, e.g., Zucca Aff., at ¶ 6, 11 (attached hereto as Exhibit 6).

It is telling that Cooper-Booth cannot cite to any instances in which a state UCSA has been deemed preempted by the Courts of that jurisdiction. While the question of whether the Delaware UCSA is a price-fixing statute has not come before the Delaware courts, this premise has been rejected by courts of sister jurisdictions. Most recently, the Superior Court of New Jersey rejected the notion that the New Jersey Act fixes prices in Zucca's sister case in New Jersey. See L.J. Zucca, Inc. v. Allen Bros., et. al., CUM-C-19-06, Letter Op. (Dec. 15, 2006).

### a. The New Jersey UCSA

In Zucca's New Jersey case, Judge Anne McDonnell held that "the [New Jersey] UCSA is not a price fixing statute, but rather, a 'sales below cost' or 'minimum markup' statute." See Opinion, at 5. In doing so, the New Jersey court considered the case of Lane Distribs., Inc. v. Tilton, 81 A.2d 786, 793 (N. J. 1951). There, the New Jersey Supreme Court rejected outright a claim that the New Jersey UCSA fixed minimum prices in violation of federal constitutional law:

> The statute under attack is, as said not a price fixing statute, its
> only purpose is to require that the commodity not be sold at a loss
> when the purpose of such a sale is not legitimate. Such statutes
> have been justified constitutionally in many instances. As the U.S.
> Supreme Court said in Mayo v. Lakeland Highland Cannery Co.,
> 309 U.S. 310, 60 S. Ct. 517, 521, 84 L. Ed. 774 (1940), 'The mere
> fact that an act fixes prices is, in itself insufficient to invalidate it;
> an allegation of that fact does not raise substantial federal
> questions . . . .'

Lane, 81 A.2d at 794-95 (emphasis added).  In interpreting the NJ UCSA, the New Jersey

Supreme Court in Lane already ruled that the NJ UCSA is not a price fixing statute.  Id. at 793.[9]

Just as the New Jersey UCSA is not a price fixing statute, neither is the Delaware UCSA and it

cannot run afoul of the Sherman Act as alleged by Defendant.

Given the lack of legislative history to the Delaware statute, the New Jersey Supreme

Court's review of the legislative history of the sister New Jersey statute is especially relevant

here.

> The history of the legislative acts such as the Unfair Cigarette
> Sales Act shows that in an endeavor to try to end the growth of
> trusts and monopolies leading to the destruction of small
> businesses through destructive price-cutting and competition
> Congress passed the Sherman Anti-Trust Act and the Clayton Act,
> 15 U.S.C.A. §§ 1-7, 15 note, 12 et seq.  These Federal anti-trust
> laws were designed to meet interstate situations only and in the
> early part of the twentieth century the various states began to enact
> unfair and anti-loss leader sales legislation until today thirty-one
> states have laws similar to our Unfair Cigarette Sales Act.
>
> 'There is a great body of fact and opinion tending to show that
> price cutting by retail dealers is not only injurious to the good will

---

[9]     In Lane, the New Jersey Supreme Court reviewed the legitimacy of the Act under the State's
constitution and found that it was deficient because the definition of the terms "wholesale dealer," "retail
dealer," and "vendor" were improper and deprived the plaintiff of its right to engage in lawful
competition.  The New Jersey Supreme Court specifically found, however, that it was not a price fixing
statute and further rejected the federal constitutional challenge under the Clayton Act because it did not
impose a burden on interstate commerce.  Id. at 790-91.  As a result of the decision in Lane, the NJ UCSA
was amended in 1952 to address definitional problems; in all other respects, it remains the same.
Accordingly, the reasons for the Supreme Court's finding that the NJ UCSA is not a price fixing statute
remain valid.

-15-

and business of the producer and distributors of identified goods, but injurious to the general public as well.' (Citing Old Dearborn Distilling Co. v. Seagram Distillers Corp., 299 U.S. 183, 57 S. Ct. 139, 145, 81 L. Ed. 109 (1936)).

***

The legislation in effect today throughout the various states has assumed various forms depending upon the economic views and legal preferences of the various Legislatures. In this State it took the form of a statute prohibiting sales below cost. Our Legislature recognized the evils of price-cutting and declared as a matter of fact that price-cutting is an unfair method of competition, as set forth in the preamble of the Act.

***

The matter of price-cutting, rebates, discounts or of selling below cost is one that may be regarded as directly affecting the welfare of the community and hence within the limits of the regulation authorized by the police power.

***

When conditions in a business become such that the welfare of the public will not be adequately protected by unrestricted competition, or if it be shown that ruinous and chaotic conditions are otherwise about to be brought about by the business, that the economic existence of large numbers of people is being threatened, then the law may step in and prescribe regulations to correct the alleged or threatened abuses.

Lane, 81 A.2d at 793-95 (emphasis added).

In enacting the NJ UCSA, the "Legislature's intent was to deal with a state-wide problem and to protect the general welfare of all citizens of New Jersey from the various misuses to which the sale and distribution of cigarettes have proven subject." Coast Cigarette Sales, Inc., 297 A.2d 599, 604 (N.J. Super. Ct. Law Div. 1972); cf. C.I.C. Corp. v. Township of East Brunswick, 628 A.2d 753 (N. J. Super. Ct. App. Div. 1993), aff'd, 638 A.2d 812 (N.J. 1994).

The Delaware UCSA sets presumptive price floors – the "Minimum Sales Price" – for wholesale and retail sales of cigarettes. It is not a price fixing statute, however, because

wholesalers and retailers are permitted to, among other things, sell cigarettes above their own actual cost, even if this is below the Minimum Sales Price. Moreover, in an effort to enable all cigarette sellers to compete fairly, the Delaware UCSA restricts the giving of rebates which would result in sales below "cost." 6 Del. C. § 2601, et. seq. A statute prohibiting rebates in the retail sale of commodities can be a reasonable exercise of Delaware's police power. Cf. General Electric Co. v. Philip Klein, 106 A.2d 206, 211 (Del. 1954) (upholding legislative judgment and finding constitutional statute that provided non-signers should not sell certain products at prices below minimum resale prices fixed in contracts); see also Atlantic Richfield Co. v. Tribbitt, 399 A.2d 535 (Del. Ch. 1977). As the Delaware UCSA makes clear, like the New Jersey UCSA, the intent of the statute is to create a level playing field in the sale of cigarettes so that all retail and wholesalers of cigarettes can fairly compete. Therefore, the statute has procompetitive purposes.

The United States Supreme Court upheld an analogous statute against a constitutional challenge in Nebbia v. New York, 291 U.S. 502 (1934). There, a New York statute regulated milk prices. The United States Supreme Court held that state regulation of prices was enacted to promote the general welfare and is not per se violative of the federal constitution. Where the legislature has determined that regulation of prices serves the public interest, a state may impose price regulation, as long as the means used are not arbitrary, discriminatory or demonstrably irrelevant to a legitimate purpose. Id. at 517.

The Judiciary has determined very clearly that the public interest is protected by the Unfair Cigarette Sales Acts because they are aimed at curbing abuses in the sale of cigarettes, eliminating illegal agreements in restraint of trade, allowing small sellers to compete with big ones, and promoting competition. See, e.g., Lane, 81 A.2d at 794.

**b.     Other Jurisdictions Uphold Similar Statutes In the Face of Constitutional Challenge**

Courts in Pennsylvania, California, Arizona, and Tennessee have each upheld their Cigarette Sales Acts despite a challenge that they ran afoul of the Sherman Act. See, e.g., Associated Wholesalers, Inc. v. Commonwealth of Pa., Dep't of Revenue, 780 A.2d 759 (Pa. Commw. Ct. 2001), allocatur denied, 808 A.2d 573 (Pa. 2002). Cooper-Booth ignores each of these decisions in its challenge to the Delaware UCSA. Yet the cases are remarkably similar to this one and support the constitutionality of Delaware's Act.

In Associated Wholesalers, the plaintiff brought a petition under the Pennsylvania Cigarette Sales and Licensing Act, 72 Pa. Stat. §§ 202-A and 227-A, before the Department of Revenue to establish a lower cost of doing business for its sales of cigarettes. The Director denied the petition. The plaintiff there argued, inter alia, that the Director violated the Sherman Antitrust Act in its interpretation of Pennsylvania's Cigarette Sales and Licensing Act. Demonstrating the fallacy of Cooper-Booth's argument here, the Pennsylvania Court held that not only is the Pennsylvania statute not in conflict and therefore not preempted by the Sherman Anti-Trust Act, but that the goals of the act and the federal anti-trust statutes are the same: "[A] properly applied sales below cost statute furthers the goals of the Sherman Anti-Trust Act." 780 A.2d at 765 (citing United States v. National Dairy Prods. Corp., 372 U.S. 29 (1963)).

Similar results were reached by courts in other jurisdictions. In William Inglis & Sons Baking Co. v. ITT Continental Banking Co., 668 F.2d 1014 (9th Cir. 1981), cert. denied, 459 U.S. 825 (1982), the court considered a challenge to California's statute that rendered sales below cost illegal on the basis of Sherman Act preemption grounds. It was argued that the statute conflicted with federal anti-trust laws which permitted pricing at or below marginal or average variable costs. The United States District Court held that the mere possibility of a

conflict between the California law and federal law was insufficient to warrant preemption. In

fact, after examining California's sales below cost, the court found there was no real conflict

between the California statute and federal law.

> [A]ny conflict between state and federal law, on the facts of this
> case, is entirely speculative. The California statute does not make
> all sales below average total cost illegal per se. Instead, such sales
> must have been made "for the purpose of injuring competitors or
> destroying competition." The statute enables a plaintiff to create a
> presumption of unlawful purpose by introducing evidence of sales
> below cost plus proof of injury to competitors or competition.
> However, this presumption may be rebutted by establishing one of
> the statute's affirmative defenses, such as meeting competition or
> by showing that the sales "were made in good faith and not for the
> purpose of injuring competitors or destroying competition."

William Inglis & Sons Baking Co., 668 F.2d at 1049-51 (citations omitted).

Likewise, in Baseline Liquors v. Circle K Corp., 630 P.2d 38, 45 (Ariz. Ct. App.), cert.

denied, 454 U.S. 969 (1981), the Arizona Court of Appeals held, as the New Jersey Supreme

Court did in Lane, that a statute prohibiting wholesalers and retailers from selling merchandise at

a price below "cost" as defined by the statute, was not a price-fixing statute in violation of the

Sherman Act. See also Rust v. Griggs, 113 S.W.2d 733 (Tenn. 1938) (holding that statute which

prohibited sales of commodities below cost did not place burden on interstate commerce, and,

therefore, did not violate any antitrust statutes).

An examination of the Act demonstrates that the Delaware UCSA, like the analogous

Pennsylvania and New Jersey statutes, encourages competition and is not a resale price

maintenance statute. Neither the manufacturer nor the distributor of cigarettes sets or fixes

prices. The Act merely provides that the wholesaler and/or retailer's cost is the starting point for

the formula to be used for each seller to establish its independent prices. 6 Del. C. §§ 2602-

2605. The Act requires that the basic cost of cigarettes be used as the basis on which to calculate

the actual sales price.

### 3.   The Delaware UCSA Does Not Conflict with Federal Antitrust Laws

In addressing the pre-emption issue, the United States Supreme Court has held:

> In determining whether the Sherman Act pre-empts a state statute, we apply principles similar to those which we employ in considering whether any state statute is pre-empted by a federal statute pursuant to the Supremacy Clause. . . . the typical inquiry is whether there exists an irreconcilable conflict between the federal and state regulatory schemes. The existence of a hypothetical or potential conflict is insufficient to warrant the pre-emption of the state statute. A state regulatory scheme is not pre-empted by the federal antitrust laws simply because in a hypothetical situation a private party's compliance with the statute might cause him to violate the antitrust laws. A state statute is not preempted by the federal antitrust laws simply because the state scheme might have an anticompetitive effect.

Rice v. Norman Williams Co., 458 U.S. 654, 659 (1982). Here, the legislative scheme does not create an irreconcilable conflict with the Sherman Act (nor does Cooper-Booth argue that it does) and, as a consequence, the Act does not constitute a per se violation.

The United States Supreme Court's decision in California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc., 445 U.S. 97 (1980), is controlling on this point. There, a state statute required merchants in the California wine industry to file fair trade contracts or price schedules posting their liquor prices with the State. The California statute provided that if a wine producer had not set prices through a fair trade contract, then it was incumbent upon the wholesalers to post a resale price schedule for that producer's brands. Unlike the Delaware UCSA, under which cigarettes are not sold at fixed prices, wine merchants in California were required to sell wine to retailers at prices set in the price schedules or in a fair trade contract. There could be no variation from these established prices. The Court noted at the outset that the purpose of the statute was resale price maintenance. In essence, the statute authorized the wholesalers to set the prices and further authorized private parties to enforce those prices. Unlike the Delaware UCSA, the California scheme provided that wine prices "posted by a single wholesaler within a trading

area bind(s) all wholesalers in that area." Id. at 100. Further, unlike Delaware, California had ceded control to other private parties to set prices without providing any mechanism "to review the reasonableness of the prices set by wine dealers." Id. As further distinguished from Delaware, the California system for wine pricing "plainly constitutes resale price maintenance in violation of the Sherman Act . . . . The wine producer holds the power to prevent price competition by dictating the prices charged by wholesalers." Id. at 103. Consequently, the Court found an irreconcilable difference with federal anti-trust law. In contrast to the California legislative scheme, the Delaware Act does not mandate resale price maintenance, and is entirely consistent with federal antitrust law. Therefore, there is no per se violation of the Sherman Act.

Cooper-Booth makes the conclusory and unsupported statement that the Delaware Act constitutes resale price maintenance,[10] though Cooper-Booth fails to examine the Act or analyze its effect on the industry. There is no suggestion, much less evidence, that the UCSA is facially inconsistent with the Sherman Act, or even that there is a hypothetical or potential conflict. On this barren record, it is impossible to reach the conclusion that the Act, in effect since 1953, violates the Sherman Act, let alone that it constitutes a per se violation.

Cooper-Booth further concludes, without any supporting case law, affidavits or industry reports, that the result of the Act is that "wholesalers are prohibited from passing on their cost savings to customers, resulting in artificially high cigarettes prices that are immune from competitive market forces." See Motion at 11. Even assuming the competitive aspects of the UCSA would need to be revisited -- which Zucca contests -- discovery would be necessary to

---

[10]     See, e.g., Cooper-Booth Motion at 9 (oversimplifying the calculation of the basic cost of cigarettes, and minimizing or even excluding consideration of the 2% cash discount, taxes, and variability of costs of doing business).

explore how the statutory formulae affect competition, cost savings and the setting of prices. Therefore, Cooper-Booth's Motion must be denied.

### E.    The Acts of the Legislature Are Prima Facie Immune from Attack As "Concerted Action" That Violates the Sherman Anti-trust Laws

#### 1.    The Legislative Enactment Is Not A Hybrid Restraint

Cooper-Booth argues that the Delaware UCSA is preempted because it imposes a "hybrid" as opposed to a "unilateral" restraint, and thus the restraint constitutes a per se violation of the Sherman Act. A hybrid restraint, unlike a unilateral restraint, is anti-competitive activity by concerted groups of entities. Hybrid restraints violate the Sherman Act. Fisher v. City of Berkeley, 475 U.S. 260, 268 (1986). There is absolutely nothing suggested by Cooper-Booth, or any reference to the record, demonstrating that there is a concerted effort by more than one entity to fix prices – the hallmark of a hybrid restraint.

Under the Delaware UCSA, it is unlawful for any wholesaler, with intent to injure competitors or to destroy or substantially lessen competition, to sell cigarettes at less than cost to such wholesaler, and/or to offer any rebates in connection with the sale of cigarettes. 6 Del. C. § 2601. The statute defines "cost to the wholesaler" as the basic cost of cigarettes plus the cost of doing business by the wholesaler. 6 Del. C. § 2602(4). With respect to wholesalers, the cost of doing business is presumed to be 5% of the basic cost of cigarettes. 6 Del. C. § 2602(4). This presumed cost is set by the State, based on cost surveys, audits and experience. However, the presumptions regarding the appropriate percentage of cost, and therefore the price at which retailers or wholesalers may sell cigarettes, is rebuttable. Accord William Inglis & Sons Baking Co., 668 F.2d 1014 (9th Cir. 1982).

The Act sets up a mechanism whereby the retailer or wholesaler may petition the Secretary of Finance to prove that its costs of doing business are higher or lower than the

-22-

presumed percentage. 6 <u>Del. C.</u> §§ 2602, 2606, 2608. In this regard, any wholesaler may

produce evidence about costs of doing business that vary from the "cost" as defined in the

statute. 6 <u>Del. C.</u> §§ 2602, 2606, 2608.

Indeed, 6 <u>Del. C.</u> § 2606 provides in part:

> In determining "cost to the wholesaler" the Secretary or any court
> shall receive and consider as bearing on the bona fides of such cost
> evidence tending to show that any person complained against
> under any of the provisions of this act purchased cigarettes, with
> respect to the sale of which complaint is made at a fictitious price
> or upon terms or in such a manner or under such invoices as to
> conceal the true costs, discounts or terms of purchase and shall also
> receive and consider as bearing on the bona fides of such cost
> evidence of the normal, customary, and prevailing terms and
> discounts in connection with other sales of a similar nature in the
> trade area.

Therefore, pursuant to the statutory formulae, retailers and manufacturers must charge

prices which do not fall below cost. The statutory calculation contains numerous variables based

upon the cost of doing business. Therefore, each seller may potentially charge different prices in

the sale of cigarettes. <u>See</u> Scott Zucca Aff. at ¶ 4-12. Under the Act, the cost of doing business

includes not only internal costs such as rent, labor and overhead, but also license fees, insurance

and taxes charged by the State pursuant to the Cigarette Sales Act. 6 <u>Del. C.</u> § 2602; <u>see</u> Scott

Zucca Aff. at ¶ 5 (some states exclude a cash discount; the State of Delaware likewise has

authority to alter or eliminate this deduction). The state excise tax on cigarettes has been

increased by the State of Delaware as recently as July, 2003, and the Governor has recently

proposed another increase. <u>See</u> Scott Zucca Aff. at ¶ 8 (in July, 2003, the tax was adjusted

upward from $0.24 per pack to $0.55). Thus, the cost of doing business is in part dictated and

supervised by the State and in part dictated by free market forces and the unique circumstances

of each independent wholesaler and retailer. However, most importantly, the prices charged are

<u>not</u> fixed by the cost: the Delaware UCSA allows that cigarettes may be sold at any price above

cost. As such, the independent activity by each cigarette seller in establishing its prices in accordance with the statutory mandate is "unilateral action" that is not prohibited by the Sherman Act.

### 2.     Judicial Decisions Dictate the Finding that the UCSA is a Unilateral Restraint

Hybrid restraints are found where state laws authorize or compel private parties to engage in anticompetitive behavior (324 Liquor Corp. v. Duffy, 479 U.S. 335, 345 (1987)), or where the state grants private parties "private regulatory power" (Fisher, 475 U.S. at 268). In Zucca's New Jersey case, the Court found that the New Jersey "UCSA does not authorize or compel private parties to enter contracts or combinations to fix prices in violation of § 1 of the Sherman Act." December 2006 Opinion at 6. It further stated that the manufacturer determines only the wholesale price and not the resale price, and New Jersey had set the formula and percentage markup that was presumed and applied "where the wholesaler does not file a satisfactory proof of a lesser or higher cost of doing business." Id. While not stated expressly, this would suggest that the Court determined that the New Jersey statute was a permissible unilateral restraint. However, the Court also granted the defendant an opportunity to engage in discovery in order to determine whether the immunity exemption applied. Id. at 6-7. On a Motion for Reconsideration, the New Jersey Court suddenly "clarified" its decision to follow the analysis in two cases in which the courts engaged in a state action immunity analysis. See L.J. Zucca, Inc. v. Allen Bros. et. al., CUM-C-19-06, Letter Op. (February 6, 2007). In what seemed to be an "ends justified the means" holding, and despite its previous findings, the Court then stated that the New Jersey UCSA was a hybrid restraint so that discovery still might be pursued to determine the scope of immunity. Nevertheless, Zucca contends that both the Delaware and New Jersey UCSAs are actually unilateral restraints that do not violate the Sherman Act.

A number of comparable decisions compel the conclusion here that the UCSA is a unilateral restraint. Where the legislature has acted to establish a methodology, there is not concerted action by a private party that restrains trade. In Hoover v. Ronwin, 466 U.S. 558, 567-68 (1984), the Supreme Court held that "when a state legislature adopts legislation, its actions constitute those of the State, and ipso facto are exempt from the operation of the antitrust laws." Indeed, the Supreme Court there stated that when the "conduct at issue is in fact that of the state legislature or supreme court, we need not address the issues of 'clear articulation' and 'active supervision.'" Id. at 569. Thus the inquiry is whether the state action "is a sovereign act by the state or the conduct of private persons." Sanders v. Lockyer, 365 F. Supp. 2d 1093, 1099 (N.D. Cal. 2005). Because the statutes at issue in the Sanders case were acts of the legislature, the District Court held that they constituted "action on the part of the California legislature, not concerted action by private parties in restraint of trade." Id. at 1101. In Sanders, the class action plaintiff alleged that a master settlement agreement entered into between domestic cigarette manufacturers and the state violated the federal anti-trust laws. Sanders also argued that two California statutes, the Qualifying Act and the Contraband amendments, were preempted by the Sherman Act. In opposition to this argument, the defendant contended there was no conflict between the statutes and federal anti-trust law. Like the Delaware UCSA, the California statutes did not permit price fixing. See also Lane, 81 A.2d 786 (did not limit output, divide markets or engage in violations of the antitrust laws). "The California statutes do not mandate, permit, or place irresistible pressure on manufacturers to take concerted action; rather they require unilateral action by each to make settlement or escrow payments." Sanders, 365 F. Supp. 2d at 1101. The Court in Sanders held that the statutes are "direct legislative activity. . . . Parker

makes clear that legislative enactments are direct state action, and under <u>Hoover</u>, the <u>Midcal</u> analysis is neither appropriate nor required for direct acts of the sovereign." <u>Id.</u> at 1099.

Likewise, in interpreting the Pennsylvania Cigarette Sales and Licensing Act, 72 Pa. Stat. §§ 202-A, <u>et seq.</u> and whether it violated the Sherman Anti-Trust Act, 15 U.S.C. § 1, the Commonwealth Court of Pennsylvania held in <u>Associated Wholesalers, Inc.</u>, that since the Pennsylvania statute constituted state action, it could not constitute a violation of the Sherman Act.

> AWI contends that the Act and the Regulations violate the Sherman Anti-Trust Act, 15 U.S.C. § 1 et seq. The Sherman Anti-Trust Act prohibits contracts that are in restraint of trade. State regulatory programs are not capable of violating the Sherman Anti-Trust Act. <u>California Retail Liquor Dealers Association v. Midcal Aluminum, Inc.</u>, 445 U.S. 97, 102, 100 S. Ct. 937, 63 L. Ed. 2d 233 (1980). The Sherman Anti-Trust Act is directed against the "individual and not state action." <u>Parker v. Brown</u>, 317 U.S. 341, 352, 63 S. Ct. 307, 87 L. Ed. 315 (1943). As AWI concedes, a properly applied sales below cost statute furthers the goals of the Sherman Anti-Trust Act. <u>United States v. National Dairy Products Corp.</u>, 372 U.S. 29, 83 S. Ct. 594, 9 L. Ed. 2d 561 (1963). Thus, as we have determined that the Act as applied by the Department is a proper sales below cost statute, AWI has no claim under the Sherman Anti-Trust Act.

<u>Associated Wholesalers,</u> 780 A.2d at 765.

Thus, applying the standard used by the <u>Sanders</u> court and the Pennsylvania Court in the <u>Associated Wholesalers</u> case, it is clear that the challenged Act is a legislative enactment and not concerted action of private parties. The Act provides a formula for <u>each</u> retailer and wholesale seller of cigarettes to use in determining its cost, and in no way encourages concerted action by private parties. As a result, the Delaware USCA is not a hybrid restraint in violation of the Sherman Act.

**F.    The State Action Immunity Doctrine Applies to Exempt the Unfair Cigarette Sales Act from Preemption**

Cooper-Booth next argues that the state immunity doctrine does not apply to save the Act from preemption. As a threshold matter, if this Court finds that there is (1) no price fixing, and (2) that the UCSA does not authorize or compel conduct that violates the Sherman Act (i.e. that constitutes a hybrid restraint), then the Court does <u>not</u> need to reach the question of state action immunity. The state action antitrust immunity doctrine is a defense—an "exemption"—to a preemption argument under § 1 of the Sherman Act. <u>See</u>, <u>e.g.</u>, <u>324 Liquor Corp.</u>, 479 U.S. at 337. When there is no Sherman Act violation, considerations of the state action doctrine are absolutely irrelevant. <u>See</u> <u>Fisher</u>, 475 U.S. at 270; <u>Rice v. Norman Williams Co</u>, 458 U.S. 654, 662 (1982).

For instance, in <u>Fisher</u>, the United States Supreme Court considered a Sherman Act preemption challenge brought by certain landlords against a rent control ordinance passed by the city of Berkeley, California. <u>See</u> <u>Fisher</u>, 475 U.S. at 267-69. Upon finding that the ordinance did not violate the Sherman Act because it was not a hybrid restraint, the Court stated that, in light of its holding, it was not necessary to address whether the ordinance would have been exempt under the state action antitrust immunity doctrine. <u>See</u> <u>id.</u> at 270; <u>see</u> <u>Rice</u>, 458 U.S. at 662, n.9 (because Court found California statute was not preempted by the Sherman Act, it was "not necessary for [them] to consider whether the statute may be saved from invalidation under the doctrine of <u>Parker v. Brown</u>[.]"). Thus, it is clear from both <u>Fisher</u> and <u>Rice</u> that once a court determines that there has been no Sherman Act violation, considerations of the immunity doctrine are rendered moot.

Indeed, even if the Delaware UCSA is considered a <u>per se</u> violation of the Sherman Act, the state action antitrust immunity doctrine set forth in <u>Parker v. Brown</u>, 317 U.S. 341, 352

(1943) immunizes the Act from scrutiny. That doctrine provides that the states are sovereign and that "save only as Congress may constitutionally subtract from their authority," the situations in which Congress nullifies a state's control over its officers and agents is "not lightly attributed to Congress." Id. at 350-51. There are two prongs to the Parker test. First, the challenged restraint must be clearly articulated and affirmatively expressed as state policy. Second, the policy must be actively supervised by the state. See California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc., 445 U.S. 97, 105 (1980); Motion at 18-21. Cooper-Booth makes no argument with respect to the first prong; therefore, it concedes that the Act is clearly articulated and affirmatively expressed.

The only issue is whether the state actively supervises the statutory scheme. Simply authorizing price setting and enforcing prices established by private parties does not satisfy the second prong of Parker. Id. at 105-06. The New York state liquor pricing statute was challenged under Sherman Anti-Trust grounds in 324 Liquor Corp. v. Duffy, 479 U.S. 335 (1987), a case where the active supervision test was not satisfied. The Supreme Court held that the statutory scheme, which provided that liquor retailers must charge at least 112% of the wholesaler's posted bottle price that is in effect at the time the retailer sells the liquor, did not provide for active supervision by the State, and therefore the state action immunity doctrine of Parker did not apply. Id. at 350-51. Unlike the Delaware UCSA, the New York statute wine pricing system allowed wholesalers to set retail prices and markups without regard to actual retail costs. Under the New York statute, "cost" was defined in terms of the posted bottle price in effect when the retailer sold the item. As a consequence, the wholesalers were able to sell retailers large quantities when prices are low, and then require retailers to sell at abnormally high markups by raising bottle prices in succeeding months. The Supreme Court found that the statutory scheme

in New York allowed wholesalers to maintain prices at artificially high levels. Id. at 340. In

contradistinction to the Delaware UCSA, the New York statute specifically forbade retailers

from reducing the minimum prices set by wholesalers. Id. at 342.

The Delaware UCSA sets forth a specific framework within which retailers or

wholesalers may reduce or increase the minimum prices depending on direct proof of cost; as a

result, it is inapposite to the statutory scheme in 324 Liquor Corp. In contrast, the State of New

York did not control variations in posted liquor prices, nor did it supervise the wholesaler's

decision to "post off" the bottle price or the frequency of such posting off. The Supreme Court

held that New York had "displaced competition among liquor retailers without substituting an

adequate system of regulation." 324 Liquor Corp., 479 U.S. at 344. The Court noted that

> a simple "minimum markup" statute requiring retailers to charge
> 112 percent of their actual wholesale cost may satisfy the "active
> supervision" requirement, and so be exempt from the antitrust laws
> under Parker v. Brown, 317 U.S. 341, 63 S. Ct. 307, 87 L. Ed. 315
> (1943). See Morgan v. Division of Liquor Control, Conn. Dept. of
> Business Regulation, 664 F.2d 353 (CA2 1981) (upholding a
> simple markup statute). Section 101-bb, however, is not a simple
> minimum markup statute because it imposes a markup on the
> "posted bottle price," a price that may greatly exceed what the
> retailer actually paid for the liquor.

Id. at 345. The statutory formula established by the Delaware UCSA cures the evils that

invalidated the statute in the 324 Liquor Corp. case because it prevents the sale of any prices

below actual cost. See also Associated Wholesalers, 780 A.2d 759.

Conversely, the United States Supreme Court has held that the active supervision prong

would be satisfied where the following are present: the State establishes prices and/or reviews

the reasonableness of the pricing schedules and/or where the State monitors market conditions or

engages in an examination of the legislative scheme. 324 Liquor Corp., 479 U.S. at 345. As but

one example, there was satisfactory "active supervision" by the program requiring state approval

of the location of new automobile dealerships in <u>New Motor Vehicle Bd. v. Orrin W. Fox Co.</u>, 439 U.S. 96 (1978). There, the program provided that the State would hold a hearing if an automobile franchisee protested the establishment or relocation of a competing dealership. The State had an active role in displacing "unfettered business freedom in the matter of the establishment and relocation of automobile dealerships." <u>New Motor Vehicle Bd.</u>, 439 U.S. at 109. Similarly, the Delaware UCSA has established a process whereby wholesalers may petition to sell cigarettes below or above "cost" as defined in the statute and to present evidence tending to show that such costs are higher or lower than the presumed costs. 6 <u>Del. C.</u> §§ 2606, 2608.

Delaware undertakes "active supervision" such that the Act is within the State immunity doctrine. A number of wholesalers have petitioned the state to sell cigarettes at below cost. One petition was filed by Southland Corporation under the Delaware statute. <u>See</u> Scott Zucca Aff. at ¶ 9. That petition was granted (and later revoked after Southland ceased distributing cigarettes). Likewise, Zucca has petitioned the state to sell below the presumed cost to stay competitive with other wholesalers. <u>See</u> Scott Zucca Aff. at ¶ 10; <u>see also</u> ¶ 11. Moreover, the State has revised the cigarette tax structure and has proposed to do so again, thereby dictating price changes by all sellers. <u>See</u> Scott Zucca Aff. at ¶ 8. The State also notifies wholesalers of any changes in the presumed cost. <u>See id.</u> at ¶ 12. Finally, the State has enforced its Acts and regulations that govern the sale and taxation of cigarettes in Delaware. The State has sent notices to advise wholesalers that illegal rebating is occurring and that the State will take "appropriate and immediate action" if it continues. <u>See id.</u> at ¶ 13. On information and belief, the State's Office of the Attorney General has also called wholesalers who are alleged to have violated the Act. <u>See id.</u> at ¶ 14. Finally, the State has delisted companies that do not comply with applicable laws regarding Stamping and Sale of cigarettes. <u>See</u> Scott Zucca Aff. at ¶ 16. Thus, Delaware clearly

satisfies the active supervision prong of <u>Parker</u> which brings the statute within the state action immunity of <u>Parker v. Brown</u>.

## CONCLUSION

For the foregoing reasons, Plaintiff L.J. Zucca respectfully requests that this Court deny Cooper-Booth's Motion for Judgment on the Pleadings on the grounds that it has not established federal preemption.

**SAUL EWING LLP**

Michael F. Bonkowski (DE Bar No. 2219)
Kimberly M. Large (DE Bar No. 4422)
222 Delaware Avenue
Wilmington, DE 19899
(302) 421-6800
(302) 421-5883 Fax

and

Adrienne C. Rogove
Francis X. Riley III
750 College Road East, Suite 100
Princeton, NJ 08540
(609) 452-3149

Counsel for L.J. Zucca, Inc.

Dated: February 22, 2007

# EXHIBIT 1

NOT FOR PUBLICATION WITHOUT THE APPROVAL OF THE COMMITTEE ON OPINIONS

## SUPERIOR COURT OF NEW JERSEY

ANNE McDONNELL
JUDGE



PO Box 797
WOODBURY, NJ 08096

December 15, 2006

**TO:   ALL COUNSEL ON ATTACHED LIST**

**Re:   L.J. Zucca, Inc. v. Allen Bros. et. al.**          **LETTER OPINION**
         **CUM-C-19-06**

Dear Counsel:

The following motions were argued before the court on December 1, 2006, in the presence of Adrienne Rogove, Esquire, of the Law Firm Saul Ewing, appearing on behalf of plaintiff; Stephen M. Orlofsky, Esquire, and Kit Applegate, Esquire, of the Law Firm Blank Rome, appearing on behalf of defendant Cooper-Booth Wholesale Co.; Christopher Ferguson, Esquire, of the Law Firm Kostelanetz & Fink, appearing on behalf of defendant Klein Candy Co.; Paul V. Lucas, Jr., Esquire, of the Law Firm Greenberg Trager & Herbst, appearing of behalf of defendants M. Berstein & Sons, Continental Tobacco & Candy, Inc., Rainbow Heaven Distribution, Inc. and Planet Wholesale, Inc.; Hyun Suk Choi, Esquire, of the Park Law Group, appearing on behalf of defendant M & J Wholesale, Inc.; and Cathy A. Melitski, Esquire, D.A.G. appearing on behalf of the interests of the State of New Jersey.

1. Defendant Cooper-Booth Wholesale Company moves to dismiss plaintiff's claims under the New Jersey Unfair Cigarette Sales Act (Counts I and V of the amended complaint).

2. Defendant Klein Candy Company ("Klein") moves to dismiss Count IV (unfair competition) of the amended complaint and to strike the third and fourth sentences of paragraph 40(m) of the amended complaint. Klein also joins in Cooper-Booth's motion to dismiss.

3. Defendants, Vikisha Corporation and M&J Wholesale, join in all motions to dismiss.

4. Defendants, Garber Brothers, Inc., Middlesex Tobacco & Confectionary Company, Inc. ("Middlesex"), and Associated Wholesalers, Inc. ("AWI"), join in Cooper-Booth's motion to dismiss Counts I and V and Klein's motion to dismiss Count IV.

5. Defendants, M. Bernstein & Sons, Continental Tobacco & Candy Inc., Rainbow Heaven Distribution, LLC, and Planet Wholesale Inc. (collectively "Continental"), move to dismiss the complaint without prejudice for failure to provide discovery.

1



6.    Defendants Bee Gee Candy Co. and Starkman General Products, move to dismiss the amended complaint against defendants Starkman General Products and Bee Gee Candy Company.

For the reasons set forth below, defendant Cooper-Booth's motion to dismiss Counts 1 and V is denied without prejudice as are the co-defendants' "join-in" motions; defendant Klein's motion to dismiss count IV of plaintiff's claim is denied; defendant Klein's motion to strike the third and fourth sentence of paragraph 40(m) and Exhibit B is granted; and defendant Continental's motion to dismiss the complaint for failure to provide discovery is denied.

## Motion Record

Plaintiff L.J. Zucca, Inc. ("plaintiff") is a wholesale distributor of cigarettes based in Vineland, New Jersey. Defendants are wholesale distributors of cigarettes who do business in New Jersey. Plaintiff alleges that defendants have sold and continue to sell cigarettes below the minimum prices established by the New Jersey Unfair Cigarette Sales Act ("UCSA") with the intent to remove or lessen competition in New Jersey. Specifically, plaintiff contends that defendants gave retailers rebates in violation of UCSA.

Plaintiff's amended complaint asserts four causes of action: (1) a private right of action under the UCSA, (2) tortious interference with existing contracts, (3) tortious interference with prospective economic advantage, and (4) unfair competition.

The UCSA and its enabling regulations make it unlawful for any retailer or wholesaler to sell cigarettes at less than cost to such retailer or wholesaler, or to give rebates in connection with the sale of cigarettes, where such acts are done with the intent to injure competition. Through the use of cost surveys, the UCSA creates minimum sales prices of cigarettes; sales of cigarettes below these prices are prima facie evidence of a violation of the statute. The statute defines "cost to the retailer" and "cost to the wholesaler" as the basic cost of cigarettes plus the cost of doing business to either the retailer or wholesaler. A wholesaler's cost of doing business is presumed to be 5.25% of the basic cost of cigarettes. A retailer's cost of doing business is presumed to be 8% of the sum of the basic cost of cigarettes and the wholesaler's cost of doing business. The UCSA confers powers of enforcement on the Director of the Division of Taxation, who is authorized to employ all the powers vested in him by the Cigarette Tax Act. A retailer or wholesaler may petition the Director to prove that its cost of doing business is higher or lower than the presumed percentage.

## Relevant Law

### 1. Standard for Motion to Dismiss Complaint for Failure to State a Claim

Motions to dismiss for failure to state a claim pursuant to Rule 4:6-2(e) must be approached with "great caution" and "should be granted in only the rarest of circumstances." Printing Mart-Morristown v. Sharp Electronics Corp., 116 N.J. 739, 772 (1989). The complaint must be searched:

in depth and with liberality to ascertain whether the fundament of a cause of action may be gleaned even from an obscure statement of claim, opportunity being given to amend if necessary. At this preliminary stage of the litigation the Court is not concerned with the ability of plaintiffs to prove the allegation contained in the complaint. For purposes of analysis plaintiffs are entitled to every reasonable inference of fact. The examination of a complaint's allegations of fact required by the aforestated principles should be one that is at once painstaking and undertaken with a generous and hospitable approach.

[Id. at 746 (internal quotations and citations omitted); See, Banco Popular N. Am. v. Gandi, 184 N.J. 161, 165-66 (2005).]

However, if the complaint fails to articulate a basis for relief, the court must dismiss the complaint. Sickles v. Cabot Corp., 379 N.J. Super. 100, 106 (App. Div.), certif. denied, 185 N.J. 297 (2005).

## II. The New Jersey Unfair Cigarette Sales Act

The New Jersey Unfair Cigarette Sales Act, §§ 56:7-18—56:7-38 (2006) provides, in relevant part, as follows:

It shall be unlawful and a violation of this act:

a. For any retailer, wholesaler or distributor with intent to injure competitors or destroy or substantially lessen competition—
. . .

(2) to offer a rebate in price, to give a rebate in price, to offer a concession of any kind, or to give a concession of any kind or nature whatsoever in connection with the sale of cigarettes; ...

d. ... [E]vidence of any offer of a rebate in price or the giving of a rebate in price or an offer of a concession or the giving of a concession of any kind or nature whatsoever in connection with the sale of cigarettes ... shall be prima facie evidence of intent to injure competitors and to destroy or substantially lessen competition.

[N.J.S.A. § 56:7-20.]

The UCSA provides for a minimum sale price of cigarettes. See, N.J.S.A § 56:7-22. The UCSA explains as follows:

a. The term "cost to the wholesaler" shall mean the "basic cost of cigarettes" to the wholesaler plus the "cost of doing business by

3

the wholesaler," as evidenced by the standards and methods of accounting regularly employed by him in his allocation of overhead costs and expenses, paid or incurred, and must include, without limitation, labor costs (including salaries of executives and officers), rent, deprecation, selling costs, maintenance of equipment, delivery costs, all types of licenses, taxes, insurance and advertising.

b. In the absence of the filing with the director of satisfactory proof of a lesser or higher cost of doing business by the wholesaler making the sale, the "cost of doing business by the wholesaler" shall be presumed to be 5.25% of the "basic cost of cigarettes" to the wholesaler, plus cartage cost, in the absence of the filing with the director of satisfactory proof of a lesser or higher cost, shall be deemed to be ¾ of 1% of the "basic cost of cigarettes" to the wholesaler.

[Ibid.]

The "basic cost of cigarettes" is defined as the invoice cost of cigarettes to the wholesaler. Id. at § 56:7-19(h). The UCSA provides a private right of action to any injured competitor for damages, costs, attorney's fees, and injunctive relief. Id. at § 56:7-32.

Cooper-Booth argues that plaintiff's claims under the UCSA must be dismissed because the UCSA is preempted by the Sherman Antitrust Act, 15 U.S.C. § 1. Specifically, Cooper-Booth contends that the UCSA requires minimum resale price maintenance of cigarettes in contravention of the Sherman Act. Cooper-Booth asserts that the UCSA is a price-fixing statute because it prohibits wholesalers from selling cigarettes below cost. Cooper-Booth further argues that UCSA is a "hybrid restraint" rather than direct state action. Plaintiff contends that the UCSA is not a price-fixing statute that authorizes resale price maintenance, but rather, a below-cost pricing statute designed to eliminate lawful competition.

Section 1 of the Sherman Act provides, in relevant part, as follows:

Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal....

[15 U.S.C. § 1.]

The Sherman Act prohibits contracts in restraint of trade. Resale price maintenance by private parties illegally restrains trade, thereby constituting a *per se* violation of Section 1 of the Sherman Act. California Retail Liquor Dealers Assn. v. Midcal Aluminum, 445 U.S. 97, 102 (1980); See also, 324 Liquor Corp. v. Duffy, 479 U.S. 335, 341 (1987). A hybrid restraint is a state action that delegates regulatory power to private parties. Rice v. Norman Williams Co., 458 U.S. 654, 665 (1982)(Stevens, J., concurring).

4

"The primary purpose of the Unfair Cigarette Sales act is to prohibit the sale of cigarettes by a wholesaler or retailer by unfair practices below cost; it is not a price fixing statute...." Lane Distributors, Inc. v. Tilton, 7 N.J. 349, 363 (1951). Plaintiff argues that this statement establishes that the UCSA is not a *per se* violation of the Sherman Act. Cooper-Booth notes that this statement is dicta that is contradicted by a previous sentence in Lane stating that the "sales were made at prices fixed by the Unfair Cigarette Sales Act...." Id. at 355. This court is satisfied that the UCSA is not a price fixing statute, but rather, a "sales below cost" or "minimum markup" statute. See, Duffy, supra, 479 U.S. at 345 n.6 (noting that a minimum markup statute requiring retailers to charge 112 percent of actual wholesale cost may satisfy active supervision requirement), citing Morgan v. Div. of Liquor Control, Conn. Dept. of Bus. Reg., 664 F.2d 353 (CA2 1981).

In Morgan, supra, Connecticut retailers of alcoholic beverages sought injunctive relief and a declaratory judgment that the pricing provisions of the statute violated Section 1 of the Sherman Act. 664 F.2d at 355. The statute mandated that the prices listed by wholesalers cannot be less that a wholesaler's "cost," which was defined to include factors such as actual cost, transportation charges, insurance and minimum markup of 11% on hard liquor, 20% on beer, 20% on wine not bottled in Connecticut, and 36% on wine bottled in Connecticut. Ibid. The retailers relied on Midcal, supra, in arguing that the Connecticut statute's alcohol pricing system constituted resale price maintenance in violation of the Sherman Act. Ibid. In holding that the statute's pricing arrangement was immune from antitrust act because of the state action doctrine, the Court of Appeals for the Second Circuit explained that the Connecticut statute's pricing arrangement was distinguishable from the illegal wine pricing system in Midcal. Ibid. In Midcal, the state's involvement consisted of the statutory requirement that wholesalers and producers set minimum prices by contract or, alternatively, that a wholesaler "post" a price for other wholesalers to follow. Ibid. The Connecticut statute under review required the state to establish the markup, thereby preventing private parties from engaging in resale price maintenance. Ibid. The state of Connecticut did not control the initial offering price determined by the manufacturers; however, the court noted:

> It may appear that the Connecticut system permits beer and wine producers and shippers to establish resale prices. The automatic application of the statutory markup to the initial offering price would seem to allow those who set that price to determine ultimate resale prices by adjusting their offering price. But this result occurs only because the State has dictated the markups, not because any producers or shippers have formed a conspiracy or combination. Moreover, the fierce competitive pressures at the retail level should prevent manufacturers from conspiring to establish prices for alcoholic beverages.

[Id. at 355 n.2.]

5

The court further explained that:

> Once that price is reported and without any compulsion or
> participation by the State, the statutory scheme defines the
> wholesale and retail prices which must be charged. Unlike the
> California statute in <u>Midcal</u>, the Connnecticut statutes do not
> authorize or compel private parties to enter contracts or
> combinations to fix prices in violation of § 1 of the Sherman Act.

[<u>Id.</u> at 355.]

The UCSA does not authorize or compel private parties to enter contracts or
combinations to fix prices in violation of § 1 of the Sherman Act. The "basic cost of cigarettes"
is defined as the invoice cost of cigarettes to the wholesaler. The manufacturer determines
wholesale price, but does not establish resale prices. New Jersey has determined the formula and
5.25% markup to be automatically presumed and applied where the wholesaler does not file a
satisfactory proof of a lesser or higher cost of doing business.

The issue presented is whether state action antitrust immunity applies to the UCSA. "In
Parker v. Brown, 317 <u>U.S.</u> 341 (1943), the Supreme Court held that the Sherman Act does not
apply to the anticompetitive conduct of a State acting through its legislature." <u>Duffy</u>, <u>supra</u>, 479
<u>U.S.</u> at 343 (internal quotations omitted). Federal antitrust laws can be superseded by state
regulatory programs. <u>FTC v. Ticor Title Ins. Co.</u>, 504 <u>U.S.</u> 621, 632-33 (1992). In determining
antitrust immunity under the state action doctrine established by <u>Parker v. Brown</u>, a court must
consider whether the state regulatory program satisfies a two-part test. <u>Duffy</u>, <u>supra</u>, 479 <u>U.S.</u> at
343. "First, the challenged restraint must be one clearly articulated and affirmatively expressed
as state policy; second, the policy must be actively supervised by the State itself." <u>Ibid.</u> (internal
quotations omitted), <u>quoting Midcal</u>, <u>supra</u>, 445 <u>U.S.</u> at 105. The purpose of the active
supervision inquiry "is to determine whether the State has exercised sufficient independent
judgment and control so that the details of the rates or prices have been established as a product
of deliberate state intervention, not simply by agreement among private parties." <u>Ticor</u>, <u>supra</u>,
504 <u>U.S.</u> at 634-35. The State must play a substantial role in determining the specifics of the
economic policy such that the anticompetitive scheme can be called the State's own. <u>Id.</u> at 635.

As to the first prong of the Parker test, the UCSA's below cost pricing arrangement is
clearly articulated and affirmatively expressed as state policy. Minimum prices are expressly
proscribed in the statute's formula, definitions, and presumptions. As to the second prong, there
is dispute as to whether the policy is actively supervised by New Jersey. The statute provides
that enforcement of the UCSA is the duty of the Director of the Division of Taxation who can
employ all of the powers provided to him in the Cigarette Tax Act. <u>See, N.J.S.A.</u> §§ 56:7-36, 37.
The director is empowered to adopt rules and regulations necessary for enforcement and may
undertake a "cost survey" to establish the lowest "cost to the retailer" and the lowest "cost to the
wholesaler." <u>See, N.J.S.A.</u> §§ 56:7-30, 31. Both retailers and wholesalers may present the
director with evidence demonstrating that their "costs" are higher or lower than those presumed
by the statute. <u>See, N.J.S.A.</u> §§ 56:7-21, 22. Cooper-Booth argues that the automatic
presumption and the permissive nature of the roles of both the director and retailers/wholesalers

6

who wish to increase or lower their "cost" demonstrates that the UCSA's supervision is reactive, not proactive, i.e. the UCSA merely enforces the formula that is comprised of numbers set by private parties.

There is a fact issue as to the manner and extent to which New Jersey actively supervises the policy. Accordingly, defendant Cooper-Booth's motion to dismiss Counts I and V is denied without prejudice as are the co-defendants' "join-in" motions. The motions may be renewed following a period of discovery directed to the active supervision prong of the Parker state action immunity doctrine.

## III. Unfair Competition

Klein moves to dismiss the plaintiff's unfair competition claim because the amended complaint does not assert that defendants engaged in the misappropriation of a trade mark or trade name or other deceptive advertising practices. Specifically, Klein contends that the tort of unfair competition is limited to instances of trade mark or trade name violations, or instances of false advertising.

New Jersey courts have indicated that the tort of unfair competition should not be too narrowly defined. In Ryan v. Carmon Bolen Home for Funerals, 341 N.J. Super. 87, 92 (App. Div. 2001), the Appellate Division stated as follows:

> The essence of unfair competition is fair play. Thus, the purpose of the law regarding unfair competition is to promote higher ethical standards in the business world. Accordingly, the concept is deemed as flexible and elastic as the evolving standards of commercial morality demand. The judicial goal should be to discourage, or prohibit the use of misleading or deceptive practices which renders competition unfair. The law must be sufficiently flexible to accommodate those goals.
>
> [Ibid. (internal citations and quotations omitted); See, N.J. Optometric Ass'n v. Hillman-Kohan, 144 N.J. Super. 411 (Ch. Div. 1976); Columbia Broadcast Sys. v. Melody Recordings, 134 N.J. Super. 368 (App. Div. 1975).]

The Restatement (Third) of Unfair Competition outlines categories of commercial actions upon which a claim of unfair competition may be based: (1) deceptive marketing, (2) infringement of trademarks and other indicia of identification, (3) misappropriation of intangible trade values including trade secrets and the right of publicity, and (4) acts or practices that are actionable under federal or state statutes. Restatement (Third) of Unfair Competition § 1 (1995). The Restatement also provides a residual category that includes "other acts or practices...determined to be actionable as an unfair method of competition, taking into account the nature of the conduct and its likely effect on both the person seeking relief and the public." Id. at cmt. (g). Comment (g) explains, in relevant part, as follows:

7

> A primary purpose of the law of unfair competition is the identification and redress of business practices that hinder rather than promote the efficient operation of the market. Certain recurring patterns of objectionable practices form the basis of the traditional categories of liability specifically enumerated in [section 1]. However, these specific forms of unfair competition do not fully exhaust the scope of statutory or common law liability for unfair methods of competition, and Subsection (a) therefore includes a residual category encompassing other business practices determined to be unfair....An act or practice is likely to be judged unfair only if it substantially interferes with the ability of others to compete on the merits of their products or otherwise conflicts with accepted principles of public policy recognized by statute or common law....As a general matter, if the means of competition are otherwise tortious with respect to the injured party, they will also ordinarily constitute an unfair method of competition.

[Ibid.]

While the Restatement's definition has not been expressly adopted by the New Jersey Supreme Court, this court deems the definition and accompanying comment informative.

Here, plaintiff's amended complaint asserts that defendants have sold and continue to sell cigarettes below cost with the intention to remove or substantially lessen competition in violation of the UCSA. Plaintiff further asserts that defendants' unlawful actions have resulted in a loss of substantial business with existing and potential customers, lost market share, and loss of revenue. While plaintiff's unfair competition claim does not involve the passing-off of goods or other similar misappropriation, this court will not dismiss plaintiff's claim on such a narrow basis. Plaintiff's allegations that defendants engaged in the distribution of illegal rebates designed to lessen or remove competition in violation of the UCSA fit within the flexible confines of New Jersey's categorization of unfair competition. See, United Stations of N.J. (US) v. Getty Oil Co., 102 N.J. Super. 459, 480-81 (Ch. Div. 1968)(enjoining oil companies from issuing game pieces in connection with purchase of gasoline, thereby violating N.J.S.A. 56:6-2(f), on basis of unfair competition); Biovail Corp. Int'l v. Aktiengesellschaft, 49 F. Supp. 2d 750, 777 (D.N.J. 1999)(denying motion to dismiss unfair competition claim under New Jersey Law because alleged conduct was unfair and constituted possible antitrust violations, thereby stating a claim under broad common law tort of unfair competition); Duffy v. Charles Schwab & Co., Inc., 97 F. Supp. 2d 592, 601, n.8 (D.N.J. 2000)(noting that New Jersey's unfair competition law should not be limited to passing off and unprivileged imitation); Coast Cities Truck Sales v. Navistar Int'l Transp. Co., 912 F. Supp. 2d. 747, 786 (D.N.J. 1995)(stating that while elements for unfair competition are unclear, New Jersey law would likely find unfair competition where there has been tortious interference or breach of good faith and fair dealing).

The UCSA falls under Title 56, Trade Names, Trade-Marks, and Unfair Trade Practices, of the New Jersey Annotated Statutes. The UCSA was enacted to curtail deceptive trade practices involved in the distribution and sale of cigarettes "with [the] intent to injure

competitors or destroy or substantially lessen competition." As such, the UCSA impliedly contemplates that actions taken in violation of its provisions would give rise to a claim of unfair competition. Accordingly, defendant Klein's motion to dismiss count IV of plaintiff's claim is denied.

## IV.    Standard for Motion to Strike Pleading or Portion Thereof as Immaterial or Redundant

Klein moves to strike, pursuant to R. 4:6-(4b), references in the amended complaint to the criminal conviction of the former CEO of Klein's predecessor-in-interest as inappropriate and unrelated to the litigation. Specifically, Klein moves to strike the third and fourth sentences of paragraph 40(m) which read:

> In fact, according to published reports, three men associated with Klein were charged with federal tax evasion and related counts in 2001. (A copy of a news article from the Times Leader, dated March 20, 2001, is annexed to this Amended Complaint as Exhibit B.

Both parties agree that motions to strike portions of pleadings are disfavored. In DeGroot v. Muccio, 115, N.J. Super. 15, 19 (Law 1971), the court made clear that only an irrelevant pleading will be stricken. R. 4:6-4(b) (2), adopted in 1987, provides that a pleading or part thereof that is immaterial or redundant may be dismissed.

In this case, the third sentence of paragraph 40(m) refers to criminal charges, not convictions. Criminal charges have no evidential value and are immaterial within the meaning of the Rule. See, State v. McBride, 213 N.J. Super. 255, 267-268 (App. Div. 1986). The fourth sentence refers to an annexed news article which reports agreements by three men associated with Klein to plead guilty to federal indictments. The court assumes for purposes of this motion that plaintiff obtained the permission of the newspaper to republish its article in light of the copyright notice at the bottom of Exhibit B. Even so, this court finds the attachment of a newspaper article to be redundant since the claims are or should be part of the body of the complaint so they may be directly addressed by a defendant's answer. Further, the substance of the article is immaterial as indictments and agreements to plead guilty are hardly convictions admissible under NJRE 609. See, 1 New Jersey Evidence Courtroom Manual RULE 609.

Accordingly, defendant Klein's motion to strike the third and fourth sentence of paragraph 40(m) and Exhibit B is granted.

## V.  Dismissal pursuant to R. 4:23-5(a) (1) for Failure to Provide Discovery

Continental moves, pursuant to R. 4:23-5(a)(1), for a dismissal of the complaint without prejudice for failure to respond to interrogatories and document requests. Plaintiff contends that Judge Bowen ordered a stay of all discovery during a case management conference on March 24, 2006. Prior to the order, plaintiff had agreed to provide the outstanding discovery by March 23, 2006.

9

This court assumes that the reason for a stay of discovery would be to allow the issue of unconstitutionality of UCSA to be determined prior to embarking on lengthy and expensive discovery. Accordingly, defendant Continental's motion is denied; however, the court will enter a management order.

### Conclusion

The court's decisions on these motions are set forth above. An order is enclosed for each motion. A case management order is enclosed directing those defendants who have not filed an answer to do so by January 20, 2007. The order further provides for a period of limited discovery on the issue of "active supervision." Following completion of that discovery, the motion to dismiss based on the Sherman Act may be renewed.

Very truly yours,


ANNE McDONNELL, P.J.Cv.

10

## COUNSEL SERVICE LIST

Francis X. Riley, III, Esq.
Adrienne Rogove, Esq.
Saul Ewing
750 College Road East, Suite 100
Princeton, NJ 08540-6617
Attys. for Plaintiff, L.J. Zucca, Inc.

Lawrence Kalikhman, Esq.
Kalikhman & Rayz
1051 Country Line Rd., Suite 102
Huntingdon Valley, PA 19006
Attys. for Defts., Allen Bros. Wholesale Distributors, Inc.
Joseph Friedman & Sons of NJ, Inc. and S&K Imports, Inc.

Robert J. Tribeck, Esq.
Rhoads & Sinon
One South Market Square, 12th Floor
P.O. Box 1146
Harrisburg, PA 17108
Attys. for Deft., Associate Wholesalers, Inc.

Steven D. Scherzer, Esq.
Cooper Levenson
1125 Atlantic Avenue
Atlantic City, NJ 08401
Attys. for Defts., Bee Gee Candy Co., Inc. and Starkman General Products

S.M. Chris Franzblau, Esq.
Franzblau Dratch
Plaza One
354 Eisenhower Parkway, Box 472
Livingston, NJ 07039
Attys. for Deft., Consolidated Service Distrib., Inc.

Stephen M. Orlofsky, Esq.
Kit Applegate, Esq.
Blank Rome
210 Lake Drive East, Suite 200
Woodland Falls Corporate Park
Cherry Hill, NJ 08002
Attys. for Deft., Cooper-Booth Wholesale Co.

Kevin P. McCann, Esq.
Chance & McCann
201 West Commerce Street
Bridgeton, NJ 08302
Attys. for Deft., Eby-Brown Company LLC

11

Dennis L. Riley, Esq.
Riley & Shovlin
1405 Chews Landing Rd., Suite 7
Laurel Springs, NJ 08021
Attys. for Deft., Gibby's Wholesale

Andrew M. Lankler, Esq.
Lankler & Carragher
845 Third Avenue, 17th Floor
New York, NY 10022
Attys. for Deft., Harold Levinson Assoc., Inc.

Francis X. Manning, Esq.
Stradley Ronon Stevens & Young
2600 One Commerce Square
Philadelphia, PA 19103
Attys. for Deft., Mclane/Midatlantic, Inc.

Marvin J. Brauth, Esq.
Wilentz Goldman & Spitzer
90 Woodbridge Center Drive
Suite 900, Box 10
Woodbridge, NJ 07095
Attys. for Deft., Middelsex Tobacco & Confectionary Co., Inc.

Julio C. Gomez, Esq.
152 Patterson Road
Fanwood, NJ 07023-1065
Atty. for Deft., Plainfield Tobacco & Candy Co. a/k/a Resnick Distributors

Gerald D. Miller, Esq.
Miller Meyerson Schwartz & Corbo
955 West Avenue
Jersey City, NJ 07306-6592
Atty. for Deft., Vikisha Corp.

Paul V. Lucas, Jr., Esq.
Greenberg Trager & Herbst
767 Third Avenue, 12th Floor
New York, NY 10017
Atty. for Defts., M. Bernstein & Sons, Continental Tobacco & Candy, Inc., Rainbow Heaven
Distribution, Inc., and Planet Wholesale, Inc.

| | |
|---|---|
| Sheppard A. Guryan, Esq. | Christopher Ferguson, Esq. |
| Lasser Hochman | Kostelanetz & Fink |
| 75 Eisenhower Parkway | 530 Fifth Avenue |
| Roseland, NJ 07068 | New York, NY 10036 |
| Atty. for Deft., Klein Candy Co. | Atty. for Deft., Klein Candy Co. |

12

Arthur Timins, Esq.
Shiriak& Timins
2 West Northfield Road, Suite 212
Livingston, NJ 07039
Atty. for Deft., Glikin Brothers

Gerald M. Eisenstat, Esq.
Eisenstat Gabage & Furman
1179 East Landis Avenue
Vineland, NJ 08360-4278
Atty. for Deft., Associated Wholesalers, Inc.

S. Robert Freidel, Jr., Esq.
University Executive Campus
151 Fries Mill Road, Suite 303
Turnersville, NJ 08012
Atty. for Deft., Bucks County Candy & Cigar Co.

David A. Avedissian, Esq.
135 Kings Highway East
Haddonfield, NJ 08033
Atty. for Deft., Sun Wholesale, Inc.

Haekyoung Suh,. Esq.
Norris McLaughlin & Marcus
721 Route 202-206
P.O. Box 1018
Somerville, NJ 08876-1018
Atty. for Deft., Ocean Tobacco, Inc.

Victor J. Horowitz, Esq.
1315 Stelton Road
P.O. Box 1325
Piscataway, NJ 08855-1325
Atty. for Deft., Value King Wholesale, LLC

Chull S. Park, Esq.
Hyun Suk Choi, Esq.
The Park Law Group
23 S. Warren Street, 2nd Floor
Trenton, NJ 08608
Atty. for Deft., M & J Wholesale, Inc.

Rocco C. Cipparone, Jr., Esq.
203-205 Black Horse Pike
Haddon Heights, NJ 08035
Atty. for Deft., Garber Brothers, Inc.

Cathy A. Melitski, Esquire, DAG
124 Halsey St., P.O. Box 45029
Newark, NJ 07101

13

BY THE COURT

FILED

DEC 15 2006

ANNE McDONNELL, J.S.C.

L.J. ZUCCA, INC.,

      Plaintiff(s),

    Vs.

ALLEN BROS. WHOLESALE DISTRIBUTORS,
INC., et als.,

: SUPERIOR COURT OF NEW JERSEY
: LAW DIVISION
: CUMBERLAND COUNTY
: DOCKET NO. CUM-C-19-06
:
: *Civil Action*
:
: CASE MANAGEMENT ORDER
:
:

   This matter having come before the court on December 1, 2006 for oral

argument on the following motions in the presence of Adrienne Rogove,

Esquire, of the Law Firm Saul Ewing, appearing on behalf of plaintiff;

Stephen M. Orlofsky, Esquire, and Kit Applegate, Esquire, of the Law Firm

Blank Rome, appearing on behalf of defendant Cooper-Booth Wholesale Co.;

Christopher Ferguson, Esquire, of the Law Firm Kostelanetz & Fink, appearing

on behalf of defendant Klein Candy Co.; Paul V. Lucas, Jr., Esquire, of the

Law Firm Greenberg Trager & Herbst, appearing of behalf of defendants M.

Berstein & Sons, Continental Tobacco & Candy, Inc., Rainbow Heaven

Distribution, Inc. and Planet Wholesale, Inc.; Hyun Suk Choi, Esquire, of the

Park Law Group, appearing on behalf of defendant M & J Wholesale, Inc.; and

Cathy A. Melitski, Esquire, D.A.G. appearing on behalf of the interests of

the State of New Jersey: (1) Defendant Cooper-Booth Wholesale Company moves

to dismiss plaintiff's claims under the New Jersey Unfair Cigarette Sales Act

(Counts I and V of the amended complaint); (2) Defendant Klein Candy Company

("Klein") moves to dismiss Count IV (unfair competition) of the amended

complaint and to strike the third and fourth sentences of paragraph 40(m) of

the amended complaint. Klein also joins in Cooper-Booth's motion to dismiss;
(3) Defendants, Vikisha Corporation and M&J Wholesale, join in all motions to
dismiss; (4) Defendants, Garber Brothers, Inc., Middlesex Tobacco &
Confectionary Company, Inc. ("Middlesex"), and Associated Wholesalers, Inc.
("AWI"), join in Cooper-Booth's motion to dismiss Counts I and V and Klein's
motion to dismiss Count IV; and (5) Defendants, M. Bernstein & Sons,
Continental Tobacco & Candy Inc., Rainbow Heaven Distribution, LLC, and
Planet Wholesale Inc. (collectively "Continental"), move to dismiss the
complaint without prejudice for failure to provide discovery.

        IT IS on this 15th day of December, 2006, ORDERED as follows:

        1.    Any defendant that has not filed an Answer shall do so by January
20, 2007;

        2.    The stay of discovery imposed by Judge Bowen is vacated. Parties
shall engage in limited discovery on the issue of "active supervision." Such
discovery shall be completed by April 1, 2007; and

        3.    Upon completion of the "active supervision" discovery, motions to
dismiss may be re-filed.

                                    _____
                                    ANNE McDONNELL, P.J.Cv.

                                            2

**FILED**

**DEC 1 8 2006**

ANNE McDONNELL, J.S.C.

THE PARK LAW GROUP, LLC
23 S. Warren Street, 2nd Floor
Trenton, New Jersey 08608
(609) 396-2800
Attorneys for Defendant M&J Wholesale, Inc.

| | |
|---|---|
| L.J. ZUCCA, INC.,<br><br>Plaintiff,<br><br>v.<br><br>ALLEN BROS. WHOLESALE<br>DISTRIBUTORS INC.; ASSOCIATED<br>WHOLESALERS INC.; BEE GEE CANDY<br>CO., INC.; BUCKS COUNTY CIGAR &<br>CANDY; CONSOLIDATED SERVICE<br>DISTRIBUTORS, INC.; CONTINENTAL<br>TOBACCO & CANDY INC.; COOPER-<br>BOOTH WHOLESALE COMPANY;<br>EBYBROWN COMPANY, LLC; GARBER<br>BROTHERS INC.; GIBBY'S<br>WHOLESALE; GLIKTN BROTHERS, INC.;<br>HAROLD LEVINSON ASSOCIATES,<br>INC.; JOSEPH FRIEDMAN & SONS;<br>KLEIN CANDY CO. LP; M & J<br>WHOLESALE, INC.; M. BERNSTEIN &<br>SONS; MANDEL TOBACCO CO OF NJ,<br>INC.; MCLANE/MIDLANTIC, INC.;<br>MIDDLESEX TOBACCO &<br>CONFECTIONERY CO., INC; OCEAN<br>TOBACCO, INC.; PLAINFIELD<br>TOBACCO & CANDY CO., INC, a/k/a<br>RESNICK DISTRIBUTORS; PLANET<br>WHOLESALE INC.; RAINBOW HEAVEN<br>DISTRIBUTION, L.L.C.; S&K IMPORTS,<br>INC.; STARKMAN GENERAL<br>PRODUCTS; SUN WHOLESALE, INC.;<br>VALUE KING WHOLESALE; and<br>VIKISHA CORP.,<br><br>Defendants. | SUPERIOR COURT OF NEW JERSEY<br>CUMBERLAND COUNTY<br>CHANCERY DIVISION<br><br>Docket No.: C-19-06<br>           (formerly CUM-L-1200-05)<br><br>CIVIL ACTION<br><br>**ORDER** |

*Denied w/o prej
Ah Donnell
12/18/2006*

*Anne McDonnell, P.J.Cv.*

This matter having been brought before the Court by the law firm of The Park Law Group, LLC, attorneys on behalf of Defendant M&J Wholesale, Inc. ("Defendant"); seeking dismissal of all counts of the Amended Complaint as to Defendant by joining in co-defendants' motions to dismiss the various counts of the Amended Complaint, and the Court having reviewed the memoranda of law or briefs, including all supporting papers, submitted by all co-defendants in support of their motions in which Defendant joins, any opposition filed on behalf of Plaintiff, any oral argument, and for good cause shown:

It is on this _____ day of _____ _____, 2006;

1)  ORDERED that Defendant's Motion to Dismiss all Counts of the Amended Complaint as to Defendant GRANTED; and it is further

2)  ORDERED that a copy of this order be served upon all counsel of record within seven (7) days of the date of receipt.

                                                    •

                                    _____
                                    Anne McDonnell        (PJCH)


_____ Opposed

_____ Unopposed


2

MILLER, MEYERSON, SCHWARTZ & CORBO
955 West Side Avenue
Jersey City, New Jersey 07306
(201) 333-9000
Attorneys for Defendant, Vikisha Corp.
Our File No.: 30288

**FILED**

DEC 1 8 2006

ANNE McDONNELL, J.S.C.

|  |  |
|---|---|
| L.J. ZUCCA, INC.  :<br><br>          Plaintiff(s)  :<br><br>          vs.  :<br><br>ALLEN BROS, WHOLESALE  :<br>DISTRIBUTORS INC., ASSOCIATED :<br>WHOLESALERS INC.; BEE GEE  :<br>CANDY CO., INC., BUCKS COUNTY :<br>CIGAR & CANDY; CONSOLIDATED  :<br>SERVICE DISTRIBUTORS, INC.,  :<br>CONTINENTAL TOBACCO & CANDY  :<br>INC.; COOPER-BOOTH WHOLESALE  :<br>COMPANY; EBY-BROWN COMPANY  :<br>LLC; GIBBY'S WHOLESALE; GLIKIN:<br>BROTHERS, INC.,; HAROLD  :<br>LEVINSON ASSOCIATES, INC.;  :<br>HBA DIRECT, INC.; JOSEPH  :<br>FRIEDMAN & SONS; KLEIN CANDY  :<br>CO., LP; M&J WHOLESALE, INC.,:<br>M. BERNSTEIN & SONS; MANDEL  :<br>TOBACCO CO. OF NJ, INC.;  :<br>MCLANE/MIDATLANTIC, INC.;  :<br>MIDDLESEX TOBACCO & CONFECT-  :<br>IONARY CO., INC., OCEAN  :<br>TOBACCO, INC., PLAINFIELD  :<br>TOBACCO & CANDY CO., INC.,  :<br>a/k/a RESNICK DISTRIBUTORS;  :<br>PLANET WHOLESALE INC.; RAINBOW:<br>HAVEN DISTRIBUTION, L.L.C.;  :<br>S&K IMPORTS, INC.; STARKMAN  :<br>GENERAL PRODUCTS; SUN  :<br>WHOLESALE, INC., SUPER RITE  :<br>FOODS, INC.; and VIKISHA CORP.:<br><br>          Defendant(s)  : | SUPERIOR COURT OF NEW JERSEY<br>CUMBERLAND COUNTY-LAW DIVISION<br>Docket No.: C-19-06<br><br><br><br>          Civil Action<br><br><br>          **ORDER**<br><br><br><br><br>*Denied w/o prej*<br>*AM Donnell*<br>*12/18/06*<br>*Anne McDonnell, P.J.CV.* |

          THIS MATTER having been presented to the Court by Miller,

Meyerson, Schwartz & Corbo attorneys for the Defendant, Vikihsa

Corp. and for good cause shown it is on this___ day of_____ 2006

   **ORDERED AND ADJUDGED** all the Counts of the Amended Complaint are dismissed.



                                    _____
                                    ANNE McDONNELL        (PJCH)

LAW OFFICES OF ROCCO C. CIPPARONE, JR.
203-205 Black Horse Pike
Haddon Heights, NJ 08035
(856) 547-2100

    and

Charles L. Solomont, Esq. *(pro hac vice)*
Justin M. O'Sullivan, Esq. *(pro hac vice)*
BINGHAM McCUTCHEN LLP
150 Federal Street
Boston, MA  02110
(617) 951-8000

Attorneys for Defendant, Garber Brothers, Inc.

FILED

DEC 1 8 2006

ANNE McDONNELL, J.S.C.

| | |
|---|---|
| L. J. ZUCCA, INC.,     ) | SUPERIOR COURT OF NEW JERSEY |
|     ) | CUMBERLAND COUNTY |
|     Plaintiff,     ) | CHANCERY DIVISION |
|     ) | DOCKET NO. : C-19-06 |
| v.     ) | |

ALLEN BROS. WHOLESALE DISTRIBUTORS INC.;
ASSOCIATED WHOLESALERS INC.;
BEE GEE CANDY CO., INC.; BUCKS COUNTY CIGAR &
CANDY; CONSOLIDATED SERVICE DISTRIBUTORS, INC.;
CONTINENTAL TOBACCO & CANDY INC.; COOPER-BOOTH
WHOLESALE COMPANY; EBY-BROWN COMPANY LLC;
GARBER BROTHERS INC.;
GIBBY'S WHOLESALE; GLIKIN BROTHERS, INC.; HAROLD
LEVINSON ASSOCIATES, INC.; JOSEPH FRIEDMAN & SONS;
KLEIN CANDY CO., LP; M & J WHOLESALE, INC.;
M. BERNSTEIN & SONS; MANDEL TOBACCO CO. OF N.J.,
INC.; MCLANE/MIDATLANTIC, INC.; MIDDLESEX TOBACCO
& CONFECTIONERY CO., INC.; OCEAN TOBACCO, INC.;
PLAINFIELD TOBACCO & CANDY CO., INC., A/K/A RESNICK
DISTRIBUTORS; PLANET WHOLESALE, INC.; RAINBOW
HEAVEN DISTRIBUTION, L.L.C.; S & K IMPORTS, INC.;
STARKMAN GENERAL PRODUCTS;
SUN WHOLESALE, INC.; VALUE KING WHOLESALE; AND
VIKISHA CORP.,

    Defendants.

**ORDER**

*Denied w/o prej*
*All Donnell*
*12/18/2006*
Anne McDonnell, P.J.CV.

THIS MATTER having been presented to the Court by Rocco C. Cipparone, Jr., Esquire,

Charles L. Solomont, Esquire (pro hac vice) and Justin M. O'Sullivan, Esquire (pro hac vice),

attorneys for Defendant, Garber Brothers, Inc., and for good cause shown it is on this _18_ day

of _December_, 2006;

ORDERED AND ADJUDGED that all Counts of the Amended Complaint are here by dismissed.

_____
HONORABLE ANNE McDONNELL, J.S.C.

LASSER HOCHMAN, L.L.C.
75 EISENHOWER PARKWAY
ROSELAND, NEW JERSEY 07068-1694
(973) 226-2700

FILED

DEC 1 8 2006

ANNE McDONNELL, J.S.C.

    -and-

Brian C. Wille, Esq.
Christopher M. Ferguson, Esq.
KOSTELANETZ & FINK, LLP
530 Fifth Avenue
New York, New York 10036
(212) 808-8100
Attorneys for Defendant Klein Candy Co.

----------------------------------------------------------X

L.J. ZUCCA, INC.,

                        Plaintiff,

        v.

ALLEN BROS. WHOLESALE DISTRIBUTORS
INC.; ASSOCIATED WHOLESALERS INC.;
BEE GEE CANDY CO., INC.; BUCKS COUNTY
CIGAR & CANDY; CONSOLIDATED SERVICE
DISTRIBUTORS, INC.; CONTINENTAL
TOBACCO & CANDY INC.; COOPER-BOOTH
WHOLESALE COMPANY; EBY-BROWN
COMPANY LLC; GARBER BROTHERS, INC.
GIBBY'S WHOLESALE; GLIKIN BROTHERS,
INC.; HAROLD LEVINSON ASSOCIATES, INC.;
JOSEPH FRIEDMAN & SONS; KLEIN
CANDY CO. LP; M & J WHOLESALE, INC.;
M. BERNSTEIN & SONS MANDEL TOBACCO
CO OF NJ, INC.; MCLANE/MIDATLANTIC,
INC.; MIDDLESEX TOBACCO &
CONFECTIONERY CO., INC.; OCEAN
TOBACCO, INC.; PLAINFIELD TOBACCO
& CANDY CO., INC., a/k/a RESNICK
DISTRIBUTORS; PLANET WHOLESALE, INC.
RAINBOW HEAVEN DISTRIBUTION, L.L.C.;
S & K IMPORTS, INC.; STARKMAN GENERAL
PRODUCTS; SUN WHOLESALE, INC.; VALUE
KING WHOLESALE; and VIKISHA CORP.,

                    Defendants.

----------------------------------------------------------X

SUPERIOR COURT OF NEW JERSEY
CHANCERY DIVISION: GENERAL
EQUITY PART: CUMBERLAND
COUNTY

DOCKET NO.: C-19-06

Civil Action

ORDER ~~DISMISSING COUNT
FOUR OF THE AMENDED
COMPLAINT AND~~ STRIKING
OTHER PORTIONS OF THE
AMENDED COMPLAINT

This matter being opened before the Court on the motion of defendant Klein Candy Co. ("Klein"), through its attorneys, Lasser Hochman, L.L.C., and Kostelanetz & Fink, LLP, for an Order, pursuant to R. 4:62 (e) and R. 4:6-4(b), for the following relief: (i) pursuant to R. 4:62 (e), dismissing Count Four of the Amended Complaint for failure to state a claim upon which relief can be granted; (ii) pursuant to R. 4:6-4(b), striking the third and fourth sentences of Paragraph 40(m) of the Amended Complaint on the grounds that they contain scandalous and impertinent material; and (iii) awarding such other, further or different relief as the Court deems just and proper in the circumstances, and copies of all papers being served upon all parties, and other good cause having been shown,

IT IS on this  18  day of  December, 2006,

ORDERED as follows:

1. Klein's motion, pursuant to R. 4:62 (e), for dismissal of Count Four of the Amended Complaint for failure to state a cause of action is hereby *Denied*.

2. Klein's motion, pursuant to R. 4:62 (b), seeking to strike the third and fourth sentences of Paragraph 40(m) of the Amended Complaint is hereby *Granted*.

3. A true copy of the within Order shall be served upon all parties to this action within ___ days of the date hereof.

_____
J.S.C.
Anne McDonnell, P.J.CV.

Papers Considered:

✓ Notice of Motion
✓ Moving Certification
✓ Answering Affidavit/Certification

-2-

**FILED**

DEC 1 8 2006

ANNE McDONNELL, J.S.C.

BLANK ROME LLP
A Pennsylvania LLP
STEPHEN M. ORLOFSKY
New Jersey Resident Partner
KIT APPLEGATE
Woodland Falls Corporate Park
210 Lake Drive East, Suite 200
Cherry Hill, New Jersey 08002
(856) 779-3600

Attorneys for Defendant
Cooper-Booth Wholesale Company

| | |
|---|---|
| L.J. ZUCCA, INC., | SUPERIOR COURT OF NEW JERSEY |
| | LAW DIVISION |
| Plaintiff, | CUMBERLAND COUNTY |
| v. | CIVIL ACTION |
| ALLEN BROS. WHOLESALE | Docket No. L-1200-05 |
| DISTRIBUTORS INC. *et al.*, | |
| Defendants, | **ORDER** |

THIS MATTER having come before the Court on the motion of Defendant Cooper-

Booth Wholesale Company for an Order under Rule 4:6-2(e) dismissing Counts I, II, and III of

the Complaint for failure to state a claim upon which relief may be granted on the ground that,

pursuant to Article VI, Paragraph 2 of the United States Constitution, the Delaware Unfair

Cigarette Sales Act, Del. Code Ann. tit. 6 §§ 2601 – 2608, the New Jersey Unfair Cigarette Sales

Act, N.J. Stat. Ann. §§ 56:7-18 – 56:7-38, and the Pennsylvania Cigarettes Sales and Licensing

Act, 72 Pa. Stat. Ann. §§ 202-A – 231-A, are preempted by the Sherman Act, 15 U.S.C. § 1; and

110018.00601/30288087v.1

notice of this motion having been served upon the Attorneys General for the State of Delaware, the State of New Jersey, and the Commonwealth of Pennsylvania; and the Court having considered the moving and opposing papers, argument of counsel, and having placed its findings of fact and conclusions of law on the record on March 24, 2006;

IT IS on this _____ day of March, 2006, **ORDERED** that:

1.  Defendant Cooper-Booth Wholesale Company's motion is **GRANTED.**

2.  Counts I, II, and III of the Complaint are **DISMISSED** under Rule 4:6-2(e) for failure to state a claim upon which relief may be granted on the ground that, pursuant to Article VI, Paragraph 2 of the United States Constitution, the Delaware Unfair Cigarette Sales Act, Del. Code Ann. tit. 6 §§ 2601 – 2608, the New Jersey Unfair Cigarette Sales Act, N.J. Stat. Ann. §§ 56:7-18 – 56:7-38, and the Pennsylvania Cigarettes Sales and Licensing Act, 72 Pa. Stat. Ann. §§ 202-A – 231-A, are preempted by the Sherman Act, 15 U.S.C. § 1.

3.  Counsel for Defendant Cooper-Booth Wholesale Company shall serve a copy of this Order on all counsel of record and the Attorneys General for the State of Delaware, the State of New Jersey, and the Commonwealth of Pennsylvania within seven days of its receipt.

_____
HON. G. THOMAS BOWEN, J.S.C.

_____ Opposed

_____ Unopposed

2

RHOADS & SINON LLP
One South Market Square, 12th Floor
Harrisburg, PA 17101
(717) 233-5731
Attorneys for Defendant Associated Wholesalers, Inc.

**FILED**

**DEC 1 8 2006**

**ANNE McDONNELL, J.S.C.**

L.J. ZUCCA, INC.

Plaintiff

v.

ALLEN BROS. WHOLESALE
DISTRIBUTORS, INC.; ASSOCIATED
WHOLESALERS, INC.; BEE GEE CANDY
CO., INC.; BUCKS COUNTY CIGAR &
CANDY; CONSOLIDATED SERVICE
DISTRIBUTORS, INC.; CONTINENTAL
TOBACCO & CANDY, INC.; COOPER-
BOOTH WHOLESALE COMPANY; EBY-
BROWN COMPANY, LLC; GARBER
BROTHERS INC.; GIBBY'S WHOLESALE;
GLIKIN BROTHERS, INC.; HAROLD
LEVINSON ASSOCIATES, INC.; JOSEPH
FRIEDMAN & SONS; KLEIN CANDY CO.
LP; M & J WHOLESALE, INC.; M.
BERNSTEIN & SONS; MANDEL TOBACCO
CO. OF NJ, INC.; MCLANE/MIDATLANTIC,
INC.; MIDDLESEX TOBACCO &
CONFECTIONERY CO., INC.; OCEAN
TOBACCO, INC.; PLAINFIELD TOBACCO &
CANDY CO., INC., a/k/a RESNICK
DISTRIBUTORS; PLANET WHOLESALE
INC.; RAINBOW HEAVEN DISTRIBUTION,
LLC; S & K IMPORTS, INC.; STARKMAN
GENERAL PRODUCTS; SUN WHOLESALE,
INC.; VALUE KING WHOLESALE; and
VIKISHA CORP.,

Defendants.

SUPERIOR COURT OF NEW JERSEY
CHANCERY DIVISION
CUMBERLAND COUNTY

DOCKET NO.: C-19-06

Civil Action

**ORDER**

*Denied w/o prej.*
*Anne McDonnell, P.J.CV.*
*12/18/2006*

Associated Wholesalers, Inc. ("Defendant AWI") having moved this Court for an Order

dismissing all counts of the Amended Complaint as to Defendant AWI by joining in co-

defendants' motions to dismiss the various counts of Plaintiff's Amended Complaint, and the

Court having reviewed the memoranda of law or briefs, and all supporting papers, submitted by

all co-defendants, including but not limited to Klein Candy Co. LP and Cooper-Booth Wholesale

Company in support of their motions, as well as any opposition filed on behalf of Plaintiff, any

oral argument and for good cause shown:

It is on this _____ day of _____, 2006,

ORDERED that the Motion to Dismiss all Counts of the Amended Complaint as to

Defendant AWI be GRANTED; and it is further

ORDERED that a copy of this Order be served upon all counsel of record within seven

(7) days of the date of receipt.

                                         _____

                                         Hon. Anne McDonnell

_____ Opposed

_____ Unopposed

WILENTZ, GOLDMAN & SPITZER P.A.
Attorneys at Law
90 Woodbridge Center Drive
Post Office Box 10
Woodbridge, New Jersey 07095
(732) 636-8000
Attorneys for Defendant
  Middlesex Tobacco & Confectionery Co., Inc.

FILED

DEC 1 8 2006

ANNE McDONNELL, J.S.C.

------------------------------------X
                                    :
LJ ZUCCA, INC.,                     :
                                    :
        Plaintiff,                  :   SUPERIOR COURT OF NEW
                                    :     JERSEY
v.                                  :   CHANCERY DIVISION
                                    :   CUMBERLAND COUNTY
ALLEN BROS. WHOLESALE DISTRIBUTORS, :   DOCKET NO. L-19-06
INC.; ASSOCIATED WHOLESALERS, INC.; :
BEE GEE CANDY CO., INC.; BUCKS      :
COUNTY CIGAR & CANDY; CONSOLIDATED  :
SERVICE DISTRIBUTORS, INC.;         :
CONTINENTAL TOBACCO & CANDY, INC.;  :        Civil Action
COOPER-BOOTH WHOLESALE COMPANY; EBY-:
BROWN COMPANY, LLC; GIBBY'S         :
WHOLESALE; GILKIN BROTHERS, INC.;   :
HAROLD LEVINSON ASSOCIATES, INC.;   :        **ORDER**
HBA DIRECT, INC.; JOSEPH FRIEDMAN & :
SONS; MANDEL TOBACCO CO. OF N.J.,   :
INC.; MCLANE/MIDATLANTIC, INC.;     :
MIDDLESEX TOBACCO & CONFECTIONERY   :
CO., INC.; OCEAN TOBACCO, INC.;     :
PLAINFIELD TOBACCO & CANDY CO.,     :
INC., a/k/a RESNICK DISTRIBUTORS;   :
PLANET WHOLESALE, INC.; RAINBOW     :
HEAVEN DISTRIBUTION, LLC; S & K     :
IMPORTS, INC.; STARKMAN GENERAL     :
PRODUCTS; SUN WHOLESALE, INC.; SUPER:
RITE FOODS, INC.; and VIKISHA CORP.,:
                                    :
        Defendants.                 :
                                    :
                                    :
------------------------------------X

Denied of, per
McDonnell
12/18/2006
Anne McDonnell, P.J.CV.

#2702886 (124053.013)

THIS MATTER being opened to the Court on the application of Wilentz, Goldman & Spitzer, P.A., attorneys for defendant, Middlesex Tobacco & Confectionery Co., Inc. (Marvin J. Brauth, Esq., of counsel) and upon notice to Saul Ewing, LLP, attorneys for plaintiff, LJ Zucca, Inc. (Francis X. Riley, Esq.); and the Court having considered the papers submitted in connection with the application, and for good cause shown;

IT IS on this _____ day of _____, 2006,

ORDERED that all the Counts of the Amended Complaint are dismissed.

ORDERED that a copy of the within Order shall be served upon all parties within ___ days from the date of this Order.

_____
                                                    J.S.C.

_____    Opposed
_____    Unopposed

#2801546 (124053.013)                        2

**Greenberg, Trager & Herbst, LLP**
Paul V. Lucas, Jr., Esq.
767 Third Avenue, 12th Floor
New York, NY 10017
212-688-1900
Attorneys for Defendants, M. Bernstein
& Sons, Continental Tobacco & Candy Inc.,
Rainbow Heaven Distribution, L.L.C. and
Planet Wholesale Inc.

F I L E D

DEC 1 8 2006

ANNE McDONNELL, J.S.C.

L.J. ZUCCA, INC.,

Plaintiff,

v.

ALLEN BROS. WHOLESALE
DISTRIBUTORS INC.; ASSOCIATED
WHOLESALERS INC.; BEE GEE CANDY
CO., INC.; BUCKS COUNTY CIGAR &
CANDY; CONSOLIDATED SERVICE
DISTRIBUTORS, INC.; CONTINENTAL
TOBACCO & CANDY INC.; COOPER-
BOOTH WHOLESALE COMPANY; EBY-
BROWN COMPANY LLC; GIBBY'S
WHOLESALE; GLIKIN BROTHERS, INC.;
HAROLD LEVINSON ASSOCIATES, INC.;
HBA DIRECT, INC.; JOSEPH FRIEDMAN &
SONS; KLEIN CANDY CO. LP; M & J
WHOLESALE, INC.; M. BERNSTEIN &
SONS; MANDEL TOBACCO CO. OF NJ,
INC.; MCLANE/MIDATLANTIC, INC.;
MIDDLESEX TOBACCO &
CONFECTIONERY CO., INC.; OCEAN
TOBACCO, INC.; PLAINFIELD TOBACCO
& CANDY CO., INC., a/k/a RESNICK
DISTRIBUTORS; PLANET WHOLESALE
INC.; RAINBOW HEAVEN
DISTRIBUTION, L.L.C.; S & K IMPORTS,
INC.; STARKMAN GENERAL PRODUCTS;
SUN WHOLESALE, INC.; SUPER RITE
FOODS, INC.; and VIKISHA CORP.,

Defendants.

SUPERIOR COURT OF NEW
JERSEY
CUMBERLAND COUNTY
LAW DIVISION

DOCKET NO. L-1200-05

Civil Action

**ORDER**

Denied
McDonnell
12/18/2006
Anne McDonnell, P.J.CV.

This matter having been opened to the Court by motion of Greenberg, Trager & Herbst, LLP, attorneys for defendants M. Bernstein & Sons, Continental Tobacco & Candy Inc., Rainbow Heaven Distribution, L.L.C. and Planet Wholesale Inc., and having been served upon all counsel of record, and the Court having read and considered the submissions of the parties and the argument of counsel, if any, for the reasons expressed on the record, and for good cause shown;

IT IS ON THIS                    day of                         , 2006;

1.   ORDERED that the plaintiff's complaint be dismissed without prejudice for failure to respond to the request for the production of documents and to provide answers to interrogatories; and it is

2.   FURTHER ORDERED that a copy of this Order shall be served upon all counsel within seven (7) days of receipt hereof.

_____, J.S.C.

[  ] opposed
[  ] unopposed

2

William J. Hughes, Jr., Esquire
COOPER LEVENSON APRIL NIEDELMAN & WAGENHEIM, P.A.
1125 Atlantic Avenue - 3rd Floor
Atlantic City, NJ 08401
(609) 344-3161
File No.: 44741.002
Attorneys for Defendants, Bee Gee Candy Co., Starkman General Products

**FILED**

**DEC 1 8 2006**

*ANNE McDONNELL, J.S.C.*

| | |
|---|---|
| L.J. ZUCCA, INC., | : SUPERIOR COURT OF NEW JERSEY |
| | : LAW DIVISION |
| Plaintiff, | : CUMBERLAND COUNTY |
| | : |
| | : DOCKET NO.: C-19-06 |
| vs. | : |
| | : Civil Action |
| ALLEN BROS. WHOLESALE DISTRIBUTORS, | : |
| INC.; ASSOCIATED WHOLESALERS, INC.; BEE | : |
| GEE CANDY CO., INC.; BUCKS COUNTY | : |
| CIGAR & CANDY; CONSOLIDATED SERVICE | : |
| DISTRIBUTORS, INC.; CONTINENTAL | : |
| TOBACCO & CANDY, INC.; COOPER-BOOTH | : |
| WHOLESALE COMPANY; EBY-BROWN | : |
| COMPANY, LLC; GIBBY'S WHOLESALE; | : |
| GLIKIN BROTHERS, INC.; HAROLD | : |
| LEVINSON ASSOCIATES, INC.; HBA DIRECT, | : |
| INC.; JOSEPH FRIEDMAN & SONS; KLEIN | : |
| CANDY CO., LP; M & J WHOLESALE, INC.; M. | : |
| BERNSTEIN & SONS; MANDEL TOBACCO CO. | : |
| OF NJ, INC.; MCLANE/MIDATLANTIC, INC.; | : |
| MIDDLESEX TOBACCO & CONFECTIONERY | : |
| CO., INC.; OCEAN TOBACCO, INC.; | : **ORDER DISMISSING THE AMENDED** |
| PLAINFIELD TOBACCO & CANDY CO., INC., | : **COMPLAINT AGAINST** |
| a/k/a RESNICK DISTRIBUTORS; PLANET | : **DEFENDANTS STARKMAN** |
| WHOLESALE INC.; RAINBOW HEAVEN | : **GENERAL PRODUCTS AND BEE** |
| DISTRIBUTION, LLC; S & K IMPORTS, INC.; | : **GEE CANDY COMPANY** |
| STARKMAN GENERAL PRODUCTS; SUN | : |
| WHOLESALE, INC.; SUPER RITE FOODS, INC.; | : |
| and VIKISHA CORP., | : |
| | : |
| Defendants. | : |
| | : |

*Denied w/o prej*
*AMcDonnell*
*12/18/2006*
*Anne McDonnell, P.J.CV.*

**THIS MATTER** having been opened to the court by William J. Hughes, Jr., Esq. of the firm of Cooper Levenson April Niedelman & Wagenheim, P.A., counsel for defendants, Starkman General Products and Bee Gee Candy Co., Inc. for an Order Dismissing the Amended Complaint; and the court having considered the submissions of the parties; and having heard the arguments of counsel; and for good cause shown;

**IT IS ON THIS** _____ **DAY OF JANUARY, 2007, ORDERED AND ADJUDGED** that Defendants' Bee Gee Candy Co., Inc. and Starkman General Products' motion dismissing the Amended Complaint be and hereby is GRANTED; and

**IT IS FURTHER ORDERED** that a copy of this Order shall be served upon all counsel within _____ days of the date hereof.

_____
ANNE McDONNELL, J.S.C.

CLAC; 60588.1

2

# EXHIBIT 2

NOT FOR PUBLICATION WITHOUT THE APPROVAL OF THE COMMITTEE ON OPINIONS

## SUPERIOR COURT OF NEW JERSEY

ANNE McDONNELL
JUDGE



PO BOX 797
WOODBURY, NJ 08096

February 6, 2007

Adrienne Rogove, Esquire
Saul Ewing LLP
750 College Road East, Suite 100
Princeton, NJ 08540

Stephen M. Orlofsky, Esquire
Kit Applegate, Esquire
Blank Rome
Woodland Falls Corporate Park
210 Lake Drive East, Suite 200
Cherry Hill, NJ 08002

Re:    L.J. Zucca, Inc. v. Allen Bros. et. al.          **LETTER OPINION**
       Docket No. CUM-C-19-06

Dear Counsel:

On February 2, 2007, the court heard oral argument on plaintiff's motion for reconsideration of its December 1, 2006 decision denying without prejudice defendants' motion for dismissal based on the Sherman Antitrust Act; in the presence of Adrienne Rogove, Esquire, of the Law Firm Saul Ewing, appearing on behalf of plaintiff; Stephen M. Orlofsky, Esquire, and Kit Applegate, Esquire, of the Law Firm Blank Rome, appearing on behalf of defendant Cooper-Booth Wholesale Co.; and the court having reviewed the papers filed and having considered the arguments in support of and in opposition to the motion; for the reasons set forth herein, the motion is denied. The motion to quash defendant's subpoena issued to the New Jersey Division of Taxation is denied. An Order is enclosed.

Reconsideration is denied. The court clarifies its letter opinion of December 1, 2006 as follows:

The court relied on 324 Liquor Corp. v. Duffy, 479 U.S. 335, 341 (1987) and Morgan v. Div. of Liquor Control, Conn. Dept. of Bus. Reg., 664 F.2d 353 (CA2 1981) in finding that a state action immunity doctrine analysis as set forth in Parker v. Brown, 317 U.S. 341 (1943) is required in this case. Both Duffy and Morgan involved statutory schemes that required the application of percentage mark-ups to the wholesaler's posted bottle price (Duffy) or the manufacturer's initial offering price (Morgan.) Whether or not these statutes are classified as minimum mark-up statutes, in each case the court engaged in a state action immunity analysis. In Zucca, the UCSA requires the application of a percentage mark-up to the invoice price of cigarettes. In each of these three cases, a third party and not the state set the base price to which the state-mandated percentage was

1

applied. Thus, the UCSA is a hybrid restraint unlike the unilateral restraint described in Fisher v. City of Berkeley, 473 U.S. 260 (1986).

Thank you for your courtesy and for your attention to this case.

Sincerely,

ANNE McDONNELL, P.J.Cv.

# EXHIBIT 3

LEXSEE 2003 U.S. DIST. LEXIS 19400



Caution
As of: Feb 21, 2007

**MELVIN PELL and ELLEN PELL, Plaintiffs, v. E.I. DUPONT DE NEMOURS & COMPANY INCORPORATED, et al., Defendants.**

**Civil Action No. 02-21 KAJ**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*2003 U.S. Dist. LEXIS 19400; 31 Employee Benefits Cas. (BNA) 2035*

**October 29, 2003, Decided**

**SUBSEQUENT HISTORY:** Summary judgment granted by *Pell v. E.I. Dupont De Nemours & Co., 348 F. Supp. 2d 306, 2004 U.S. Dist. LEXIS 28133 (D. Del., 2004)*

**DISPOSITION:** [*1] DuPont's Motion for Judgment on the Pleadings was denied.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff retired employee and his wife sued defendant employer and retirement plan administrator (collectively, employer), alleging that they breached their duties, obligations, and fiduciary responsibilities under *29 U.S.C.S. § 1132* by calculating the employee's pension benefits based on a later date than the commencement of his employment with the employer's subsidiary. The employer moved for judgment on the pleadings.

**OVERVIEW:** The employee and wife argued that the employer's representations assuring that the total combined service of the employee's employment with the subsidiary and the employer would be utilized in determining the basis of his pension benefits gave rise to an equitable estoppel claim under the Employee Retirement Income Security Act, *29 U.S.C.S. § 1001* et seq. The employer's multiple oral and written assurances that the employee would receive pension benefits for his

total combined service were material representations as the employee relied on them in deciding when to retire. The employee and wife sufficiently alleged that they reasonably and detrimentally relied on the representations given their selection of a retirement date and the fact that they were receiving a lower benefit payment than expected. Finally, the employee's diligence in attempting to obtain accurate information regarding his service date and the employer's delay in informing the employee of the actual service date until two weeks before the employee's retirement date may have constituted extraordinary circumstances, thereby supporting an equitable estoppel claim.

**OUTCOME:** The motion for judgment on the pleadings was denied.

**COUNSEL:** For Melvin Pell, Ellen Pell, PLAINTIFFS: Robert Jacobs, Jacobs & Crumplar, Wilmington, DE USA.

For EI Dupont De Nemours & Company Incorporated, The Board of Benefits and Pensions of EI Dupont De Nemours, DEFENDANTS: Kathleen Furey McDonough, Potter Anderson & Corroon, LLP, Wilmington, DE USA.

**JUDGES:** Kent A. Jordan, UNITED STATES DISTRICT JUDGE.

Case 1:07-cv-00002-JJF    Document 25-4    Filed 02/22/2007    Page 3 of 7

Page 2

2003 U.S. Dist. LEXIS 19400, *1; 31 Employee Benefits Cas. (BNA) 2035

**OPINION BY:** Kent A. Jordan

**OPINION:**

MEMORANDUM ORDER

I. Introduction

Presently before the Court is a Motion for Judgment on the Pleadings (Docket Item ["D.I."] 7; the "Motion") filed by defendants E.I. du Pont de Nemours & Co., Inc., a Delaware corporation, and the Board of Benefits and Pensions of E.I. du Pont de Nemours (collectively "DuPont"). n1

> n1 Subject matter jurisdiction is proper under *28 U.S.C. § 1331.*

The Complaint filed by Plaintiffs Melvin Pell, a retired employee of DuPont, and Ellen Pell, Mr. Pell's wife, alleges that DuPont breached its duties, obligations [*2] and fiduciary responsibilities under Section 502 of the Employee Retirement Income Security Act ("ERISA"), *29 U.S.C. § 1132*, by calculating Mr. Pell's benefits under the DuPont pension plan based on a later date than the commencement of his employment with Consolidated Coal Company ("Consol"), a DuPont subsidiary, n2 even though DuPont represented on several occasions over the course of his employment that it would use the earlier date in calculating his pension. (D.I. 1 at PP 10-14.) Plaintiffs seek to estop DuPont from using the later date in calculating the benefit rights due under the pension plan, as well as damages, interest, and costs. (D.I. 1 at P 30.)

> n2 Consol is no longer a subsidiary of DuPont, but was at the time Mr. Pell became a DuPont employee. (D.I. 5 at P 6.)

DuPont's Motion alleges that Plaintiffs are receiving the full amount due them under the DuPont pension plan and that the relief that Plaintiffs seek is unavailable as a matter of law. (D.I. 8 at 2.)

For the reasons [*3] set forth herein, DuPont's Motion is denied.

II. Standard of Review

A Motion for Judgment on the Pleadings under *Rule 12(c) of the Federal Rules of Civil Procedure* requires the court to "accept the allegations in the complaint as true, and draw all reasonable factual inferences in favor of the plaintiff." *Turbe v. Gov't of the Virgin Islands, 938 F.2d 427, 428 (3d Cir. 1991)*. The motion can be granted "only if no relief could be granted under any set of facts that could be proved." *Id. See also Southmark Prime Plus, L.P. v. Falzone, 776 F. Supp. 888, 891 (D. Del. 1991)* (citing *Turbe, 938 F.2d at 428*); *Cardio-Medical Associates, Ltd. v. Crozer-Chester Med. Ctr., 536 F. Supp. 1065, 1072 (E.D. Pa. 1982)* ("If a complaint contains even the most basic of allegations that, when read with great liberality, could justify plaintiff's claim for relief, motions for judgment on the pleadings should be denied.").

III. Background

Mr. Pell was employed by Consol on February 10, 1971. (D.I. 1 at P 6; D.I.13 at 3.) Mr. Pell provided engineering services to DuPont and worked [*4] at their facilities in Delaware while he was on "loan" to DuPont as a Consol employee between 1982 and January 1984. (D.I. 1 at P 7.) Mr. Pell claims that, in 1983, he was asked to consider transferring employment from Consol to DuPont. (*Id.* at P 8.) According to Mr. Pell, one of the key factors he considered in making his decision was whether his DuPont Pension and Retirement Plan (the "DuPont Plan") would be vested based on his total combined service at Consol and DuPont. (*Id.* at PP 9-11.)

Mr. Pell alleges that he transferred his employment to DuPont on January 1, 1984, after receiving assurances that his total combined service would be counted for vesting purposes. (*Id.*) n3 In explaining what effect his transfer of employment would have on his pension, Mr. Pell was told in a letter dated January 13, 1984, from the Director of Employee Compensation and Benefits at Consol, with a copy to the head of the DuPont Pension and Employment Relations Department, that the "pension [he] receives will be calculated under the DuPont Plan based on [his] total combined service." (D.I. 1 at Ex. A.) n4

> n3 In the Complaint, Plaintiffs claim that "it was only when assured of this total vesting of years by [the letter from the Director of Employee Compensation and Benefits at Consol] that he agreed to transfer from Consol to DuPont." (D.I. 1

Case 1:07-cv-00002-JJF    Document 25-4    Filed 02/22/2007    Page 4 of 7

Page 3

2003 U.S. Dist. LEXIS 19400, *4; 31 Employee Benefits Cas. (BNA) 2035

at P 11). However, Mr. Pell transferred on January 1, 1984 and the letter was dated January 13, 1984. Plaintiffs clarify in their Opposition to Defendant's Motion that the representations Mr. Pell received regarding his pension were reduced to writing in the January 13, 1984 letter from DuPont Plan administrators or their agents. (D.I. 13 at 3.)

[*5]

n4 The 1984 letter lists Mr. Pell's "Employment Date" as 02-10-71 and "Credited Service Date" as 08-01-72. The letter goes on to say, "The pension you will receive will be calculated under the DuPont Plan based on your total combined service." (D.I. 1 at Ex. A.)

Subsequent to the 1984 letter, Mr. Pell received a calculation of his pension benefits from DuPont on at least four occasions: 1991, 1992, 1998 and 1999. (D.I. 1 at P 12.) All four calculations used February 10, 1971 to calculate his pension benefits under the DuPont Plan. (Id.) Mr. Pell alleges that in reliance upon representations that his pension was based on his total combined service starting February 10, 1971, he decided to retire in December 2000. (Id. at P 13.) Eleven days prior to the date of his retirement, Mr. Pell was, he says, informed by DuPont that his pension was going to be calculated beginning on November 1, 1975 and therefore he would be given credit for 25.1667 years of service rather than the 29.9 he had expected and been assured of by DuPont. (Id. at PP 14-15.)

DuPont does not deny that it made numerous [*6] representations to Mr. Pell about basing his pension on February 10, 1971 as the date that his service began, but characterizes the representations as estimates that were "subject to final confirmation at the time a formal application for benefits was made." (D.I. 8 at 4.) DuPont points to the disclaimer language that appears on the representations, such as "data used in this estimate ... are subject to review and confirmation," to support its assertion. (Id.)

DuPont claims that its actuaries, in their final calculation of Mr. Pell's pension benefits, used November 1, 1975 rather than February 10, 1971 because guidelines that were in place at the time of Mr. Pell's transfer

governed the treatment of pension benefits for employees who transferred between Consol and DuPont. (Id.; see also D.I. 5 at Ex. B) Those "Transfer Guidelines" state that:

> pension benefits for any employee transferring from Consol to DuPont are to be calculated 'as though the individual's total recognized service has been with [DuPont] ... and the pension will be offset by the [Consol] pension accrued at the time of transfer and paid by [Consol] at time of retirement. Consol service for DuPont [*7] pension calculation purposes will be recognized only from 11/1/75 forward.'

(Id. at 7; D.I. 5, Ex. B at 6, 14.) Mr. Pell denies that he was ever given a copy of the Transfer Guidelines that were in effect at the time of his transfer to DuPont. (D.I. 13 at 5.)

Mr. Pell deferred retirement until May 31, 2001 while he appealed the service date used to calculate his pension benefits to the Board of Benefits and Pensions (the "Board"). (D.I. 1 at P 19.) On May 24, 2001, the Board denied Plaintiffs' appeal. (D.I. 5 at Ex. A.) It explained that since Mr. Pell's service under the DuPont Plan and transfer policy "started on November 1, 1975, a service adjustment of 4.72500 was applied to [Plaintiff's] February 10, 1971 ASD." (Id.)

The reduction in credited service of approximately four-and-a-half years under the DuPont Plan resulted in a smaller benefit than Plaintiffs had anticipated. (D.I. 1 at P 14.) According to Plaintiffs, the difference between the pension payments is approximately $ 725 per month, and if Plaintiffs live their normal life expectancies, the loss will exceed $ 100,000 in benefits. (Id. at PP 15, 24.) n5 DuPont has offered no compensation. The Board has [*8] simply told Mr. Pell that it:

> sincerely regrets that [he] received several incorrect letters and statements over the years, and that [he was] informed of the correct treatment for [his] pension benefit only shortly prior to [his] intended retirement date. Unfortunately, due to the uniqueness of [his] situation (the timing and direction of [his] transfer), significant

Case 1:07-cv-00002-JJF    Document 25-4    Filed 02/22/2007    Page 5 of 7

Page 4
2003 U.S. Dist. LEXIS 19400, *8; 31 Employee Benefits Cas. (BNA) 2035

research was required to determine [his] proper treatment. That research began only upon receipt of [his] notice of intention to retire, and required significant time and resources from Consol, Conoco, and DuPont.

(D.I. 5 at Ex. D.)

> n5 It is unclear whether Plaintiffs are receiving benefits from August 1, 1972, the day Mr. Pell's credited service commenced under the Consol pension plan, to October 31, 1975. DuPont claims that even though Mr. Pell is not receiving pension benefits for this time period under the DuPont Plan, he is receiving pension benefits for this time period under the Consol plan. (*See* D.I. 8 at 8.) Plaintiffs do not seem to disagree that Mr. Pell is receiving pension benefits under the Consol plan from August 1, 1972 to October 31, 1975. They merely state that had Mr. Pell's "service been dated February 10, 1971 instead of the date alleged to be utilized by DuPont, August 1, 1972, he would have another 1.5538 years of service and a higher pension benefit." (D.I. 13 at 7-8.) Nonetheless, Plaintiffs argue that Mr. Pell's pension benefits under the DuPont Plan should be based on his total combined service at Consol and DuPont. (*Id.*) Nothing in this order is intended to indicate a factual determination on that question or the legal consequence of it.

[*9]

Prior to bringing suit on January 9, 2002, Mr. Pell exhausted all of his appeals. (D.I. 1 at PP 19, 16.) Plaintiffs allege that DuPont breached its fiduciary duties under ERISA by misrepresenting the basis of the pension plan. Based on their reliance on the misrepresentations, Plaintiffs argue that DuPont should be estopped from changing the service date of February 10, 1971 as the basis of Mr. Pell's pension. (*Id.* at P 28.) Plaintiffs also seek back pay for pension benefits, plus interest and future benefits calculated with the February 10, 1971 service date. (*Id.* at P 30.)

IV. Discussion

Section 502(a)(3) of ERISA permits a beneficiary "to

obtain ... appropriate equitable relief ... to redress [ERISA] violations or ... to enforce any provisions of [ERISA] or the terms of the plan." *29 U.S.C. 1132(a)(3)*. In *Gridley v. Cleveland Pneumatic Co., 924 F.2d 1310, 1319 (3d Cir. 1991)*, the Third Circuit held that *section 502* permits an ERISA beneficiary to recover benefits under an equitable estoppel theory.

Plaintiffs' argue that the representations made by DuPont assuring that the total combined service of Mr. Pell's employment [*10] with Consol and DuPont would be utilized in determining the basis of his pension benefits give rise to an equitable estoppel claim under ERISA. "To succeed under [an equitable estoppel] theory of relief, an ERISA plaintiff must establish (1) a material representation, (2) reasonable and detrimental reliance upon the representation, and (3) extraordinary circumstances." *Curcio v. John Hancock Mutual Life Ins. Co., 33 F.3d 226, 235 (3d Cir. 1994)*.

First, Plaintiffs must show that DuPont made material representations. The Third Circuit has held that a "misrepresentation is material if there is a substantial likelihood that it would mislead a reasonable employee in making an adequately informed decision about if and when to retire." *Fischer v. Philadelphia Elec. Co., 994 F.2d 130, 135 (3d Cir. 1993)*. In this case, DuPont's multiple oral and written representations that Mr. Pell would receive pension benefits for his total combined service at Consol and DuPont is material. Plaintiffs allege that Mr. Pell decided to retire in December 2000 because Dupont had represented that his pension benefits would be based on February 10, 1971, the commencement of [*11] his employment with Consol. Thus, in the context of DuPont's Motion, the representations that DuPont made were "material representations." *Fischer, 994 F.2d at 135*.

Second, Plaintiffs must demonstrate reasonable and detrimental reliance upon the representations that DuPont made. In *Smith v. Hartford Ins. Group, 6 F.3d 131 (3d Cir. 1993)*, one of the plaintiffs suffered a cerebral hemorrhage and, as a result, required continuous care in a skilled nursing facility. *Id. at 133*. She was covered by her employer's group health insurance policy, but her employer changed its group health policy to a self-insured plan while she was still recovering from her injury. *Id.* Her husband, on her behalf, enrolled in the new plan based on the employer's erroneous oral and written representations that she would receive the same

Case 1:07-cv-00002-JJF    Document 25-4    Filed 02/22/2007    Page 6 of 7

Page 5
2003 U.S. Dist. LEXIS 19400, *11; 31 Employee Benefits Cas. (BNA) 2035

level of nursing coverage. *Id. at 133-134.* After the plaintiffs were denied coverage under the insurance policy, they brought suit claiming that, were it not for the employer's misrepresentations, they could have converted to an individual policy in order to retain the skilled nursing care coverage provided [*12] by the former policy. *Id. at 137.* The Court held that a fact finder could find that the plaintiffs "reasonably and detrimentally relied on" the employer's continued misrepresentations. *Id. at 140.*

Like the plaintiffs in *Smith,* Plaintiffs here can credibly claim, at least at this pleading stage, that they detrimentally relied on DuPont's erroneous oral and written representations. Mr. Pell has alleged that he relied upon DuPont's oral and written representations in 1984, and written representations in 1991, 1992, 1998, and 1999 in choosing December 2000 as his retirement date. Mr. Pell's alleged reliance on these erroneous representations could be found to be detrimental. Plaintiffs assert that, as a result of DuPont's determination that November 1, 1975 was the correct date to calculate Mr. Pell's pension benefits, they are receiving $ 725 less per month than they are owed, which could amount to as much as $ 100,000 in benefits if Plaintiffs live their normal life expectancies. n6

> n6 Plaintiffs claim that, at the very least, they should be receiving benefits based on an additional 1.5538 years of service. (D.I. 13 at 7.)

[*13]

Finally, Plaintiffs must demonstrate the existence of extraordinary circumstances. While that term is not specifically defined, a number of cases have helped to establish its parameters. In *Curcio,* the widow of the decedent brought an ERISA suit against the decedent's employer under ERISA to recover additional accidental death and dismemberment ("AD & D") benefits. *33 F.3d at 229.* Before his death, decedent's employer held group meetings for its employees where, through an audio-visual presentation, it stated that it was going to provide supplemental AD & D coverage to its employees. *Id.* Although decedent purchased the maximum amount of coverage under his employer's insurance plan, the plan insurer argued that employees in decedent's position never had the opportunity to purchase supplemental AD & D coverage and, even if they did, decedent only paid premiums for supplemental life insurance. *Id. at 230.* The

court found it extraordinary that decedent's employers reassured the widow that she was covered for the additional AD & D benefits, that they initially argued to the insurer that additional AD & D benefits were included in the plan, and even [*14] encouraged her to file suit against the plan insurer, but later had a change of heart and argued that the supplemental AD & D insurance was never offered in the first place. *Id. at 238.*

The Court in *Smith, 6 F.3d 131,* held that the fact finder could determine that extraordinary circumstances were established "in light of [employer's] repeated oral and written misrepresentations to [Mr.] Smith [and] his diligence in attempting to obtain accurate answers regarding is wife's coverage." *Id. at 142.*

Here, Mr. Pell apparently was diligent in attempting to obtain accurate information regarding his service date. Mr. Pell alleges that in 1984 he obtained written assurances that his total combined service would be counted for vesting purposes. That representation was made in a January 13, 1984 letter that was executed by the persons in charge of benefits at Consol and reviewed by the head of the DuPont Pension and Employment Relations Department. (D.I. 1 at P 10.) On June 3, 1991, Mr. Pell inquired about the date to be used for as his service, and was assured that it was February 10, 1971. (D.I. 1 at Ex. B.) As a result of some information [*15] contained in a pension rule book that his service date might be 1975 instead of 1971, Mr. Pell made the two more inquiries, on August 19, 1992 and April 28, 1998. (*Id.* at Ex.'s C, D.) n7 On both occasions, he was told that February 10, 1971 was the date for his pension benefit calculations. (*Id.*) However, less than two weeks before his retirement, DuPont informed Mr. Pell that 1975 was the actual service date. (D.I. 1 at P 15.) As was the case in *Smith,* this pattern of events may constitute extraordinary circumstances, and, accordingly, viewing the pleadings and every inference from them in Plaintiffs' favor, Plaintiffs may have a valid equitable estoppel claim. n8

> n7 Plaintiffs discuss Mr. Pell's inquiry regarding the date used for calculating his pension benefits in their "Answering Brief in Opposition to Defendant's Motion for Judgment on the Pleadings." (*See* D.I. 13 at 4-5.) The allegations in the Complaint of DuPont's misrepresentations in 1991, 1992, 1998 and 1999 are sufficient for a determination that Plaintiffs may be able to prove

2003 U.S. Dist. LEXIS 19400, *15; 31 Employee Benefits Cas. (BNA) 2035

extraordinary circumstances.

n8 DuPont argues that under "Third Circuit law, it is well-established that ERISA precludes an employer from making 'oral or informal modifications' to employee benefit planns." *Abramowicz v. Rohm and Haas Co.,* C.A. 00-4745m, 2001 U.S. Dist. LEXIS 17693, at *25 (E.D. Pa. Oct. 30, 2001). Even if the documents given to Mr. Pell by DuPont can be classified as informal documents under *Abramowicz,* Plaintiffs may be able to establish the necessary elements of an equitable estoppel claim under *Curcio* and *Smith,* for the reasons described herein.

[*16]

V. Conclusion

Under the *Rule 12(c)* standard governing the court's review of the Motion, there are facts which, if proved, could serve as a basis for relief.

Accordingly, IT IS HEREBY ORDERED that DuPont's Motion for Judgment on the Pleadings (D.I. 7) is DENIED.

Kent A. Jordan

UNITED STATES DISTRICT JUDGE

October 29, 2003
Wilmington, Delaware

# EXHIBIT 4

LEXSEE 2007 U.S. DIST. LEXIS 2786



Analysis
As of: Feb 21, 2007

**MAGTEN ASSET MANAGEMENT CORPORATION, suing individually and
derivatively on behalf of CLARK FORK AND BLACKFOOT, LLC, Plaintiff, v.
PAUL HASTINGS JANOFSKY & WALKER LLP, Defendant.**

**Civil Action No. 04-1256-JJF**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*2007 U.S. Dist. LEXIS 2786*

**January 12, 2007, Decided**

**PRIOR HISTORY:** *Magten Asset Mgmt. Corp. v.
NorthWestern Corp., 2006 U.S. Dist. LEXIS 71002 (D.
Del., Sept. 29, 2006)*

**COUNSEL:** [*1] Magnet Asset Management, Suing
Individually and derivatively on behalf of Clark Fork and
Blackfoot, LLC., Plaintiff: David A. Jenkins, Kathleen
M. Miller, LEAD ATTORNEYS, Smith, Katzenstein, &
Furlow, Wilmington, DE; Mark J. Packel, Blank Rome
LLP, Wilmington, DE; Bijan Amini, Esquire and Avery
Samet, Esquire of STORCH AMINI & MUNVES PC,
New York, New York.

Paul Hastings Janofsky & Walker LLP, Defendant:
Robert J. Dehney, LEAD ATTORNEY, Curtis S. Miller,
Morris, Nichols, Arsht & Tunnell, Wilmington, DE.

**JUDGES:** Joseph J. Farnan, Jr., UNITED STATES
DISTRICT JUDGE.

**OPINION BY:** Joseph J. Farnan, Jr.

**OPINION:**

**MEMORANDUM OPINION**

January 12, 2007
Wilmington, Delaware

**Farnan, District Judge**

Presently before the Court is a Motion For Judgment
On The Pleadings (D.I. 86) filed by Defendant, Paul
Hastings Janofsky & Walker, LLP. For the reasons set
forth below, the Court will grant the Motion.

**I. BACKGROUND**

By its Complaint, Plaintiff Magten Asset
Management Corporation, alleges that Northwestern
Corporation ("Northwestern") attempted to cover up its
losses from poor investment decisions by stripping the
assets of its solvent and profitable subsidiary, Clark Fork
and [*2] Blackfoot LLC ("Clark Fork"). Specifically,
Magten contends that Northwestern transferred to itself
assets of Clark Fork, valued between $ 1.1 and 1.4
billion, in exchange for Northwestern's assumption of $
700 million in Clark Fork's debt. Magten contends that
this consideration was inadequate and illusory, and that
Northwestern subsequently encumbered Clark Fork's
assets with new debt, which resulted in the
disenfranchisement of Clark Fork's creditors. Shortly
thereafter, Northwestern filed for Chapter 11 bankruptcy
protection.

Paul Hastings has admitted that it represented both
Northwestern and Clark Fork in the transfer. However,
Magten contends that Paul Hastings aided and abetted

Clark Fork's directors and officers in breaching their fiduciary duties and knowingly designed and implemented the transfer with the purpose of defrauding Clark Fork's creditors.

One of Clark Fork's creditors was Montana Power Capital I (the "QUIPS Trust"). Pursuant to an Indenture Agreement (the "Indenture") dated November 1, 1996 between Clark Fork's predecessor, the Montana Power Company, and Bank of New York n1, the QUIPS Trust was issued $ 65 million in bonds by the Montana Power Company. Instead [*3] of selling these bonds directly to investors, the QUIPS Trust issued Series A 8.45% Quarterly Preferred Securities (the "QUIPS"), whose value was based entirely on Clark Fork's ability to pay interest and principal to the Quips Trust. The Indenture also provided that the holders of the QUIPS were the intended beneficiaries of Clark Fork's obligations to the QUIPS Trust and that, if the trust failed to act, any holder of the QUIPS could sue directly to enforce the rights of the QUIPS Trust. Magten owns in excess of 33% of the QUIPS and contends that it is an express third-party beneficiary under the Indenture.

> n1 The Bank of New York has been succeeded by Law Debenture Trust Company of New York.

By its Complaint, Magten asserts four causes of action individually and derivatively on behalf of Clark Fork against Paul Hastings. Specifically, Magten contends that Paul Hastings (1) aided and abetted the officers of Clark Fork in breaching the fiduciary duties they owed to Clark Fork's creditors by carrying out the [*4] allegedly fraudulent transfer without adequate consideration and rendering Clark Fork insolvent; (2) aided and abetted the allegedly fraudulent transfer by structuring the transaction to leave Clark Fork insolvent and providing substantial assistance and guidance to Northwestern and Clark Fork to carry out the transaction; (3) engaged in a civil conspiracy to conduct the allegedly fraudulent transfer; and (4) committed malpractice by breaching its duties to Clark Fork in failing to disclose its conflict of interest to Clark Fork's officers and directors.

## II. PARTIES' CONTENTIONS

By its Motion, Paul Hastings contends that Magten's claims should be dismissed, because Paul Hastings was not the transferee of the assets in question. According to Paul Hastings, Montana's Uniform Fraudulent Transfer Act ("MUFTA") does not impose liability on non-transferees, and the imposition of any such liability would be inconsistent with the purpose of fraudulent transfer statutes in general.

Paul Hastings also contends that Magten does not have standing to assert its claims against Paul Hastings, because those claims are derivative claims accruing to Clark Fork and not to any creditors of [*5] Clark Fork. Paul Hastings also contends that Clark Fork is a limited liability company under Montana law and the applicable Montana statute only authorizes members of the limited liability company to bring derivative claims. Paul Hastings further contends that, in any event, Magten was not a creditor of Clark Fork at the time of the allegedly fraudulent transfer, and therefore, Magten lacks standing to bring this derivative law suit.

In response, Magten contends that the MUFTA preserves principles existing at equity and common law, and Montana courts have long-recognized a cause of action for conspiracy to defraud creditors. Magten contends that courts have upheld claims for conspiracy and aiding and abetting fraudulent conveyances under the Uniform Fraudulent Conveyance Act.

With respect to the question of standing, Magten contends that Montana's limited liability code says nothing about the rights of creditors, and therefore, these statutes do not limit Magten's ability to sue. Magten also contends that it is an express third party beneficiary under the Indenture, and both the United States Bankruptcy Court for the United States District Court for the District of Montana rejected [*6] Paul Hastings' lack of standing arguments.

## III. STANDARD OF REVIEW

A motion for judgment on the pleadings under *Federal Rule of Civil Procedure 12(c)* is governed by the same standards that apply to a motion to dismiss under *Rule 12(b)(6)*. Specifically, the Court must accept the facts alleged in the pleadings as true and draw all reasonable factual inferences in the light most favorable to the nonmovant. A motion for judgment on the pleadings may only be granted if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson, 355 U.S. 41, 45-46, 78 S. Ct. 99, 2 L.*

*Ed. 2d 80 (1957).* The movant bears the burden of demonstrating that no material issue of fact remains to be resolved and judgment as a matter of law is appropriate. *Institute for Scientific Info v. Gordon & Breach, Sci. Publs., Inc., 931 F.2d 1002, 1005 (3d Cir. 1991).*

## IV. DISCUSSION

Magten's claims in this action are based upon an alleged fraudulent transfer under *Mont. Code Ann. § 31-2-326, et seq.* At least one court interpreting the MUFTA [*7] has recognized that it "bear[s] a close resemblance" to the language of the Bankruptcy Code, and therefore, the fraudulent transfer provisions of the MUFTA should be interpreted "contemporaneously with those of the Bankruptcy Code." *Samson v. U.S. West Communications, Inc. (In re Gigonis), 208 B.R. 950, 958 (Bankr. D. Mont. 1997).* The majority of courts interpreting the Bankruptcy Code have declined to impose liability for fraudulent transfers on third parties who did not receive the assets in question. See e.g., *Mack v. Newton, 737 F.2d 1343, 1358 (5th Cir. 1984)* (recognizing that holding nontransferee liable for fraudulent transfer is inconsistent with purpose of fraudulent transfer statutes which is to "preserve the assets of the bankrupt" and not "to render civilly liable all persons who may have contributed in some way to the dissipation of those assets"); *Robinson v. Watts Detective Agency, Inc., 685 F.2d 729, 737 & n. 10 (1st Cir. 1982)* (finding no liability because neither defendant received any of the fraudulently transferred property); *Jackson v. Star Sprinkler Corp., 575 F.2d 1223, 1234 (8th Cir. 1978)* [*8] (holding that "recovery under the Bankruptcy Act does not extend to permit a judgment against 'conspirators' who did not receive the property transferred").

The MUFTA also expressly provides that it should "be applied and construed to effectuate the general purpose of making uniform the law with respect to the subject of this part among states enacting it." *Mont. Code Ann. § 31-2-327.* The majority of courts interpreting state UFTA laws, whose provisions have been similar to those enacted by the State of Montana, have concluded that liability cannot be imposed on non-transferees under aiding and abetting or conspiracy theories. See e.g., *In re Parmalat Sec. Litig., 377 F. Supp. 2d 390, 417 (S.D.N.Y. 2005)* (holding that aiding and abetting claims do not exist under Illinois UFTA and recognizing that courts have been reluctant to impose such liability absent

statutory authorization); *Baker O'Neal Holdings v. Ernst & Young, 2004 U.S. Dist. LEXIS 6277 (S.D. Ind. Mar. 24, 2004)* (holding that "catch-all" provision similar to one contained in MUFTA did not encompass aiding and abetting liability); *Rohm & Haas Co. v. Capuano, 301 F. Supp. 2d 156, 161 (D.R.I. 2004)* [*9] (refusing to extend liability for fraudulent transfer to a nontransferee under the Rhode Island UFTA); *Freeman v. First Union Nat'l Bank, 865 So. 2d 1272 (Fla. 2004)* (holding that aiding and abetting claims may not be brought under Florida UFTA).

It is evident from the pleadings in this case, that Paul Hastings did not receive the assets in question. As the Complaint alleges, Northwestern was "the only party that benefitted in the transaction." (D.I. 1 at P 5). Because the Court concludes its interpretation of the MUFTA should be guided by the majority approach to this issue, the Court concludes that Magten cannot establish its claims for aiding and abetting and conspiracy based upon an alleged fraudulent transfer under the MUFTA. Accordingly, the Court will grant Paul Hastings Motion for Judgment on the pleadings.

To the extent that any issue remains regarding Magten's claims that Paul Hastings committed malpractice and aided and abetting the officers and. directors of Clark Fork to breach their fiduciary duties, the Court concludes that Magten lacks standing to pursue these claims. Under Montana law, "stockholders and guarantors of a corporation do not have the [*10] right to pursue an action on their own behalf when the cause of action accrues to the corporation." *Kondelik v. First Fidelity Bank, 857 P.2d 687, 692, 259 Mont. 446 (Mont. 1993)* (citations omitted). Regardless of any claims that Clark Fork was "in the zone of insolvency," the Court concludes that Magten's claims are appropriately considered to be derivative claims. See e.g., *Production Resources Group, L.L.C. v. NCT Group, Inc., 863 A.2d 772, 776, 792 (Del. Ch. Ct. 2004).* Under the Montana statue authorizing derivative claims against limited liability companies, such claims may only be brought by member of the company, who was a member at the time of the transaction at issue. *Mont. Code Ann. 35-8-1104(2).*

Magten contends that it has third party beneficiary standing under the Indenture, and therefore, it has standing to sue Paul Hastings regardless of the express provisions of *Section 35-8-1104(2).* While the Indenture

2007 U.S. Dist. LEXIS 2786, *10

may give Magten the right to enforce the Trust's rights, in the Court's view, it does not provide Magten with the right to bring its derivative claims on behalf of Clark Fork. Even if Magten can bring a derivative claim [*11] against Clark Fork as a creditor, Magten has not demonstrated that it was a creditor of Clark Fork at the time of the alleged transaction at issue. Thus, Magten cannot satisfy the "contemporaneous ownership" requirements of *Section 35-8-1104*, whose purpose is particularly applicable here, i.e. to prevent courts from litigating "purchased grievances." Cf. *Kaliski v. Bacot (In re Bank of N.Y. Derivative Litig.), 320 F.3d 291, 297 (2d Cir. 2003)* (discussing contemporaneous ownership provision in context of *Federal Rule of Civil Procedure 23.1* pertaining to derivative actions). Accordingly, the Court concludes, in the alternative, that Magten lacks standing to bring its derivative claims against Paul Hastings.

## V. CONCLUSION

For the reasons discussed, the Court will grant Paul Hastings' Motion For Judgment On The Pleadings.

An appropriate Order will be entered.

## ORDER

At Wilmington, this 12 day of January 2007, for the reasons set forth in the Memorandum Opinion issued this date;

IT IS HEREBY ORDERED that Defendants' Motion For Judgment On The Pleadings (D.I. 86) is **GRANTED.**

Joseph J. Farnan, [*12] Jr.

UNITED STATES DISTRICT JUDGE

# EXHIBIT 5

LEXSEE 2006 DEL. SUPER. LEXIS 473



Cited
As of: Feb 21, 2007

### LEHMAN BROTHERS BANK, FSB, Appellee, v. STATE BANK COMMISSIONER, Appellant,

#### C.A. No. 05A-06-004-FSS

#### SUPERIOR COURT OF DELAWARE, NEW CASTLE

*2006 Del. Super. LEXIS 473*

**August 28, 2006, Submitted**
**November 30, 2006, Decided**

**NOTICE:** [*1] THIS OPINION HAS NOT BEEN RELEASED FOR PUBLICATION. UNTIL RELEASED, IT IS SUBJECT TO REVISION OR WITHDRAWAL.

**PRIOR HISTORY:** Upon Appeal From the State Bank Commissioner's Decision.

**DISPOSITION:** AFFIRMED.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Appellee, the Delaware State Bank Commissioner (Commissioner), upheld a tax assessment and penalties imposed under the bank franchise tax against appellant bank. The bank appealed.

**OVERVIEW:** The bank challenged the tax imposed. Alternatively, it alleged that the tax violated both the Commerce and Due Process Clauses. But the tax covered all the bank's business activities relating to mortgages on the bank's books in the State of Delaware, and not the bank's activities through its subsidiary in Colorado, the decision-making in New York, or the interest earned while the mortgages were in New York. Hence, it was properly assessed. As to the constitutional arguments, the bank failed to show that the tax was not fairly apportioned or that no rational relationship existed between the tax and the income. Also, the bank failed to prepare a separate Delaware balance sheet accounting for the money earned in Delaware. Second, nothing showed that the tax was duplicative. Third, because the bank was not headquartered in Delaware, it was not entitled to use separate accounting under *Del. Code Ann. tit. 5, § 1101(b)*, and no evidentiary error resulted from the exclusion of the bank's expert testimony or the denial of the use of the separate accounting methodology presented by its accountants. Finally, the Commissioner properly refused to abate the bank's taxes or penalties.

**OUTCOME:** The judgment was affirmed.

**COUNSEL:** Stanford L. Stevenson, III, Esquire, Morris Nichols Arsht & Tunnell, Wilmington, Delaware, Attorney for Plaintiff.

Thomas P. McGonigle, Esquire, Wolf Block Schorr and Solis-Cohen, LLP, Wilmington, Delaware, Attorney for Defendant.

**JUDGES:** Fred S. Silverman, Judge.

**OPINION BY:** Fred S. Silverman

**OPINION:**

2006 Del. Super. LEXIS 473, *1

**OPINION and ORDER**

**SILVERMAN, J.**

This is an appeal from a decision by the State Bank Commissioner upholding a tax assessment and penalties imposed under the bank franchise tax. The appellant, a federal bank chartered in Delaware, challenges the tax's applicability, as most of the Bank's employees, especially its senior management, work in New York. Alternatively, the Bank contends that the tax violates federal Commerce and *Due Process Clauses*.

A common thread running through the Bank's argument is its insistence that it is a multi-state operation and Delaware taxed all of its operations, regardless of where they happened. Thus, the Bank repeatedly accuses Delaware of overreaching. That argument [*2] exaggerates what Delaware taxed. The bank franchise tax covers all the Bank's business activities relating to the mortgages, but only while the mortgages were on the Bank's books here. Delaware, for example, did not tax the Bank's activities through Aurora in Colorado, the decision-making in New York or the interest earned while the mortgages were in New York.

**I.**

Although the parties disagree about their legal significance, they basically agree about the facts. As discussed in the Commissioner's decision and presented below, Lehman Brothers Holdings, Inc., has operated a mortgage business since the 1980s. LBH's executive office and senior management were in New York. LBH bought or acquired mortgages issued by independent mortgage lenders and brokers, or by its subsidiary mortgage company, Aurora Loan Services, Inc. LBH did not deal directly with the borrowers. Before 1999, LBH's mortgage business was funded by unsecured bank loans, commercial paper, or short and long-term repurchase agreements. This funding was unstable since the markets could collapse, causing a financial crisis for LBH. Due to this instability, for several years LBH actively sought a federal savings bank. [*3] Through a federal savings bank, LBH would gain access to Federal Home Loan Bank funds. FHLB funding is more stable and efficient than market funding. Also, a FHLB would lend more money on the dollar, up to 70%.

Around July 1, 1999, LBH acquired Delaware Savings Bank, FSB, changing the Bank's name to Lehman Brothers Bank, FSB. The Bank's Federal Stock Charter became effective on June 30, 1999, making the Bank a federally chartered savings bank, organized under the Federal Home Owner's Loan Act, Section 5. Being organized under HOLA, the Bank was subject to regulation and supervision by the United States Office of Thrift Supervision. Also, a federal charter gave the Bank access to the FHLB, which gave the Bank the ready source of funds LBH wanted. For the tax years in question, 2000-2003, the Bank's home office, designated in its federal charter, was Wilmington, Delaware, and the Bank's sole retail banking office was in Wilmington. Delaware's home office designation meant that the Bank could access funds through the FHLB in Pittsburgh.

As stated in the record, the Bank's income came primarily from the mortgage banking business, but the Bank did have an unprofitable retail banking office [*4] for personal banking, including savings and checking accounts. As provided above, LBH primarily used the Bank to obtain federal funds and buy mortgages.

To fund mortgages, the Bank had two primary sources: money generated by CD sales and loans made by the FHLB in Pittsburgh. Since only a bank can accept deposits and issue CDs, the CDs were issued in the Bank's name and deposited at the Bank. Also, the Bank, not LBH, could receive loans from the FHLB. Therefore without the Bank, LBH would not have had access to FHLB loans nor be could it issue CDs. After LBH acquired the Bank, up to 90% of the funds for its mortgage business came from the Bank. Of this 90%, 25-30% came from the CDs, and 50-60% from the FHLB loans.

Using the FHLB loans and proceeds from CD sales, the Bank obtained mortgages from three sources. The Bank obtained some mortgages by buying residential mortgage pools. The Bank would buy a group of these mortgages that were already issued and funded.

Alternatively, the Bank originated mortgage loans directly, either through a broker or correspondent channel. With a broker, a borrower who wanted a mortgage would go to LBH's subsidiary, Aurora. Aurora, under the Bank's guidelines, [*5] would review the loan and approve the borrower's credit and the mortgage. Aurora's services usually took place in Colorado. For an Aurora mortgage settlement, the Bank, through its funding desk in New York, would wire the funds to Aurora. The funds came to the funding desk from the

2006 Del. Super. LEXIS 473, *5

Bank in Delaware through CDs and FHLB funds, as explained above. These mortgages were funded by the Delaware Bank and in the Bank's name. Therefore, the Bank held these mortgages.

Otherwise, when the Bank bought a mortgage through a correspondent channel, another lender would underwrite and fund the loan. The lender held that mortgage. Then, the lender would sell the mortgage to the Bank, through Aurora. Again, the Bank would then hold the mortgage.

In all three situations, the Bank held the mortgages in Delaware. Normally, the Bank would keep the mortgages for 45-60 days, with the mortgages staying on the books in Delaware, generating interest income for the Bank. As the Bank's representative testified:

> [W]e sent the money to Delaware because that's where our main operating--that's where our operating account was....[I]t has to hit the books and records somewhere. It can't really hit your books [*6] and records in New York. It has to hit your books and records in the bank.

During these 45-60 days, the Bank received about 4% in interest income, amounting to millions of dollars. According to the Bank, this interest income comprised 97-98% of the Bank's total income. The Bank then "sold" the mortgages to LBH, realizing no profit on the transfer. As discussed below, LBH is challenging the tax Delaware indirectly imposed on the income earned by the Bank while the mortgages were held in Delaware.

As mentioned, however, most of the Bank's management was located in New York. To conduct the mortgage banking business, 20-25 full-time employees and 66 "dual employees" were in New York. These "dual employees" held positions with the Bank, and the Bank reimbursed LBH for their services. Also, the Bank had 24 "dual employees" in Colorado who were on Aurora's payroll. These Colorado employees followed the Bank's guidelines when approving mortgages, and the Bank reimbursed Aurora for these employees' services.

## II.

For each year at issue, the Bank filed a franchise tax report. For the years 2000-2002, the Bank filed under *5 Del. C. § 1101 (a)*, n1 as a [*7] banking organization

with its principal place of business in Delaware. The Bank claimed a 50% income deduction on its franchise tax report, using a line 4(b) deduction. Line 4(b) allows a banking organization to deduct "[n]et operating income before taxes verifiable by documentary evidence from any...branch within the United States pursuant to *§ 771* of Title 5..., which is derived from business activities carried on outside the State and subject to income taxation under the laws of another state...." The Bank, however, failed to provide the "documentary evidence" specified in *5 Del. C. § 1101(a)(1)*.

> n1
>
> A franchise tax is hereby imposed on the "taxable income" of banking organizations and trust companies...."

In 2002, the Commissioner requested the required documentation. After repeated requests with no response, the Commissioner finally notified the Bank that its 2000-2002 tax returns were deficient and recalculated the Bank's tax liability, without the line 4(b) deduction. [*8] The Commissioner computed the Bank's franchise tax assessments, not including penalties as:

. $ 3,209,996 for 2000;

. $ 4,936,270 for 2001;

. $ 7,715,354 for 2002; and

. $ 11,577,586 for 2003.

The Commissioner also assessed late payment penalties amounting to $ 14,515,474 for 2000-2003, and also another penalty of $ 5,251.74 for each day after May 20, 2005 that the assessments remain unpaid.

The Bank disputed the assessment, and the Commissioner sent a notice initiating a proceeding to determine the Bank's franchise tax for 2000-2002. n2 Meanwhile, the Bank filed its 2003 tax return without claiming a 4(b) deduction. Instead, the Bank reported dramatically less income than the previous years, relying on *5 Del. C. § 1101(b)*. n3 The Commissioner then sent the Bank another notice initiating proceedings, this time

to determine tax liability for the 2003 tax year.

n2

> *29 Del.C. § 10122* ("Whenever an agency proposes to proceed for a case decision, it shall give 20 days' prior notice to all parties....").

n3

> "A franchise tax is hereby imposed on the 'taxable income' of federal savings banks not headquartered in this State but maintaining branches in this State, verifiable by documentary evidence."

[*9]

In September 2004, the Bank recomputed the franchise tax owed for the years at issue, based on amended reports prepared by its accountants, Ernst & Young, LLP. And, the Bank asked for refunds. These amended returns were prepared on the premise that the Bank was not headquartered in Delaware but instead should be treated as a branch. The Commissioner initially rejected the recalculations and denied refunds. At the Bank's request, an evidentiary hearing on all the assessments was held on September 30, 2004, before the Commissioner.

In his decision, dated May 20, 2005, the Commissioner upheld the deficiencies and penalties, and he further found that the franchise tax did not violate Delaware law, and the federal Commerce or *Due Process Clauses.* On June 10, 2005, the Bank filed a timely Notice of Appeal with this court. The Bank does not challenge the administrative proceedings' procedural correctness.

### III. Standard of Review

This is on appeal from the State Bank Commissioner's Decision. The Commissioner's factual findings will be upheld if they are supported by substantial evidence. n4 Questions of law are reviewed *de novo.* n5 In other words, the court will apply the facts

[*10] as the Commissioner found them to be, to the law as the court finds it to be, and in that way decide the appeal.

n4

> *29 Del. C. 10142(d). See also Public Water Supply Co. v. DiPasquale, 735 A.2d 378, 380-81 (Del. 1999).*

n5

> *Bd. of Educ. of Smyrna School Dist. v. DiNunzio, 602 A.2d 85, 93 (Del. 1990). See also State Dept. of Correction v. Worsham, 638 A.2d 1104, 1106 (Del. 1994); Public Water, 735 A.2d at 380-81.*

### IV. Delaware's Franchise Tax

The Bank vehemently argues that it is not a Delaware domiciliary, as it is federally chartered, and therefore, neither legally nor commercially domiciled in the state. Instead, the Bank contends that it is headquartered, and also commercially domiciled, in New York, meaning that the Bank would pay less franchise taxes. Alternatively, the Bank contends its mortgage activity was conducted outside Delaware, and therefore, Delaware cannot include [*11] this out-of-state activity when computing the bank franchise tax.

A franchise tax generally is a tax on an entity for the right or privilege of doing business or exercising its franchise in a state. n6 While it is a tax on doing business, the tax is based on the "taxable income" of corporations or banking organizations doing business in the state. n7 Franchise taxes "are not placed upon a particular corporate business or transaction, but upon the privilege of doing business as a corporation and exercising corporate powers for the purpose of producing a profit." n8 "The term 'doing business' is not uniformly defined in the cases, and its meaning will vary dependent on the

Case 1:07-cv-00002-JJF    Document 25-6    Filed 02/22/2007    Page 6 of 18

Page 5
2006 Del. Super. LEXIS 473, *11

situation." n9

n6

Pacific Co. v. Johnson, 285 U.S. 480, 501, 52 S. Ct. 424, 76 L. Ed. 893 (1932). See also Martin v. Producers Pipe Line Co., 113 F.2d 817, 818 (6th Cir. 1940).

n7 5 Del. C. § 1101

n8

Broadmoor-Kingsport Apartments, Inc. v. State, 686 S.W.2d 70, 72 (Tenn. 1985). Although this case deals with a corporate franchise tax, the statute included banks and was also for the privilege of doing business in the state, as is the case here. T.C.A. § 67-4-903 (1985) states, "All corporations...doing business in Tennessee, including state chartered banks and national banks doing business in Tennessee shall, without exception other than as provided herein; pay to the commissioner of revenue, annually a privilege tax."

[*12]

n9 Id.

A franchise tax is different from other taxes, including income taxes, as it is imposed for different purposes. "The [franchise] tax is not laid on property or on income, though both are regarded in measuring it." n10 A state can tax the entity's income and also impose a franchise tax since "income taxes are based on taxing individuals and entities on monies made whereas franchise taxes stem from the notion that a company should pay for the privilege of operating its business in this state." n11 Therefore, a franchise tax is still constitutional even if it taxes property that was already

subjected to taxation. n12

n10 Southern Realty Corp. v. McCallum, 65 F.2d 934, 935 (5th Cir. 1933).

n11

Miss. State Tax Com'n v. Chevron U.S.A., Inc., 650 So. 2d 1353, 1355-56 (Miss. 1995). See also Bass, 266 U.S. at 280.

n12 Bass, Ratcliff & Gretton v. State Tax Comm'n, 266 U.S. 271, 280, 45 S. Ct. 82, 69 L. Ed. 282 (1924).

[*13]

In Delaware, a bank franchise tax is "imposed on the 'taxable income' of a banking organization." n13 In its Post-Hearing Reply Brief, the Bank argues that it was not a banking organization. n14 On appeal, however, the Bank no longer disputes that it is a banking organization for franchise tax purposes, and therefore, it must pay the franchise tax. n15 Under Delaware's bank franchise tax, the taxation method depends on whether the banking organization is headquartered in Delaware. n16 Under §§ 101(4)(b) and 1101 (a), a bank whose "principal office" is based in Delaware is taxed on all taxable income, except the bank may exclude income earned from activities conducted outside Delaware by branches or subsidiaries subject to tax outside Delaware. n17 If the bank is not "headquartered" in Delaware, if it is an out-of-state bank with a branch in Delaware, it is still subject to a franchise tax, but to a limited extent. n18 For an out-of-state bank, the franchise tax is only imposed on the income from that branch in Delaware. n19 The code, though, does not define "headquartered" or "principal office."

n13 5 Del. C. § 1101(a).

[*14]

n14 Appellant's Post-Hearing Reply Brief at 13.

n15 *See 5 Del. C. § 101 (17)* and *7 Del. C. § 101.*

n16 *5 Del. C. § 1101 (a)-(b).*

n17 *5 Del. C. §§ 101(4)(b), 1101(a).*

n18 *5 Del. C. § 1101 (a)-(b).*

n19 *Id.*

## A. Headquarters

Relying on the fact that the Bank is chartered in Delaware and its home office is here, the Commissioner found that the Bank is headquartered in Delaware for franchise tax purposes. The Bank, however, draws a distinction between its home office and headquarters. Because the Bank's senior management is New York-based and some mortgage decisions come from there, the Bank concludes that the Commissioner was legally bound to hold that the Bank was headquartered in New York for franchise tax purposes.

Also, the Bank urges the court to look to the Uniform Division of Income for Tax Purposes, a model law, which defines commercial domicile as the "principal place from which the trade or business of [*15] the taxpayer is directed or managed," and the Multistate Tax Commission Regulation, another model law, which defines commercial domicile as "the place from which the trade or business is principally managed or directed." n20 As the Commissioner found, both arguments are flawed. First, Delaware has never adopted UDITPA, although it has been around for years. Second, Delaware is not a MTC member. Therefore, neither UDITPA nor MTC is controlling.

n20 UDITPA § 1(b) and MTC Regulation § 2(c)(1)

The Bank further argues that the Commissioner should look to the definition of commercial domicile provided in *30 Del. C. § 1901(2)*, which is identical to the UDITPA's definition. This also is unpersuasive. Thirty Del. C. *§ 1901(2)* deals with corporate income tax, not a bank franchise tax. Also, commercial domicile is never mentioned in *5 Del. C. § 1101.*

Meanwhile, four reasons support the Commissioner's finding that the Bank is headquartered in Delaware for franchise [*16] tax purposes. First, as a general matter, there may be several ways to characterize the Bank as an entity. Under the statute, however, there are only two possibilities: the bank is either headquartered in Delaware or the bank is located out-of-state with a branch in Delaware. For franchise tax purposes, the Bank simply cannot be a branch. At times the Bank calls itself a branch, yet it fails to show, with supporting documents, that it is a branch as defined in *5 Del. C. § 1101.*

The Commissioner correctly held that to be a branch, a bank must apply and be approved by authority of the State Bank Commissioner. n21 As noted in the record, the Bank has not received such authority. n22 Therefore, by negative inference, the Bank must have been headquartered in Delaware as it clearly was not a branch. That conclusion is also consistent with how the Bank operated. No banking took place in New York. It cannot be that the Delaware entity was a branch bank.

n21 *5 Del. C. §§ 770(a)(1), 771(a).*

n22

> The Bank once had a Delaware branch, which closed in 20 00. Also, in 2003, the Bank received authority to open a branch in Jersey City, New Jersey.

[*17]

Second, under *12 C.F.R. § 545.91(a)*, which governs the Bank, "[a]ll operations of a Federal savings association are subject to direction from the home office." If there is a change in the home office's address, the Federal savings association must apply to the OTS Regional Office. n23 Furthermore, "the principal place of business of an institution is the state in which the institution maintains its home office." n24 Although these federal definitions are not dispositive, Delaware's Supreme Court has used federal definitions when a Delaware statute did not clearly define a term. n25 The record shows that the Bank's federal stock charter designates Wilmington, Delaware as the home office, and the Bank has never applied to change this status.

n23 *12 C.F.R. § 545.91(b).*

n24 *12 C.F.R. § 925.18(b).*

n25

> *Dir. of Revenue v. CNA Holdings, Inc., 818 A.2d 953, 957-59 (Del. 2003).*

Third, a federal savings [*18] bank "may become a member only of, or secure advances from, the Federal Home Loan Bank of the district in which is located the institution's principal place of business...." n26 Here, the Bank's principal place of business in Delaware allowed LBH access to the FHLB in Pittsburgh. The FHLB in Pittsburgh does not serve New York. Therefore, it is understood that the FHLB in Pittsburgh could only serve the Bank if the Bank's place of business was in Delaware, not New York.

n26 *12 U.S.C. § 1424(b).*

Fourth, as the Commissioner held, he has traditionally "deferred to the bank's federal chartering authority to determine the location of the bank's principal office for franchise tax purposes." This is based on *5 Del. C. § 801(5),* which states that a bank is located in the State if the "organization certificate identifies an address in this State as the place at which its discount and deposit operations are to be carried out." This definition is cross-referenced in the franchise [*19] tax provisions. n27 The Bank's charter designates Wilmington as its home office. Therefore, the Commissioner correctly concluded that the Bank is headquartered in Delaware for franchise tax purposes.

n27 *5 Del. C. § 1101(a)(1)(b.2).*

## B. Taxable Income

Although the Bank dwells on "domicile," "headquarters" and "principal place of business," it ignores the fact that all its income was actually earned in and derived from sources in Delaware. Even if the Bank were not headquartered in Delaware for franchise tax

purposes, which it is, the Bank actually earned the money in Delaware. That means the income is still included in the Bank's "taxable income." For income tax purposes, there are two basic ways a state can tax: a state can tax a person or entity domiciled in the state, even on income earned outside the jurisdiction, or the state may tax nonresidents on their income derived from sources within the state. n28 Although a franchise tax is different from an income tax, the franchise [*20] tax in Delaware is calculated based on a bank's "taxable income." If Delaware could tax the income, then that income can be included in calculating the franchise tax. So, "taxable income" includes all income derived from sources in the state.

> n28 *Shaffer v. Carter, 252 U.S. 37, 57, 40 S. Ct. 221, 64 L. Ed. 445 (1920).*

The Commissioner relied on two important facts when deciding that the income was earned in Delaware. First, the Bank actually received the interest income in Delaware, as that is where the income "hit the books." Second, the Bank obtained the funds used to generate the income through Delaware. Those funds included the money from CD sales and the FHLB loans. Without the funds from Delaware, the Bank and LBH could not have produced the income. Further, the Commissioner made it clear that after the Bank "sold" the mortgages to New York, he did not include any of the New York interest income in the franchise tax assessment. Thus, Delaware only taxed income the Bank earned in Delaware.

The Bank continually focuses [*21] on where the decisions were made and where the employees were located to reach the conclusion that none of its activities took place in Delaware. The Bank, though, tries to minimize Delaware's involvement. While the Bank emphasizes the employee's location and payroll, these employees were on the Bank's books and funded through Delaware. Ultimately, they were paid by the Bank in Delaware. The Bank also de-emphasizes the fact that the interest income was earned at the Bank in Delaware.

The lynchpin of the Commissioner's decision is the fact that the Delaware tax is only imposed on interest income earned in Delaware. In computing the franchise tax, Delaware did not include other transactions, e.g. when the mortgages were purchased outside Delaware or any interest earned after their transfer to LBH in New

2006 Del. Super. LEXIS 473, *21

York. n29 As described above, what is done within the state's own borders can be taxed. n30 Here, Delaware only taxed what happened within the state. Delaware taxed the mortgage interest, for franchise tax purposes, only when the mortgages were held by and on the books at the Delaware Bank. Also, the funds used to purchase the mortgages came from the Bank. The Bank marshaled the FHLB [*22] funding received in Delaware with money earned from the CD sales in Delaware and channeled it to the borrowers. Therefore, the taxed income was earned in Delaware.

n29

> Transcript of hearing pgs. 40-41. Answers by Mr. Slomka, the Bank's CEO: "And so as I said, it's about 45 to 60 days on average of the loans we have sitting in our portfolio... We earn our approximate 4 percent net interest margin on them during that time and then sell them over to the holding company.
>
> Q: Is it the interest on the mortgages held for that 45-day period that comprises the bulk of the income of the bank?
>
> A: That's correct."

n30

> *Stephan v. State Tax Comm'r, 245 A.2d 552, 554 (Del. 1968); Guaranty Trust Co. v. Virginia, 305 U.S. 19, 23, 59 S. Ct. 1, 83 L. Ed. 16 (1938).*

As the Commissioner determined the tax was only on activities that occurred in Delaware, it was unnecessary to determine where the Bank is domiciled. But if the case turned on the Bank's domicile, there [*23] is much to commend Delaware as the Bank's domicile. The Bank kept its home and its most valuable property in Delaware, as discussed above.

## V. Constitutional Arguments

The Bank also argues that Delaware cannot tax all the Bank's interest income, as doing so violates the Commerce and *Due Process Clauses.* Under the former, the Bank's only takes issue with one prong of the analysis, described below. The Bank contends that the tax is not fairly apportioned. Under the *Due Process Clause,* the Bank argues no rational relationship exists between the tax and the income. Under both clauses, the argument is that the Bank "earned nearly all of its income from activities conducted entirely outside of Delaware, principally from its mortgage banking activities conducted in New York," and therefore, Delaware cannot tax the interest income.

When reviewing a statute, the court presumes the statute is valid unless it clearly contravenes a constitutional provision. n31 A strong presumption for validity exists for state taxing statutes. n32 Additionally, tax assessments by the proper taxing authority are considered presumptively valid. n33 "[I]t is to be presumed that governmental authority has [*24] been exercised correctly and in accordance with the law." n34

n31

> *McClelland v. Mayor and Council of Wilmington, 39 Del. Ch. 114, 159 A.2d 596, 601 (Del.Ch. 1960). See also State v. Wickenhoefer, 22 Del. 120, 6 Penne. 120, 64 A. 273, 276-77 (Del. 1906); Davies Warehouse Co. v. Bowles, 321 U.S. 144, 153, 64 S. Ct. 474, 88 L. Ed. 635 (1944); Pacific States Box & Basket Co. v. White, 296 U.S. 176, 185, 56 S. Ct. 159, 80 L. Ed. 138 (1935).*

n32

> *Kunkel's Estate v. U. S., 689 F.2d 408, 424 (3rd Cir. 1982). See also Estate of Kunze v. C.I.R., 233 F.3d 948, (7th Cir. 2000).*

n33

> Delaware Racing Ass'n v. McMahon, 340 A.2d 837, 840 (Del. 1975). See also In re AWB Associates, G.P., 144 B.R. 270 (E.D.Pa. 1992).

n34 Id.

The challenger then has the heavy burden to overcome these presumptions. n35 Under both the Commerce and Due Process Clauses, when a state has chosen an apportionment method, an objecting taxpayer has the burden to demonstrate [*25] by "'clear and cogent evidence,' that 'the income attributed to the State is in fact out of all appropriate proportions to the business transacted...in that State, or has led to a grossly distorted result.'" n36 Also, if two states are taxing the income, a taxpayer has to show that this state is the one that was at fault in the constitutional sense. n37

n35 CNA Holdings, 818 A.2d at 959.

n36

> Oklahoma Tax, 514 U.S. at 195 (quoting Moorman Mfg. Co. v. Bair, 437 U.S. 267, 274, 98 S. Ct. 2340, 57 L. Ed. 2d 197 (1978)).

n37 Moorman, 437 U.S. at 267-68.

The Commissioner found, after looking at each argument, that the Bank did not meet its burden of proof. First, the Bank failed to prepare a separate Delaware balance sheet accounting for the money earned in Delaware. For example, the Commissioner found that the Bank "did not consider the interest that the home office should charge to the mortgage operation because the home office was the source of deposit funds [*26] . . . and FHLB borrowings."

Second, the Bank failed to demonstrate exactly what was allegedly being taxed in other states. The Bank argues that the franchise tax subjects the Bank to multiple taxation, but fails to show how. The Bank, through Pricewaterhouse Cooper's Separate Accounting Review, establishes that it is paying taxes in other jurisdictions, but does not layout the kind of tax is being imposed. For example, the Bank does not say whether the other states taxed the same mortgage interest income or if they taxed other transactions, such as an origination fee or transfer fee.

Different states taxing different transactions is constitutional. n38 For example, a property tax and income tax on the same corporate property is not double taxation. n39 Similarly, a franchise tax and income tax on the same property is also not double taxation." n40 Therefore, if the other states imposed an income tax, as opposed to a franchise tax, the franchise tax is valid. Nothing in the record reveals that Delaware is taxing the same thing that another state is taxing. The Bank also failed to prove that Delaware was at fault for any duplicative tax. n41 Thus, the Bank has not met its burden to [*27] show that the tax is constitutional.

> n38 Indian Motorcycle Co. v. U.S., 283 U.S. 570, 574, 51 S. Ct. 601, 75 L. Ed. 1277 (1931).

> n39 State of Tennessee v. Whitworth, 117 U.S. 129, 135-37, 6 S. Ct. 645, 29 L. Ed. 830 (1886).

n40

> Mississippi State Tax Com'n v. Chevron U.S.A., Inc., 650 So.2d 1353, 1355 (Miss. 1995).

n41

> See, e.g., Oklahoma Tax, 514 U.S. at 195-96 and Moorman, 437 U.S. at 277.

## A. Commerce Clause

The Commerce Clause, Article I, § 8, clause 3,

expressly authorizes Congress to "regulate Commerce...among the several States." Although this is an "affirmative grant of power," the Supreme Court has consistently held that the Commerce Clause contains a negative implication, known as the dormant Commerce Clause. n42 Concerned with the national economy, the dormant Commerce Clause prohibits certain state actions that interfere with interstate commerce. n43

n42

> Oklahoma Tax Comm'n v. Jefferson Lines, Inc., 514 U.S. 175, 179-180, 115 S. Ct. 1331, 131 L. Ed. 2d 261 (1995).

[*28]

n43

> South Carolina State Highway Dept. v. Barnwell Brothers, Inc., 303 U.S. 177, 185, 58 S. Ct. 510, 82 L. Ed. 734 (1938).

Some state taxes impermissibly interfere with interstate commerce, and therefore encroach on the regulatory authority granted by Congress. n44 The Supreme Court, however, has repeatedly held that the Commerce Clause's purpose is not to "relieve those engaged in interstate commerce from their just share of state tax burden...." n45 Therefore, state taxation is only prohibited when it imposes a burden on interstate commerce. n46 A burden exists if the tax subjects interstate commerce to an unreasonable risk of multiple taxation. n47 Even so, some duplicative taxes are tolerable because all states do not follow identical taxation methods. n48 Simply because some duplicative taxes exist does not, by itself, render a state's tax unconstitutional. n49

n44 Oklahoma Tax, 514 U.S. at 179-80.

n45

> Id. at 182 (quoting Western Live

> Stock v. Bureau of Revenue, 303 U.S. 250, 254, 58 S. Ct. 546, 82 L. Ed. 823 (1938)).

[*29]

n46 Quill, 504 U.S. at 309-10.

n47 Moorman, 437 U.S. at 288.

n48 Id. at 278.

n49 Id.

Again, when challenging a statute, the taxpayer carries the burden. Not only must the taxpayer prove that the tax is unconstitutional, but also must show that this state is the one at fault. To determine a statute's constitutionality under the dormant Commerce Clause, the Supreme Court has consistently applied the *Complete Auto*, four-part test. n50 This test upholds a tax as long as it is "[1] applied to an activity with a substantial nexus with the taxing State, [2] is fairly apportioned, [3] does not discriminate against interstate commerce, and [4] is fairly related to the services provided by the State." n51 The parties agree that *Complete Auto* controls here.

n50 Oklahoma Tax, 514 U.S. at 182.

n51

> Quill, 504 U.S. at 311 (citing Complete Auto Transit, Inc. v. Brady, 430 U.S. 274, 279, 97 S. Ct. 1076, 51 L. Ed. 2d 326 (1977)).

[*30]

As mentioned above, the Bank contends that the bank franchise tax violates the Commerce Clause because the tax is not fairly apportioned. The Bank insists that Delaware cannot tax 100% of the Bank's income, since none of its income generating activities occurred in Delaware. Also, by taxing all the Bank's income, the Bank contends that Delaware is subjecting the Bank to multiple taxation.

**1. Substantial Nexus**

2006 Del. Super. LEXIS 473, *30

Under the *Complete Auto* test's first prong, a substantial nexus must exist with the taxing state. n52 The Commerce Clause's nexus requirement can be met if the taxpayer has physical presence in the state. n53 This prong is also satisfied if the taxpayer conducts activities in the taxing state that "substantially contributed to the taxpayer's ability to maintain operations in the taxing state." n54

n52 *Id.*

n53 *Id. at 312.*

n54

*J.C. Penney Nat. Bank v. Johnson, 19 S.W.3d 831, (Tenn. Ct. App. 1999)* (citing *Tyler Pipe Industries, Inc. v. Washington State Dept. of Revenue, 483 U.S. 232, 250-51, 107 S. Ct. 2810, 97 L. Ed. 2d 199 (1987)* and *Scripto, Inc. v. Carson, 362 U.S. 207, 210-12, 80 S. Ct. 619, 4 L. Ed. 2d 660 (1960)).*

[*31]

The Bank does not deny its nexus to Delaware, even for Commerce Clause purposes, since the Bank is physically present here. Also, the Bank's Delaware activities, such as accepting CD deposits and accessing FHLB loans, substantially furthered the Bank's mortgage business, contributing over 90% of the funds for it.

**2. Fair Apportionment**

In analyzing *Complete Auto's* second prong, the court determines "whether a tax is fairly apportioned by examining whether it is internally and externally consistent." n55 As mentioned, this is the one prong challenged by the Bank. For internal consistency, the tax must be such that if applied by every jurisdiction, there would not be multiple taxation. n56 "Thus, the internal consistency test focuses on the text of the challenged statute and hypothesizes a situation where other States have passed an identical statute." n57 If every state's franchise tax included mortgage interest only when its banks held the mortgages, there would not be multiple taxation. Therefore, the internal consistency test is met.

n55 *Goldberg v. Sweet, 488 U.S. 252, 261, 109 S. Ct. 582, 102 L. Ed. 2d 607 (1989).*

[*32]

n56 *Container Corp. of Am. v. Franchise Tax Bd., 463 U.S. 159, 169, 103 S. Ct. 2933, 77 L. Ed. 2d 545 (1983).*

n57 *Goldberg, 488 U.S. at 261.*

"The second and more difficult requirement is what might be called external consistency-the factor or factors used in the apportionment formula must actually reflect a reasonable sense of how income is generated." n58 "The external consistency test asks whether the State has taxed only that portion of the revenues from the interstate activity which reasonably reflects the in-state component of the activity being taxed." n59 External consistency looks at the economic justification for the state's claim upon the value taxed. n60

n58 *Container Corp., 463 U.S. at 169.*

n59 *Goldberg, 488 U.S. at 262* (citing *Container Corp., 463 U.S. at 169-70*).

n60 *Oklahoma Tax, 514 U.S. at 185.*

Again, a state is allowed to [*33] impose a tax on what happens within its borders. n61 And as mentioned above, Delaware only imposed its franchise tax on the income received in Delaware, when the interest income is on the books here. This income is attributable to Delaware since the funds from the Bank "fueled the entire mortgage banking business." Without these funds, the Bank could not buy the mortgages. And, it was the Bank that bought the mortgages. (It does not matter that someone else, LBH, told the Bank which mortgages to buy.) Then, the Bank earned money from them while they were here. Delaware did not tax any other transactions. It did not tax the Bank's activities outside Delaware, such as Aurora's lending in Colorado. Nor did it tax the loans and the interest income after they were moved from Delaware to New York.

n61 *Guaranty Trust, 305 U.S. at 23.*

Also, the Commissioner's bank franchise tax assessment is fairly apportioned because, as mentioned, an in-state bank can deduct business done outside the state, n62 and [*34] an out-of-state bank can deduct income from out-of-state branches, as long as it submits documentation to support that deduction. n63 Thus, to the extent that income is earned in a branch outside of Delaware and subject to tax in another state, it is not included in calculating Delaware's franchise tax. n64 This is a separate accounting method that taxes only what happens within the state. In other words, this method "taxes corporations that operate within its borders only on the income those corporations recognize on their own books." n65 This separate accounting method has been upheld as constitutional. n66 That is exactly what is happening here. Delaware only taxed income that the Bank recognized on its books.

> n62 *5 Del. C. 1101(a).*
>
> n63 *5 Del. C. 1101(b).*
>
> n64 *Id.*
>
> n65 *Id.*
>
> n66
>
> > *Barclays Bank PLC v. Franchise Tax Bd. of California, 512 U.S. 298, 305, 114 S. Ct. 2268, 129 L. Ed. 2d 244 (1994).*

Additionally, as mentioned above, the Bank did [*35] not meet its burden to show that the tax is unfairly apportioned. Although the Bank did show the Commissioner that it was paying taxes in other jurisdictions, the Bank failed to show exactly what was being taxed elsewhere. This is not enough to overcome the tax statutes' strong presumption of validity.

### 3. Non-Discriminatory

Under *Complete Auto's* third prong, the state cannot discriminate against interstate commerce by providing a direct commercial advantage to local business. n67

Unconstitutional discrimination typically occurs when a state taxes in-state transactions differently than out-of-state transactions. n68 The Bank does not claim the statute is discriminatory, as the tax treats the Bank like a local business. Moreover, federal law permits a state to tax a federal savings bank or national bank the same as in-state banks. n69 The Bank admittedly is taxed exactly the same as a state chartered bank.

> n67 *Boston Stock Exch. v. State Tax Comm'n, 429 U.S. 318, 329, 97 S. Ct. 599, 50 L. Ed. 2d 514 (1977).*
>
> n68 *Id.*
>
> n69 *12 U.S.C. § 548* and *§ 1464(h).*

[*36]

### 4. Fair Relationship

The *Complete Auto* test's fourth prong requires a fair relation between a tax and benefits, which means that the taxpayer has to "contribute to the cost of providing *all* governmental services, including those services from which it arguably receives no direct 'benefit.'" n70 This means "that the measure of the tax be reasonably related to the taxpayer's presence or activities in the State." n71 "The purpose of this test is to ensure that a State's tax burden is not placed upon persons who do not benefit from services provided by the State." n72

> n70
>
> > *Oklahoma Tax, 514 U.S. at 199-200* (quoting *Goldberg, 488 U.S. at 267*) (emphasis in original).
>
> n71 *Id.*
>
> n72
>
> > *Goldberg, 488 U.S. at 266-67* (citing *Commonwealth Edison Co. v. Montana, 453 U.S. 609, 627, 101 S. Ct. 2946, 69 L. Ed. 2d 884 (1981)).*

2006 Del. Super. LEXIS 473, *36

"The fourth prong of the *Complete Auto* test thus focuses on the wide range of benefits provided to the taxpayer, not [*37] just the precise activity connected to the interstate activity at issue." n73 The Supreme Court noted that "a taxpayer's receipt of police and fire protection, the use of public roads and mass transit, and the other advantages of civilized society satisfied the requirement that; the tax be fairly related to benefits provided by the State to the taxpayer." n74 These benefits though do not have to be limited to the exact services provided by the entity being taxed. n75

> n73 *Id. at 267.*
>
> n74 *Id.*
>
> n75 *Id.*

The Bank does not contest the fair relationship test because the Bank received the normal protection that a state offers, including access to courts, fire and police protection, a safe place to conduct business, as well as services furnished to the Bank's employees, such as schools, health care, and welfare benefits. Also, the Bank is authorized to lend money in accordance with Delaware laws, especially when it extends credit to others outside the state, n76 Therefore, the Bank uses Delaware [*38] law to lend money in other states, without regard to the other state's lending restrictions or usury laws. As the *Complete Auto* four-part test is met and the Bank has not met its burden to prove otherwise, Delaware's tax does not violate the Commerce Clause.

> n76 *12 C.F.R. § 560.110.*

## B. Due Process Clause

"The *Due Process Clause* 'requires some definite link, some minimum connection, between a state and the person, property or transaction it seeks to tax.'" n77

> For a State to tax income generated in interstate commerce, the *Due Process Clause of the Fourteenth Amendment* imposes two requirements: a 'minimal connection' between the interstate activities and the taxing State, and a

rational relationship between the income attributed to the State and the intrastate values of the enterprise. n78

Under this analysis, the courts look at "the fundamental fairness of governmental activity." n79 Therefore, Due Process focuses on the "notice" or "fair warning" to the taxpayer. [*39] n80

> n77
>
> > *Quill Corp. v. North Dakota, 504 U.S. 298, 306, 112 S. Ct. 1904, 119 L. Ed. 2d 91 (1992)* (quoting *Miller Brothers Co. v. Maryland, 347 U.S. 340, 344-345, 74 S. Ct. 535, 98 L. Ed. 744 (1954)).*
>
> n78
>
> > *Mobil Oil Corp. v. Comm'r of Taxes of Vermont, 445 U.S. 425, 436, 100 S. Ct. 1223, 63 L. Ed. 2d 510 (1980)* (citing *Moorman, 437 U.S. at 272-73.*
>
> n79 *Quill, 504 U.S. at 299.*
>
> n80 *Id.*

As previously mentioned, the Bank also argues that taxing all the Bank's income violates the *Due Process Clause* because no rational relationship exists between the tax and the income, as the income was earned from activities conducted outside of Delaware.

### 1. Minimal Connection

To satisfy the first requirement, only a "minimal connection" is necessary. n81 "The requisite 'nexus' is supplied if the corporation avails itself of the 'substantial privilege of carrying on business' within the State...." n82 The court must decide whether the "connections with a State are substantial enough to legitimate [*40] the State's exercise of power over him." n83 The touchstone

for the Due Process analysis is established in *International Shoe,* which requires minimum contacts. n84 Physical presence in the taxing state satisfies the minimum connection. n85 Nexus has also been found where the taxpayer merely maintains an office in the taxing state. n86

n81 *Quill, 504 U.S. at 303.*

n82

> *Mobil, 445 U.S. 425, 436, 100 S. Ct. 1223, 63 L. Ed. 2d 510* (quoting *Wisconsin v. J. C. Penney Co., 311 U.S. 435, 444-445, 61 S. Ct. 246, 85 L. Ed. 267, (1940)).*

n83 *Quill, 504 U.S. at 312.*

n84 *International Shoe Co. v. State of Washington, 326 U.S. 310, 316, 66 S. Ct. 154, 90 L. Ed. 95 (1945).*

n85 *Id. at 307-308.*

n86

> *D.H. Holmes, Ltd. v. McNamara, 486 U.S. 24, 32, 108 S. Ct. 1619, 100 L. Ed. 2d 21 (1988); National Geographic v. Cal. Equalization Bd., 430 U.S. 551, 556, 97 S. Ct. 1386, 51 L. Ed. 2d 631 (1977).*

Despite their similar language, the nexus requirements of the *Due Process* and Commerce Clauses are not identical. n87 The [*41] Commerce Clause is more stringent than the *Due Process Clause* on the state's taxation power. n88 Here, the Bank does not dispute that it has minimum contacts with Delaware, as the Bank has physical presence here, a banking office in Wilmington, and that is where its income "hits the books." As these facts satisfy the Commerce Clause's substantial nexus requirement, that is enough to satisfy the Due Process minimal connection.

N87 *Quill, 504 U.S. at 312.*

n88

> *Id. at 313. See also J.C. Penney Nat. Bank v. Johnson, 19 S.W.3d 831 (1999).*

## 2. Rational Relationship

For the second requirement, a rational relationship must exist between the taxed income and the "values connected with the taxing State." n89 Here, the court must consider "whether the taxing power exerted by the State bears fiscal relation to protection, opportunities and benefits given by the state." n90 The tax will be upheld "if by the practical operation of a tax the state has [*42] exerted its power in relation to opportunities which it has given, to protection which it has afforded, to benefits which it has conferred by the fact of being an orderly, civilized society." n91 "The simple but controlling question is whether the state has given anything for which it can ask return." n92 Usually, the privilege of carrying on a business in the state supports a tax. n93 Police and fire protection, emergency health services, public utilities, and "a safe climate to conduct business" have also been deemed enough to support the tax. n94 As analyzed above, the Bank receives many of Delaware's benefits and protection, thus satisfying this requirement.

n89

> *Moorman, 437 U.S. at 267* (citing *Norfolk & Western R. Co. v. MO. State Tax Comm'n, 390 U.S. 317, 325, 88 S. Ct. 995, 19 L. Ed. 2d 1201 (1968)).*

n90 *J.C. Penney, 311 U.S. at 444.*

n91 *Id.*

n92 *Id.*

n93 *Id.*

n94

*Bridges v. Autozone Properties, Inc.,* 900 So.2d 784, 809 *(La. 2005). See also Appeal of R.J. Reynolds Tobacco Co.,* 73 N.C. App. 475, 326 S.E.2d 911, 919 *(N.C. Ct. App. 1985); Zelinsky v. Tax Appeals Tribunal of State,* 1 N.Y.3d 85, 801 N.E.2d 840, 848, 769 N.Y.S.2d 464 (N.Y. 2003).

[*43]

The fact that the tax is "contingent upon events brought to pass without a state does not destroy the nexus between such a tax and transactions within a state for which the tax is an exaction." n95 In other words, it does not matter that the mortgages were originated or approved somewhere else nor that the funds for the mortgages came through Pittsburgh. That does not affect Delaware's ability to impose a tax.

n95 *J.C.Penney,* 311 U.S. at 444.

The Supreme Court has noted that to guarantee that the rational relationship test is further satisfied, a state should use some apportionment formula, so that the risk of multiple taxation is not unreasonable. n96 As to that, Delaware's bank franchise tax allows for extraterritorial income to be apportioned through a separate accounting method, so long as the taxpayer prepares sufficient records. n97 As previously noted, an in-state bank can exclude income earned from activities conducted outside Delaware by branches or subsidiaries. n98 Also, an out-of-state [*44] bank would only include income from the in-state branch when computing its taxes. n99 Thus, a bank is able to apportion, and exclude, out-of-state income when determining its tax liability. Thereby, the Commissioner correctly held that the bank franchise tax does not violate the *Due Process Clause.*

n96 *Mobil Oil Corp. v. Comm'r of Taxes,* 445 U.S. 425, 437-40, 100 S. Ct. 1223, 63 L. Ed. 2d 510 (1980).

n97 *5 Del. C. § 1101 (a)-(b).*

n98 *5 Del. C. §§ 101(4)(b), 1101(a).*

n99 *5 Del. C. § 1101(b).*

## VI. Other Arguments

### A. Professor Pomp's Testimony

The Bank argues that Professor Richard D. Pomp should have been allowed to testify and offer his opinion letter into evidence. During the hearing, Pomp was allowed to testify, but not about (1) the meaning of "commercial domicile" according to common usage and (2) whether the Bank's franchise tax assessment is consistent with the normative principles of state taxation. [*45] Pomp's opinion letter, which discussed these two issues, was not admitted into evidence. The Bank claims that disallowing his testimony was an abuse of discretion since Pomp was highly qualified. The Bank relies on Delaware Rules of Evidence, 702, which states that an expert witness may testify if his "specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue...."

The Commissioner ruled that this evidence was irrelevant under D.R.E. 401. n100 The Commissioner found that "commercial domicile" is a legal concept, as opposed to a fact, and testimony about normative principles of taxation did "not belong on the witness stand" because these principles do not speak directly to Delaware's laws. In the alternative, the Commissioner excluded the evidence as cumulative, since "[a]mple factual testimony existed in the record prior to Professor Pomp's proffered testimony...."

n100

"'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

[*46]

The Commissioner has discretion to exclude evidence at a hearing if it is "irrelevant, immaterial, insubstantial, cumulative and privileged evidence...."

2006 Del. Super. LEXIS 473, *46

n101 Also as the Commissioner properly noted, expert testimony expressing an opinion concerning applicable domestic law is inadmissible. n102 Therefore, the Commissioner's discretionary decision to exclude some of Professor Pomp's testimony and opinion letter was proper.

n101 *29 Del. C. § 10125(b).*

n102

> *Itek Corp. v. Chicago Aerial Industries, Inc., 274 A.2d 141, 143 (Del. 1971).*

### B. Ernst & Young Analysis

The Bank also argues that if the tax is constitutional, it should be entitled to use the separate accounting methodology presented by its accounting experts, Ernst & Young, LLP. This assessment relied on *5 Del. C. § 1101(b)*, which imposes a franchise tax on banks not headquartered in the state. As discussed above, the Commissioner correctly found that the Bank was [*47] not headquartered in Delaware, and therefore not entitled to use separate accounting under *5 Del. C. § 1101(b).* The Commissioner also concluded that the Bank did not provide enough information to support the Ernst & Young analysis, and therefore, the analysis should not be considered.

### C. Commissioner's Abatement Authority

Finally, the Bank argues that the Commissioner erred in refusing to abate the Bank's tax assessment or penalties, as both the taxes and penalties were excessive, leading to an inequitable result. The Commissioner is authorized to abate both tax assessments and penalties under *5 Del. C. § 1114(a).* n103 The Code, however, authorizes the Commissioner to abate, but does not demand that he do so. n104 Therefore, the matter is discretionary. Furthermore, as both the Commissioner and the Bank noted, the Delaware statute is almost identical to the Internal Revenue Code's abatement provision, which has been construed as a discretionary power as opposed to a duty. n105 If the Bank is correct that under the Internal Revenue Code abatement is a form of "equitable clemency," n106 the Commissioner is still

free to abate, [*48] but is not required to do so.

n103

> "The Commissioner is authorized to abate the unpaid portion of the assessment of any tax, interest, penalty, additional amount or addition to the tax, or any liability in respect thereof, which is: (1) Excessive in amount...."

n104 *5 Del. C. § 1114(a).*

n105 *I.R.C. § 6404(a)(1). Matter of Bugge, 99 F.3d 740, 744 (5th Cir. 1996). Wright v. C.I.R.,* T.C.M. 2004,-69 (2004).

n106 *Edelson v. C.I.R., 829 F.2d 828, 832 n.4 (9th Cir. 1987).*

"In order to prevail on a claim that the IRS abused its discretion in failing to abate interest, a taxpayer must prove that the IRS exercised its discretion arbitrarily, capriciously, or without sound basis in fact or law." n107 The Commissioner did not abate here because "the proposed assessment in this case was not 'excessive' in that the Bank has been assessed for the proper amount of tax and penalty due based on the correct application [*49] of the statute." Since the Commissioner has discretion on abatement and the Bank did not prove that the Commissioner exercised this authority arbitrarily, the Commissioner did not err in refusing to abate the Bank's taxes or penalties. n108

n107

> *McElroy v. C.I.R.,* T.C.M. 2004-254 (2004). *Dormer v. C.I.R.,* T.C.M.. 2004-167 (2004).

n108

> The court, however, is not adopting all the Commissioner's reasoning: that judicial notice should be taken for LBH's filings

2006 Del. Super. LEXIS 473, *49

and websites touting Delaware as its principal office and headquarters; that the only requirement under HOLA is that a state tax statute treat state and nationally chartered banks alike; and that the Bank could have avoided the tax by structuring its organization differently.

## VII.

For the foregoing reasons, the Commissioner's May 20, 2005 decision is based on substantial evidence, and it is legally sound. Therefore, it is ***AFFIRMED.***

### IT IS SO ORDERED.

/s/ Fred S. Silverman

Judge

# EXHIBIT 6

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

L.J. ZUCCA, INC.,                          :
                                           :
          Plaintiff,                 :    Civil Action No.: 1:07-cv-00002
                                           :
    v.                                    :
                                           :    Removed from Chancery Court
ALLEN BROS. WHOLESALE                      :    New Castle County, Delaware
DISTRIBUTORS INC.; COOPER-BOOTH            :    C.A. No.  2572-N
WHOLESALE COMPANY; EBY-BROWN               :
COMPANY LLC; and WESTERN SKIER,            :    JURY TRIAL DEMANDED
LTD. F/K/A KLEIN CANDY CO. LP,             :
                                           :    AFFIDAVIT OF SCOTT J. ZUCCA
          Defendants.                :    IN OPPOSITION TO COOPER-
                                           :    BOOTH'S MOTION

STATE OF NEW JERSEY          )
                             ) ss
COUNTY OF CUMBERLAND         )

      SCOTT J. ZUCCA, being duly sworn, deposes and states as follows:

      1.     I am the Treasurer of L.J. Zucca, Inc. ("Zucca"), the Plaintiff in the above-

captioned matter. I have personal knowledge of the facts set forth hereafter. I submit this

affidavit in opposition to the Motion for Judgment on the Pleadings filed by Cooper-Booth

Wholesale Company (and joined by Allen Bros.) in this case.

      2.     Zucca is a wholesale distributor of food and non-food items, including cigarettes.

Zucca's customers include, but are not limited to, liquor stores, gas stations, tobacco outlets and

convenience stores. The defendants in this case, including Cooper-Booth and Allen Bros., are

each wholesalers.

      3.     On information and belief, approximately 30 other states besides Delaware have

laws that are the same as or similar to the Delaware Unfair Cigarette Sales Act ("UCSA" or the

"Act"). New Jersey and Pennsylvania, where Zucca does business, are but two examples of states with similar statutes.

4.      In general terms, cigarettes are made by the manufacturer and then sold to a wholesaler, like Zucca and the defendants, who in turn sells them to retailers or other wholesalers. The cost of cigarettes to a retailer in Delaware, much like other states, is based on a number of factors. The cost is actually determined by the State, and the list price of the cigarettes by the manufacturer to a wholesaler is merely a starting point for the pricing.

5.      As set by the Act, the factors which comprise this cost include the list price of the cigarettes (i.e. the price at which the manufacturer sells the cigarettes to a wholesaler), less a 2% cash discount, plus the State excise tax, and a 5% presumed cost of doing business (also known as a "markup"). Delaware determines the factors that are considered in setting the cost. Some states have eliminated the 2% cash discount altogether (and so could Delaware). New Jersey is one example of a state that excludes any cash discount.

6.      In other words, there is a lot of variety in the cost to wholesalers and, in turn, the cost to retailers. As described further below, the State has established a minimum "markup" that is presumed to be 5%, but could be as low as 1.02% if a wholesaler has applied to show a lower cost of business than the presumed cost. However, a wholesaler can sell above the 1.02% and frequently does; with lower sales volume, it does not make economic sense for a wholesaler to sell at the minimum price at which it is able to sell.[1]

7.      The same is true for manufacturers. They may set a variety of different prices depending on the wholesaler and its performance under various programs. These factors can and

---

[1]      The acts complained of by Zucca in its First Amended Verified Complaint are that wholesalers are selling at less than 1.02% to retailers, and are violating the Act as a result.

do result in a variation of the ultimate price paid for cigarettes from manufacturers and can also vary from wholesaler to wholesaler.

8.      The State of Delaware has changed the cigarette excise tax a number of times, which led to a change in the selling prices of cigarettes at both the wholesale and retail levels. In this regard, in July, 2003, the Delaware state tax on cigarette sales was changed from $0.24 per pack of 20 cigarettes to $0.55 per pack of 20 cigarettes. See Exhibit A attached hereto (July 14, 2003 State of Delaware, Division of Revenue, Technical Information Memorandum 2003-01). The Governor of Delaware has just proposed a further increase of up to $1 per pack for the State excise tax on cigarettes.

9.      The State is further regulating (but not "fixing") the minimum prices at which cigarettes are sold to retailers by creating a process whereby wholesalers can apply for a lower markup. The 5% presumptive cost of doing business is established by the State of Delaware, and a wholesaler may use a lower cost of doing business if the State approves it. A wholesaler has to submit proof of a lower cost of doing business by letter to the Division of Revenue. Other wholesalers have applied to the State to sell cigarettes at wholesale/retail below the established presumption in the Act. For example, in March, 1989, Southland Corporation ("Southland") requested authorization to reduce the presumed markup to 2.6% for regular and king sized cigarettes, and to 2.7% for 100's. See Exhibit B attached hereto (December 3, 1992 Letter from Division of Revenue). Zucca applied for the same reduced markup to stay competitive. As of November 30, 1992, Southland ceased distributing cigarettes, and the Division of Revenue sent a letter notifying Zucca (and presumably other wholesalers) that the authorization it had extended was revoked and the 5% markup was once again effective until the wholesaler applied for and was granted authorization to sell below the presumed markup in the Act. See Ex. B.

-3-

10.     Zucca has submitted subsequent applications for a lower markup in order to stay competitive with other wholesalers. See, for example, Exhibit C attached hereto (Letters dated July 1, 1993 and August 27, 1998 from Zucca to the Division of Revenue). Most recently, the Division of Revenue of the State of Delaware has granted the request to use a 1.02% cost of doing business to "meet the price of a competitive wholesaler" pursuant to the Act. See Exhibit D attached hereto (Letter dated September 1, 1998 from the Division of Revenue to Zucca). This option is available to any wholesaler who believes it can sell for lower than the presumed 5% markup.

11.     The State of Delaware does not publish its wholesale and retail cigarette prices; rather, it sends a letter to affected parties whenever a change is made. See Exhibit E attached hereto (Unfair Cigarette Sales Act Memos from August 12, 1997 through July 23, 2003 from the Division of Revenue setting the presumed 5% cost of doing business, and the authorized minimum of 1.02% cost of doing business). At present, the authorized 1.02% cost of doing business (which Zucca is authorized to sell at, and presumably at least some other wholesalers are as well) is the lowest markup available. However, even within the minimum 5% (or 1.02%) market, manufacturer, wholesaler, and retailer prices vary and wholesalers frequently sell above the lowest markup that is available.

12.     When a wholesaler sells to another wholesaler or to a vending machine operator, rather than to a retailer, the calculation differs. There, the seller has to include the "basic cost of cigarettes" as defined by the Act, plus a 1% charge (unless it applies to the State for approval of a lower charge). The two different types of sales are reflected in the Memos attached as Exhibit E (demonstrating different charges for "wholesale to retail" versus "wholesale to wholesale").

-4-

13.     The State of Delaware has also taken steps to enforce its Acts and regulations
with respect to the sale and taxation of cigarettes in Delaware. For example, the State has sent
out a number of notices to cigarette wholesalers that "field investigations conducted by the
Division of Revenue have revealed that various wholesalers are providing discounts to cigarette
retailers in direct violation of the [Act]. All wholesalers are hereby directed to immediately
cease and desist from this unlawful practice....if any wholesaler is found to be conducting
business activities in violation of the [Act], appropriate and immediate action will be initiated."
See Exhibit F attached hereto (Memos from 1993 to 1997 from the State to Cigarette
Wholesalers).

14.     Further, when wholesalers complete their monthly Reports of Cigarettes and
Cigarette Tax Stamps ("Reports"), they have to execute the documents under penalty of perjury
and attest that they are in compliance with the Act. See Exhibit G (Sample Report) attached
hereto. As a result, each wholesaler is verifying monthly that it is aware of the law and any
penalties for failure to abide by it.

15.     Additionally, salesmen at Zucca have reported a number of violations of the Act
to the State's Office of the Attorney General. Most recently, these reports have been made to
Ray Benton, Deputy Attorney General. Mr. Benton told Zucca that he telephoned the
wholesalers that employed the salesmen who have made the violations. On information and
belief (as told to Zucca by the Attorney General's office), the Attorney General's office was
reassured by the violators that the "miscalculations" would be corrected. In other words, the
State has been active in policing the enforcement of the Act.

16.     The State of Delaware's Division of Revenue has also periodically requested
documents from wholesalers that list the retail and wholesale customers to ensure compliance

-5-

with its cigarette acts. <u>See</u> Exhibit H attached hereto (Letter of September 1, 1999). The Attorney General's Office has delisted companies that are not in compliance with the requirements for Cigarette Manufactured Brands and Brand Families Approved for Stamping and Sale. <u>See</u> Exhibit I attached hereto (Letters of December 4, 2003 and December 22, 2003).

17.    As alleged in the First Amended Verified Complaint, due to the illegal rebating activity that is occurring, Zucca has lost and will continue to lose business. If illegal rebating is left unrestrained, Zucca's business will continue to be severely injured.

18.    Zucca has lost, and continues to lose, customers as a result of unlawful rebating in violation of the Act.

SCOTT J. ZUCCA

SWORN TO AND SUBSCRIBED before me this *22* day of February, 2007.

NOTARY PUBLIC
My Commission Expires: *3-17-10*

-6-

# EXHIBIT A



STATE OF DELAWARE
DEPARTMENT OF FINANCE
DIVISION OF REVENUE
CARVEL STATE BUILDING
820 N. FRENCH STREET
PO Box 8763
WILMINGTON, DELAWARE 19899-8763

## DIVISION OF REVENUE

## TECHNICAL INFORMATION MEMORANDUM 2003-01

DATE:  July 14, 2003

SUBJECT:  CIGARETTE TAX INCREASE

CONTACT:  Jeanne Davis, Phone (302) 577-8448, jeanne.davis@state.de.us
Fax     (302) 577-8662

House Bill 270 of the 142nd General Assembly amended Chapter 53 of Title 30 of the Delaware Code to provide for an increase of 31 cents to the existing cigarette tax of 24 cents per pack of 20 cigarettes.  House Bill 270 also provided for an increase of 39 cents to the existing cigarette tax of 30 cents per pack of 25 cigarettes.

This Act establishes the rate of tax to pay or to have been paid on cigarettes in possession of any person liable for payment of the tax on or after midnight July 31, 2003.

The new tax rate also applies to cigarettes in possession of any person (generally wholesalers and affixing agents) liable for the payment of the tax as of midnight July 31, 2003, which as of that date have been affixed with any Delaware tobacco product tax stamp or other indicia of payment of the tax in effect prior to the effective date of this Act.  The increase in tax is also imposed on Delaware tobacco tax stamps purchased on or before July 31, 2003, and not affixed to any cigarette pack.  The amount of the additional tax due is the difference between the new tax rate and the tax paid for Delaware cigarette stamps in their possession which are affixed or unaffixed to packs of cigarettes.

Wholesalers who are not affixing agents and who also possess a retailer license are required to inventory, report and pay the tax increase on all cigarettes in their possession on which the increased tax has not been paid in accordance with the requirements of this Technical Information Memorandum.

Between noon local time and midnight July 31, 2003, all persons liable to pay the tax will be required to conduct a floor stock inventory of Delaware stamped cigarettes and unaffixed Delaware tax stamps in their possession. For purposes of this regulation, possession means cigarettes in the physical control of which remain with the wholesaler or affixing agent including goods in transit where the title to such goods has not passed to the purchaser. The floor stock inventory requirement does not apply to retailers.

All persons liable to pay the tax must report their inventory at close of business on July 31, 2003, via fax to (302)577-8662 to the attention of Ms. Jeanne Davis, using the enclosed Form 1074M, Resident Wholesaler Dealer's Monthly Report of Cigarette & Cigarette Tax Stamps, or Form 1075M, Nonresident Wholesaler Dealer's Monthly Report of Cigarette & Cigarette Tax Stamps, reporting the number of Delaware stamped packs of cigarettes and unaffixed Delaware tax stamps in their possession which are subject to the tax increase.

On or before August 20, 2003, all persons liable to pay the tax must complete and file the enclosed Form 1074M, Resident Wholesaler Dealer's Monthly Report of Cigarette & Cigarette Tax Stamps, or Form 1075M, Nonresident Wholesaler Dealer's Monthly Report of Cigarette & Cigarette Tax Stamps, reporting the number of Delaware stamped packs of cigarettes and unaffixed Delaware tax stamps in their possession which are subject to the tax increase. The Resident or Nonresident Wholesaler Dealer's Monthly Report of Cigarette & Cigarette Tax Stamps must be accompanied by full payment of the tax increase. Please use the revised Forms 1074M or 1075M, which are enclosed.

Contact Jeanne Davis concerning the tax increase or the use of the reporting forms.

Patrick T. Carter

Director of Revenue

# EXHIBIT B



STATE OF DELAWARE
DEPARTMENT OF FINANCE
DIVISION OF REVENUE
CARVEL STATE BUILDING
820 N. FRENCH STREET
P.O. BOX 8911
WILMINGTON, DELAWARE 19899-8911

December 3, 1992

L. J. Zucca, Inc
P.O. Box 804
Vineland, NJ  08360

Dear Sir:

On March 16, 1989 Southland Corporation requested authorization to sell cigarettes at wholesale/retail below the established Delaware Unfair Cigarette Sales Act based upon documentation which supported the firm's cost of doing business to be less than five (5) percent. As a consequence, the Division of Revenue approved the application to reduce the markup to 2.6% for regular and king size cigarettes and to 2.7% for 100's. Pursuant to 30 Del. C. §2605, you applied to the Division for permission to meet competitor price and authorization was subsequently provided.

Southland Corporation has advised that as of November 30, 1992, the firm is no longer involved in the stamping and distribution of cigarettes. Therefore, effective December 3, 1992, the authorization previously extended to your firm on May 27, 1992 to reduce the markup to the level that had been provided to Southland Corporation is revoked. In computing the minimum price for wholesale and retail, you must use the 5% markup established pursuant to Section 2608, Title 6, Del. C.

If your firm desires to apply for authorization to sell cigarettes below the Delaware Unfair Cigarette Sales Act, your firm must submit to the Division of Revenue (SIB) for consideration, complete documentation showing your cost of doing business is below the statutory mandated 5%.

Sincerely,

Ron Armstrong
Chief, Special Investigations Bureau
Division of Revenue

RA/mm

# EXHIBIT C

Tobacco & Confectionery

**L.J. ZUCCA INC.**
DISTRIBUTORS

609-692-7425
1-800-552-2639
FAX 609-696-7112

760 So. Delsea Drive
P.O. Box 804
Vineland, NJ 08360

July 1, 1993

Marilyn Brisco
Tax Examiner Supervisor
State of Deleware, Div. of Revenue
Carvel State Building
PO Box 8911
820 N. French Street
Wilmington, DE  19801

Dear Ms. Brisco,

In the past we have been granted permission to sell cigarettes in
Delaware below the established price as set forth by the Deleware
Unfair Cigarette Sales Act.

Once again we are requesting this permission to meet competitive pricing.
I am enclosing a copy of an invoice from Harry Kenyon Distributors where
they gave one of our former customers a .40 cent per carton discount.

This customer will no longer purchase from us unless we can meet this
price.  I am therefore formally requesting permission to meet this
competitive discount.

I will await your reply before meeting this discounted price.  However,
I do hope to hear from you as soon as possible.

Should you have any questions, please call me at (609) 692-7425.

Respectfully,

Charles Leffler
Sales Manager

CL/j

cc:  T. Zucca
     Charles Leone

Tobacco & Confectionery



609-692-7425
1-800-552-2639
FAX 609-696-7112

760 So. Delsea Drive
Vineland, NJ 08360-4464

August 27,1998

:

Mr. David Smith
Tobacco Tax Auditor
Business Audit Bureau
State of Delaware

Dear Mr. Smith:

We wish to be able to meet our competitors lower of cost of business which is the authorized
1.02% cost of doing business.  Thank you for your consideration in this matter.

Sincerely,

Scott J. Zucca, Treasurer
L. J. Zucca Inc.

# EXHIBIT D



**STATE OF DELAWARE**
**DEPARTMENT OF FINANCE**
**DIVISION OF REVENUE**
CARVEL STATE BUILDING
820 N. FRENCH STREET
P.O. BOX 8911
WILMINGTON, DELAWARE 19899-8911

September 1, 1998

Mr. Scott J. Zucca
L.J. Zucca, Inc.
760 So. Delsea Drive
Vineland, NJ  08360-4464

Dear Mr. Zucca,

This letter acknowledges your request to sell cigarettes in the State of Delaware below the established wholesale price, as set forth by the Delaware Unfair Cigarette Sales Act.

As of this date, L.J. Zucca is authorized to use a figure of 1.02% as their cost of doing business, in order to determine a newly established wholesale price in the State of Delaware. This allows L.J. Zucca to meet the price of a competitive wholesaler in the State of Delaware, pursuant to 6 Del.C., Section 2602(8).

Should you have any questions, please feel free to contact me at (302) 577-8448.

Sincerely,

David M. Smith
Tobacco Tax Auditor
Business Audit Bureau

# EXHIBIT E



STATE OF DELAWARE
DEPARTMENT OF FINANCE
DIVISION OF REVENUE
CARVEL STATE BUILDING
820 N. FRENCH STREET
P.O. BOX 8763
WILMINGTON, DELAWARE 19899-8763

July 23, 2003

TO: Delaware Cigarette Affixing Agents

RE: Unfair Cigarette Sales Act

Following the increase in the Delaware cigarette tax effective August 1, 2003, it is determined that the minimum prices at which cigarettes may be sold at wholesale in this State using the **presumed 5% cost of doing business is as follows**:

|  | Wholesale to Retail | Wholesale to Wholesale |
|---|---|---|
| Premium Brands: | $34.22 | $32.92 |
| Generic Brands: | $31.44 | $30.25 |

The minimum prices at which the **authorized 1.02% cost of doing business** is as follows:

|  | Wholesale to Retail | Wholesale to Wholesale |
|---|---|---|
| Premium Brands: | $32.93 | $32.92 |
| Generic Brands: | $30.25 | $30.25 |

These per carton minimum prices are effective on August 1, 2003. Please feel free to contact me at (302)577-8448 should you have any questions.

Sincerely,

Jeanne Davis

Jeanne Davis
Tobacco Tax Auditor
Business Audit Bureau



STATE OF DELAWARE
DEPARTMENT OF FINANCE
DIVISION OF REVENUE
CARVEL STATE BUILDING
820 N. FRENCH STREET
P.O. BOX 8763
WILMINGTON, DELAWARE 19899-8763

April 2, 2002

TO: Delaware Cigarette Affixing Agents

RE: Unfair Cigarette Sales Act

Following the latest price increase announcement, it is determined that the minimum prices at which cigarettes may be sold at wholesale in this State using the **presumed 5% cost of doing business is as follows**:

|  | Wholesale to Retail | Wholesale to Wholesale |
|---|---|---|
| Premium Brands: | $30.97 | $29.79 |
| Generic Brands: | $28.19 | $27.12 |

The minimum prices at which the **authorized 1.02% cost of doing business** is as follows:

|  | Wholesale to Retail | Wholesale to Wholesale |
|---|---|---|
| Premium Brands: | $29.79 | $29.79 |
| Generic Brands: | $27.12 | $27.12 |

Please feel free to contact me at (302)577-8448 should you have any questions.

Sincerely,

Jeanne Davis
Tobacco Tax Auditor
Business Audit Bureau



STATE OF DELAWARE
DEPARTMENT OF FINANCE
DIVISION OF REVENUE
CARVEL STATE BUILDING
820 N. FRENCH STREET
P.O. Box 8763
WILMINGTON, DELAWARE 19899-8763

October 29, 2001

TO: Delaware Cigarette Affixing Agents

RE: Unfair Cigarette Sales Act

Following the latest price increase announcement, it is determined that the minimum prices at which cigarettes may be sold at wholesale in this State using the **presumed 5% cost of doing business is as follows**:

|  | Wholesale to Retail | Wholesale to Wholesale |
|---|---|---|
| Premium Brands: | $29.73 | $28.60 |
| Generic Brands: | $26.95 | $25.93 |

The minimum prices at which the **authorized 1.02% cost of doing business** is as follows:

|  | Wholesale to Retail | Wholesale to Wholesale |
|---|---|---|
| Premium Brands: | $28.61 | $28.60 |
| Generic Brands: | $25.93 | $25.93 |

Please feel free to contact me at (302)577-8448 should you have any questions.

Sincerely,

Jeanne Davis
Tobacco Tax Auditor
Business Audit Bureau



STATE OF DELAWARE
DEPARTMENT OF FINANCE
DIVISION OF REVENUE
CARVEL STATE BUILDING
820 N. FRENCH STREET
P.O. BOX 8911
WILMINGTON, DELAWARE 19899-8911

April 26, 2001

TO: Delaware Cigarette Affixing Agents

RE: Unfair Cigarette Sales Act

Following the latest price increase announcement, it is determined that the minimum prices at which cigarettes may be sold at wholesale in this State using the **presumed (5%) cost of doing business** is as follows:

|  | Wholesale to Retail | Wholesale to Wholesale |
|---|---|---|
| Premium Brands: | $29.22 | $28.11 |
| Generic Brands: | $26.44 | $25.43 |

The minimum prices at which the **authorized 1.02% cost of doing business** is as follows:

|  | Wholesale to Retail | Wholesale to Wholesale |
|---|---|---|
| Premium Brands: | $28.11 | $28.11 |
| Generic Brands: | $25.44 | $25.43 |

Please feel free to contact me at (302) 577-8448 should you have any questions.

Sincerely,

Jeanne Davis
Tobacco Tax Auditor
Business Audit Bureau



STATE OF DELAWARE
DEPARTMENT OF FINANCE
DIVISION OF REVENUE
CARVEL STATE BUILDING
820 N. FRENCH STREET
P.O. BOX 8911
WILMINGTON, DELAWARE 19899-8911

December 18, 2000

TO: Delaware Cigarette Affixing Agents

RE: Unfair Cigarette Sales Act

Following the latest price increase announcement, it is determined that the minimum prices at which cigarettes may be sold at wholesale in this State using the **presumed 5% cost of doing business is as follows**:

|                  | Wholesale to Retail | Wholesale to Wholesale |
|------------------|---------------------|------------------------|
| Premium Brands:  | $27.78              | $26.72                 |
| Generic Brands:  | $25.00              | $24.05                 |

The minimum prices at which the **authorized 1.02% cost of doing business** is as follows:

|                  | Wholesale to Retail | Wholesale to Wholesale |
|------------------|---------------------|------------------------|
| Premium Brands:  | $26.72              | $26.72                 |
| Generic Brands:  | $24.05              | $24.05                 |

Please feel free to contact me at (302)577-8448 should you have any questions.

Sincerely,

Jeanne Davis
Tobacco Tax Auditor
Business Audit Bureau



STATE OF DELAWARE
DEPARTMENT OF FINANCE
DIVISION OF REVENUE
CARVEL STATE BUILDING
820 N. FRENCH STREET
P.O. BOX 8911
WILMINGTON, DELAWARE 19899-8911

July 31, 2000

TO:   Delaware Cigarette Affixing Agents

RE:  Unfair Cigarette Sales Act

Following the latest price increase announcement, it is determined that the minimum prices at which cigarettes may be sold at wholesale in this State using the **presumed (5%) cost of doing business** is as follows:

|                  | Wholesale to Retail | Wholesale to Wholesale |
|------------------|---------------------|------------------------|
| Premium Brands:  | $26.34              | $25.33                 |
| Generic Brands:  | $23.56              | $22.66                 |

The minimum prices at which the **authorized 1.02% cost of doing business** is as follows:

|                  | Wholesale to Retail | Wholesale to Wholesale |
|------------------|---------------------|------------------------|
| Premium Brands:  | $25.34              | $25.33                 |
| Generic Brands:  | $22.67              | $22.66                 |

Please feel free to contact me at (302) 577-8448 should you have any questions.

Sincerely,

Jeanne Davis
Tobacco Tax Auditor
Business Audit Bureau



STATE OF DELAWARE
DEPARTMENT OF FINANCE
DIVISION OF REVENUE
CARVEL STATE BUILDING
820 N. FRENCH STREET
P.O. BOX 8911
WILMINGTON, DELAWARE 19899-8911

August 30, 1999

TO:   Delaware Cigarette Affixing Agents

RE:   Unfair Cigarette Sales Act

Following the latest price increase announcement, it is determined that the minimum prices at which cigarettes may be sold at wholesale in this State using the **presumed (5%) cost of doing business** is as follows:

|  | Wholesale to Retail | Wholesale to Wholesale |
|---|---|---|
| Premium Brands: | $24.38 | $23.45 |
| Generic Brands: | $21.60 | $20.78 |

The minimum prices at which the **authorized 1.02% cost of doing business** is as follows:

|  | Wholesale to Retail | Wholesale to Wholesale |
|---|---|---|
| Premium Brands: | $23.46 | $23.45 |
| Generic Brands: | $20.78 | $20.78 |

Please feel free to contact me at (302) 577-8448 should you have any questions.

Sincerely,

David M. Smith
Tobacco Tax Auditor
Business Audit Bureau



STATE OF DELAWARE
DEPARTMENT OF FINANCE
DIVISION OF REVENUE
CARVEL STATE BUILDING
820 N. FRENCH STREET
P.O. BOX 8911
WILMINGTON, DELAWARE 19899-8911

November 24, 1998

TO:   Delaware Cigarette Affixing Agents

RE:   Unfair Cigarette Sales Act

Following the latest price increase announcement, it is determined that the minimum prices at which cigarettes may be sold at wholesale in this State using the **presumed (5%) cost of doing business** is as follows:

|  | Wholesale to Retail | Wholesale to Wholesale |
|---|---|---|
| Premium Brands: | $22.53 | $21.67 |
| Generic Brands: | $19.75 | $19.00 |

The minimum prices at which the **authorized 1.02% cost of doing business** is as follows:

|  | Wholesale to Retail | Wholesale to Wholesale |
|---|---|---|
| Premium Brands: | $21.68 | $21.67 |
| Generic Brands: | $19.00 | $19.00 |

Please feel free to contact me at (302) 577-8448 should you have any questions.

Sincerely,

David M. Smith
Tobacco Tax Auditor
Business Audit Bureau



STATE OF DELAWARE
DEPARTMENT OF FINANCE
DIVISION OF REVENUE
CARVEL STATE BUILDING
820 N. FRENCH STREET
P.O. BOX 8911
WILMINGTON, DELAWARE 19899-8911

August 7, 1998

TO: Delaware Cigarette Affixing Agents

RE: Unfair Cigarette Sales Act

Following the latest price increase announcement, it is determined that the minimum prices at which cigarettes may be sold at wholesale in this State using the **presumed (5%) cost of doing business** is as follows:

|                  | Wholesale to Retail | Wholesale to Wholesale |
|------------------|---------------------|------------------------|
| Premium Brands:  | $17.90              | $17.22                 |
| Generic Brands:  | $15.12              | $14.54                 |

The minimum prices at which the **authorized 1.02% cost of doing business** is as follows:

|                  | Wholesale to Retail | Wholesale to Wholesale |
|------------------|---------------------|------------------------|
| Premium Brands:  | $17.22              | $17.22                 |
| Generic Brands:  | $14.55              | $14.54                 |

Please feel free to contact me at (302) 577-8448 should you have any questions.

Sincerely,

David M. Smith
Tobacco Tax Auditor
Business Audit Bureau



STATE OF DELAWARE
DEPARTMENT OF FINANCE
DIVISION OF REVENUE
CARVEL STATE BUILDING
820 N. FRENCH STREET
P.O. BOX 8911
WILMINGTON, DELAWARE 19899-8911

September 1, 1997

TO: Delaware Cigarette Affixing Agents

RE: Unfair Cigarette Sales Act

Following the latest price increase announcement, it is
determined that the **minimum** prices at which cigarettes may be
sold at wholesale in this State using the presumed cost of doing
business is as follows:

|                 | Wholesale to Retail | Wholesale to Wholesale |
|-----------------|---------------------|------------------------|
| Premium Brands: | $16.00              | $15.39                 |
| Generic Brands: | $13.22              | $12.71                 |

The minimum prices at which cigarettes may be sold at wholesale
in this State using the **authorized 1.02% cost of doing business**
is as follows:

|                 | Wholesale to Retail | Wholesale to Wholesale |
|-----------------|---------------------|------------------------|
| Premium Brands: | $15.39              | $15.39                 |
| Generic Brands: | $12.72              | $12.71                 |

Please feel free to contact me at (302) 577-5800 Ext. 7533 should
you have any questions.

Sincerely,

David M. Smith
Tobacco Tax Auditor
Business Audit Bureau



STATE OF DELAWARE
DEPARTMENT OF FINANCE
DIVISION OF REVENUE
CARVEL STATE BUILDING
820 N. FRENCH STREET
P.O. BOX 8911
WILMINGTON, DELAWARE 19899-8911

August 12, 1997

TO: Delaware Cigarette Affixing Agents

RE: Unfair Cigarette Sales Act

Following the latest price increase announcement, it is
determined that the **minimum** prices at which cigarettes may be
sold at wholesale in this State using the presumed cost of doing
business is as follows:

|  | Wholesale to Retail | Wholesale to Wholesale |
|---|---|---|
| Premium Brands: | $15.28 | $14.69 |
| Generic Brands: | $12.50 | $12.02 |

The minimum prices at which cigarettes may be sold at wholesale
in this State using the **authorized 1.02% cost of doing business**
is as follows:

|  | Wholesale to Retail | Wholesale to Wholesale |
|---|---|---|
| Premium Brands: | $14.70 | $14.69 |
| Generic Brands: | $12.02 | $12.02 |

Please feel free to contact me at (302) 577-5800 Ext. 7533 should
you have any questions.

Sincerely,

David M. Smith

David M. Smith
Tobacco Tax Auditor
Business Audit Bureau

# EXHIBIT F



STATE OF DELAWARE
DEPARTMENT OF FINANCE
DIVISION OF REVENUE
CARVEL STATE BUILDING
820 N. FRENCH STREET
P.O. BOX 8911
WILMINGTON, DELAWARE 19899-8911

August 18, 1997

TO:  ALL CIGARETTE WHOLESALERS

RE:  SALE OF CIGARETTES TO RETAILERS

Field investigations conducted by the Division of Revenue have revealed that various
wholesalers are providing discounts to cigarette retailers in direct violation of the
Delaware Unfair Cigarette Sales Act.
**All wholesalers are hereby directed to immediately cease and desist from this
unlawful practice.**

Section 2601, Chapter 26, Title 6, Delaware Code states, "No wholesaler, with intent to
injure a competitor or competitors, or with intent to destroy or substantially lesson
competition, shall sell at wholesale, cigarettes at less than the cost to the wholesaler,
either directly or indirectly by any means or device whatever, including, but not limited
to, offering or accepting or inducing or attempting to induce a rebate in price or a
concession of any kind in connection with the sale or purchase of cigarettes".

This is to advise that if any cigarette wholesaler is found to be conducting business
activities in violation of the Delaware Unfair Cigarette Sales Act, appropriate and
immediate action will be initiated.  Section 2607(b) provides for the suspension or
revocation of the license of wholesalers found to be in violation of this chapter.

Sincerely,

David M. Smith
Tobacco Tax Auditor
Business Audit Bureau
(302) 577-5800  Ext. 7533



**STATE OF DELAWARE**
**DEPARTMENT OF FINANCE**
**DIVISION OF REVENUE**
CARVEL STATE BUILDING
820 N. FRENCH STREET
P.O. BOX 8911
WILMINGTON, DELAWARE 19899-8911

July 28, 1997

TO:          ALL AFFIXING AGENTS / WHOLESALERS

SUBJECT:     DELAWARE CIGARETTE WHOLESALERS MEETING

During recent weeks, the Business Audit Bureau has received numerous complaints that sales representatives of some cigarette wholesalers are offering discounts and/or rebates to retailers in an effort to have them change suppliers. Upon investigation, the allegations have been found to be valid. This type of activity to promote the acquisition of new customers is in direct violation of the Delaware Unfair Cigarette Sales Act (DUCSA) and will not be condoned.

Section 2601, Chapter 26, Title 6, Delaware Code states; "No wholesaler, with intent to injure a competitor or competitors, or with intent to destroy or substantially lessen competition, shall sell at wholesale, cigarettes at less than the cost to the wholesaler, either directly or indirectly by any means or device whatever, including, but not limited to, offering or accepting or inducing or attempting to induce a rebate in price or a concession of any kind in connection with the sale or purchase of cigarettes."

The Division of Revenue has reason to suspect activities of this nature in direct conflict with the DUCSA are currently prevalent in the Delaware industry. This matter is of serious concern and requires that immediate remedial steps be taken to assure future compliance.

This letter is to request all authorized Delaware Affixing Agents be present at a meeting Tuesday, August 12, 1997 at 10:00 a.m. in the Carvel State Office Building, 3rd Floor, Alcohol Beverage Control Commission Conference Room B, 820 N. French Street, Wilmington, DE 19801.

The intent of the meeting is to discuss the illegal cigarette rebating problem and to immediately correct the problems that may exist. In addition, the meeting will promote greater communication and cooperation among the cigarette wholesalers and the Division of Revenue.

Please advise by August 5, 1997 if you plan on attending.

Sincerely,

*David M. Smith*

David M. Smith
Tax Auditor
Business Audit Bureau
(302) 577-5800 Ext. 7533



STATE OF DELAWARE
DEPARTMENT OF FINANCE
DIVISION OF REVENUE
CARVEL STATE BUILDING
820 N. FRENCH STREET
P.O. BOX 8911
WILMINGTON, DELAWARE 19899-8911

DEPARTMENT OF FINANCE
DIVISION OF REVENUE

TECHNICAL INFORMATION MEMORANDUM 93-7          DECEMBER 29, 1993

SUBJECT:      TOBACCO PRODUCT WHOLESALERS

CONTACT:      RON ARMSTRONG         / - 3o2 -
              (302) 577-3320        7 3 9 - 4 5 2 7

Pursuant to the authority conferred in 30 Del. C. §5329 and §563, the Department of Finance hereby promulgates the following regulation interpreting the statutory requirement, found in 30 Del. C. §5301(14), that a "wholesale dealer" "regularly sell[]] tobacco products to others for the purpose of resale."

I.    REGULATION.

A problem has arisen whereby retail tobacco products dealers have been applying for wholesale dealer licenses in order to circumvent the Delaware Unfair Cigarette Sales Act (6 Del. C. Ch. 26) ("The Act"). Possessing the wholesale license may be thought by applicants to allow retailers to purchase tobacco products, particularly cigarettes, below the established minimum wholesaler-to-retailer price in violation of the Act. Retailers, however, do not meet the definition of "wholesale dealer" as set out in 30 Del. C. §5301(14) because they purchase tobacco products for sale to the ultimate consumer and not for resale, contrary to the statutory definition of a "wholesale dealer."

Therefore, the Division will not license a person as a "wholesale dealer" unless the person regularly sells to others who buy for the purpose of resale. "Regularly selling to others" is interpreted to mean that the person seeking or renewing a wholesale dealer license who has a minimum of five separate retail dealers willing to purchase or currently purchasing tobacco products from the person seeking the wholesale dealer license is presumed to meet the statutory definition; persons who do not meet this minimum are presumed, subject to the Exception described in Section II of this Memorandum, not to be wholesale dealers. For purposes of this Regulation, the separate retail dealers cannot be directly or indirectly owned or controlled by, or affiliated with, the person seeking the wholesale license.



STATE OF DELAWARE
DEPARTMENT OF FINANCE
DIVISION OF REVENUE
CARVEL STATE BUILDING
820 N. FRENCH STREET
P.O. BOX 8911
WILMINGTON, DELAWARE 19899-8911

TO:   CIGARETTE AFFIXING AGENTS                    APRIL 28, 1994


On December 29, 1993, the Division of Revenue advised all cigarette wholesalers of the requirements established by Technical Memorandum 93-7, i.e., provide the names of at least five (5) retail dealers by January 31, 1994.

A second letter was sent to the following cigarette wholesalers on March 1, 1994 indicating that the required information had not been received and they were provided with the date of March 15, 1994 to comply.

The Division of Revenue has revoked the business license of the following firms due to their non-compliance and, as such, cigarette affixing agents are not permitted to sell them cigarettes at wholesale prices.

G.A. Andron                          Exxon Co., USA
250-N Executive Drive                6301 Ivy Lane, Ste. 700
Edgewood, NY  11717                  Greenbelt, MD  20770

Blue Ribbon Services, Inc.           Interstate Amusements, Inc.
7400 Oxford Avenue                   301 Ruthar Drive
Philadelphia, PA  19111              Newark, DE  19711

Calotex Delaware, Inc.               John Kenyon, Inc.
P.O. Box 288                         2517 W. 6th Street
Middletown, DE  19709                Wilmington, DE  19805

Duncan Petroleum Corp.               Longs Farm, Inc.
177 Old Camden Road                  P.O. Box 440
Camden, DE  19934                    Selbyville, DE  19975


                            Sincerely,

                            Ron Armstrong

RA/mm                       Ron Armstrong
                            Chief, Special Investigations Bureau
cc:  Cig. Wholesalers       Division of Revenue



STATE OF DELAWARE
DEPARTMENT OF FINANCE
DIVISION OF REVENUE
CARVEL STATE BUILDING
820 N. FRENCH STREET
P.O. BOX 8911
WILMINGTON, DELAWARE 19899-8911

November 2, 1993

SPECIAL NOTICE

TO:    ALL DELAWARE CIGARETTE AFFIXING AGENTS

On October 18, 1993, Delaware Affixing Agents were advised
that field examinations conducted by Special Investigations
Bureau representatives have confirmed that discounts are
being offered by some wholesaler sales representatives in
violation of the Delaware Unfair Cigarette Sales Act.

The seriousness of the situation dicates that a meeting be
held with cigarette wholesalers top management represent-
atives to discuss and resolve the unlawful activities.  To
this end, the Division of Revenue has made arrangements to
conduct such a meeting on Wednesday, November 10, 1993, at
10AM, in the Alcohol Beverage Control Commission Conference
Room, 3rd Floor, state office building, in Wilmington.

It is extremely important that all Delaware Affixing Agents
have appropriate representation at the meeting if we are to
succeed in opening the lines of communication between
tobacco wholesalers and also with the Division of Revenue
representatives responsibile for enforcing the Delaware
Unfair Cigarette Sales Act.

For planning purposes, please contact me at your earliest
convenience (302) 577-3320 and advise of the name(s) and
the title of the individual(s) that will attend from your
firm.

Sincerely,

Ron Armstrong
Chief, Special Investigations Bureau
Division of Revenue



STATE OF DELAWARE
DEPARTMENT OF FINANCE
DIVISION OF REVENUE
CARVEL STATE BUILDING
820 N. FRENCH STREET
P.O. BOX 8911
WILMINGTON, DELAWARE 19899-8911

### SPECIAL NOTICE

NOVEMBER 15, 1993

TO:          ALL DELAWARE CIGARETTE WHOLESALERS

SUBJECT:     Unlawful Cigarette Sales


In response to the growing number of documented violations of the Delaware Unfair Cigarette Sales Act (DUCSA), the Division of Revenue has established a special task force of field investigators to identify and prosecute cigarette wholesalers engaged in the practice of providing discounts to cigarette retailers. To this end, a concerted effort will be made by our investigators to gather intelligence information at the various levels of distribution, to include detailed audits of wholesale and retail activities.


This letter is intended to serve notice that any cigarette wholesaler found to be in violation of the DUCSA will be subject to the penalties provided for by law. Specifically, the business license of violators will be suspended or revoked by the Secretary of Finance and, if found in violation of the DUCSA by Superior Court, shall be fined not more than $1,000 for the first offense and not more than $5,000 for each subsequent offense.


We are aware that in some instances retailers have put pressure on wholesaler representatives to sell cigarettes at an illegal price. While this clearly does not relieve the wholesaler of their responsibility under the law, this type activity is not conducive to overall compliance at all levels of the industry and will not be tolerated by the Division of Revenue.


Sincerely,

RON ARMSTRONG
Chief, Special Investigations Bureau
Division of Revenue



STATE OF DELAWARE
DEPARTMENT OF FINANCE
DIVISION OF REVENUE
CARVEL STATE BUILDING
820 N. FRENCH STREET
P.O. BOX 8911
WILMINGTON, DELAWARE 19899-8911

November 15, 1993

TO:        ALL DELAWARE CIGARETTE WHOLESALERS

During a meeting with cigarette wholesalers and Division of Revenue representatives on November 10, 1993, an agreement was reached by all of the distributors in attendance to immediately cease and desist from offering discounts to retail customers. It was understood that the failure of any wholesale to do so will result in the Division of Revenue aggressively applying the maximum punitive remedies available by law to include suspension/revocation of business licenses and fines of $1,000 to $5,000 per incident.

It is essential that all retailers be made aware cigarette price discounts will not be provided by any wholesaler. They cannot be of the view that if one wholesaler does not provide a discount, another will readily do so.

Wholesalers in attendance at the November 10th meeting requested that the Division of Revenue provide them with a letter outlining the enforcement position to be utilized in combating the violations of the Delaware Unfair Cigarette Sales Act. The enclosed letter has been prepared for that purpose and should be reproduced in sufficient copies by each wholesaler for distribution to their retail accounts.

Sincerely,

RON ARMSTRONG
Chief, Special Investigations Bureau
Division of Revenue



STATE OF DELAWARE
DEPARTMENT OF FINANCE
**DIVISION OF REVENUE**
CARVEL STATE BUILDING
820 N. FRENCH STREET
P.O. BOX 8911
WILMINGTON, DELAWARE 19899-8911

## SPECIAL NOTICE

October 18, 1993

TO:            ALL AFFIXING AGENTS/WHOLESALERS

SUBJECT:       DELAWARE UNFAIR CIGARETTE SALES ACT

During recent weeks, the Special Investigations Bureau has received a number of complaints that sales representatives of some cigarette wholesalers are offering discounts of up to 50 cents per carton to retailers in an effort to have them change suppliers. Upon investigation by our field agents, the allegations have been found to be valid. This type of activity to promote the acquisition of new customers is in direct violation of the Delaware Unfair Cigarette Sales Act (DUCSA) and will not be condoned.

An Affixing Agent or Wholesaler is prohibited from selling cigarettes at less than the "basic cost of cigarettes", as defined by the DUCSA. Section 2604(4), Chapter 26, Title 6 of the Delaware Code provides that it is unlawful for any "wholesaler to make any rebate, advertising allowance, or any other concession by any means or device whatever in connection with the sale of cigarettes, wherby the cigarettes are in effect sold below cost as herein defined, except that any reduction in cost to the seller resulting from any payment or compensation given by manufacturers of cigarettes on a uniform and nondiscriminatory basis for promotional services, and any coupons issued and ultimately redeemed by the manufacturer on the same basis may be passed on to the purchaser without violating this chapter".

This office has reason to suspect activities of this nature in direct conflict with the DUCSA are currently prevalent in the Delaware industry. This matter is of serious concern and requires that immediate remedial steps be taken to assure future compliance.

This is to advise that if any Delaware Affixing Agent is found to be conducting business activities contrary to the DUCSA, appropriate and immediate action will be initiated. Section 2607 (b,c) provides for the suspension or revocation of the license of wholesalers found to be in violation of this chapter.

The intent of this notice is to immediately correct any real or perceived problems that may exist. However, be assured that the Division of Revenue is prepared to devote the necessary resources to assure compliance with the DUCSA and to take appropriate action against licensees who fail to comply.

Sincerely,

Ron Armstrong
Chief, Special Investigations Bureau
Division of Revenue

RA/mm

# EXHIBIT G

Received 02/21/2007 03:20PM in 01:02 on line [3] for 4639 * Pg 1/1

FEB-21-2007  15:31    LJ ZUCCA INC                    1 8566926284    P.01/01

#1075

STATE OF DELAWARE
DIVISION OF REVENUE

NON-RESIDENT WHOLESALE DEALER'S
MONTHLY REPORT OF
CIGARETTE AND CIGARETTE TAX STAMPS

FOR OFFICE USE ONLY  REVENUE CODE: 0036-02

SS:

ZIP CODE:

EMPLOYER IDENTIFICATION NUMBER:

REPORT FOR MONTH OF:

IF PARTICIPATING MANUFACTURER, PRODUCTS SOLD INTO DELAWARE:  *NO  ( ) IF YES, COMPLETE SCHEDULE NPM-CIGS

| EDULE | CIGARETTE ACCOUNT | PACKAGES OF CIGARETTES | | |
|---|---|---|---|---|
| | | 20'S | 25'S | TOTAL |
| CG | NPM PRODUCTS SOLD IN DELAWARE | | | |
| A | SOLD IN DELAWARE | | | |
| B | SOLD TO DELAWARE AFFIXING AGENTS | | | |
| C | SOLD TO TAX EXEMPT ORGANIZATIONS IN DELAWARE | | | |
| | RETURNED TO MANUFACTURER (STAMPED) | | | |
| | INVENTORY BEGINNING OF MONTH (STAMPED) | | | |
| | INVENTORY END OF MONTH (STAMPED) | | | |

| STAMP ACCOUNT | STAMPS | | |
|---|---|---|---|
| | 20'S | 25'S | TOTAL |
| INVENTORY BEGINNING OF MONTH (UNAFFIXED) | $0.24 | $0.30 | |
| ON HAND AT BEGINNING OF MONTH (UNAFFIXED) | | | |
| RECEIVED FROM DELAWARE DIVISION OF REVENUE | | | |
| | SUBTOTAL | | |
| STAMPS AFFIXED DURING MONTH | ( ) | ( ) | |
| ON HAND AT END OF MONTH (UNAFFIXED) | | | |

THIS REPORT AND SCHEDULES 1075A, 1075B,
1075C AND NPM-CIGS ARE TO BE
FILED WITH THE DELAWARE DIVISION OF
REVENUE, P.O. BOX 2340, WILMINGTON, DE 19899
ON OR BEFORE THE 20TH DAY OF EACH MONTH
FOR THE PRECEDING MONTH

I hereby swear under penalty of perjury that the foregoing return has been examined by me and that all information contained herein, including any accompanying schedules or attachments, is a complete and correct, and that I/we accept a complete return for the month ending pursuant to me, I have sworn that it/is/was/is a complete and correct accordance with the DIE-TR/CIGARETTE SALE ACT, Chapter 36 of the 8 of the Delaware Code.

SIGNATURE OF LICENSEE OR OFFICER THEREOF

_____    _____    _____
                         TITLE                DATE

TOTAL P.01

# EXHIBIT H



STATE OF DELAWARE
DEPARTMENT OF FINANCE
DIVISION OF REVENUE
CARVEL STATE BUILDING
820 N. FRENCH STREET
P.O. Box 8911
WILMINGTON, DELAWARE 19899-8911

September 1, 1999

Dear Authorized Cigarette Affixing Agent,

In accordance with 30 Del.C., Ch. 53, Sec. 5321(b), "All holders of wholesale licenses shall maintain at every licensed location a list of the names and license numbers of holders of wholesale and retail licenses to whom tobacco products are sold and/or delivered".

In order to update our records, the Division of Revenue is requesting that you provide a list of the names and addresses of each of your tobacco retail and wholesale customers located within Delaware. Please provide the list to my attention in the enclosed self-addressed envelope by September 30, 1999.

The list will be due on a quarterly basis (3/31, 6/30, 9/30, 12/31) with the updated list only to include any new tobacco customers.

Please feel free to contact me at (302) 577-8448 should you have any questions.

Sincerely,

David M. Smith
Tobacco Tax Auditor
Business Audit Bureau

# EXHIBIT I



M. JANE BRADY
ATTORNEY GENERAL

**STATE OF DELAWARE**
**DEPARTMENT OF JUSTICE**

NEW CASTLE COUNTY
Carvel State Building
820 N. French Street
Wilmington, DE 19801
Criminal Division (302) 577-8500
Fax: (302) 577-2496
Civil Division (302) 577-8400
Fax: (302) 577-6630
TTY: (302) 577-5783

KENT COUNTY
102 West Water Street
Dover, DE 19904
Criminal Division (302) 739-4211
Fax: (302) 739-6727
Civil Division (302) 739-7641
Fax: (302) 739-7652
TTY: (302) 739-1545

SUSSEX COUNTY
114 E. Market Street
Georgetown, DE 19947
(302) 856-5352
Fax: (302) 856-5369
TTY: (302) 856-2500

PLEASE REPLY TO :

December 4, 2003

**VIA FIRST CLASS U.S. MAIL**
L.J. Zucca, Inc.
P.O. Box 1447
Vineland, NJ 08362-1447

RE: State of Delaware 30 Day Notice To All Affixing Agents

Dear Sir/Madam:

Pursuant to 29 *Del. C.* Ch. 60D, this letter is to notify you that effective January 9, 2004, the following companies and brands will be removed from the State of Delaware's Directory of Cigarettes Approved For Stamping and Sale (the Directory). Also, this office requests that all Affixing Agents provide to this office an E-mail address in order to receive timely 30 Day Notices of Non-Participating Manufacturer removals and additions to the Directory.

Carolina Tobacco Company
5630 S.W. Dover Lane
Portland, Oregon 97225

Brand: Roger

Citland, Ltd.
Park House 15/19 Greenhill Crescent
Watford Herts
England WD 188 PH

Brand: Boston

Pacific Tobacco
1040 Hamilton Avenue, Suite C
Duarte, CA 91010

Brand: American Liberty

L.J. Zucca, Inc.
December 4, 2003
Page 2

As you are aware, it is unlawful for any person (1) to affix a stamp to a package or other container of Cigarettes of a Tobacco Product Manufacturer or Brand Family not included in the Directory, (2) to sell, offer or possess for sale in this State, cigarettes of a Tobacco Product Manufacturer or Brand Family not included in the Directory. Sale of tobacco products not listed on the State of Delaware's Directory is in violation of both federal and state law. Violators are subject to penalties including substantial fines, seizure of product, and license revocation.

Should you have questions, please contact this office.

Sincerely

C. Drue Chichi
Deputy Attorney General

CDC/erh



**M. JANE BRADY**
ATTORNEY GENERAL

**STATE OF DELAWARE**
**DEPARTMENT OF JUSTICE**

| NEW CASTLE COUNTY | KENT COUNTY | SUSSEX COUNTY |
|---|---|---|
| Carvel State Building | 102 West Water Street | 114 E. Market Street |
| 820 N. French Street | Dover, DE 19904 | Georgetown, DE 19947 |
| Wilmington, DE 19801 | Criminal Division (302) 739-4211 | (302) 856-5352 |
| Criminal Division (302) 577-8500 | Fax: (302) 739-6727 | Fax: (302) 856-5369 |
| Fax: (302) 577-2496 | Civil Division (302) 739-7641 | TTY: (302) 856-2500 |
| Civil Division (302) 577-8400 | Fax: (302) 739-7652 | |
| Fax: (302) 577-6630 | TTY: (302) 739-1545 | |
| TTY: (302) 577-5783 | | |

PLEASE REPLY TO :

December 22, 2003

**VIA FIRST CLASS MAIL**
L.J. Zucca, Inc.
P.O. Box 1447
Vineland, NJ 08362-1447

     RE: Citland, Ltd.

To All Affixing Agents:

     Recently, this office notified you via letter dated December 4, 2003 of the State of Delaware's intention to delist Citland, Ltd, from our Directory of Cigarette Manufactured Brands and Brand Families Approved for Stamping and Sale (the Directory), on January 9, 2004. This letter serves to inform you that the State of Delaware has entered into an agreement with Citland, Ltd. that provides that Citland will not be delisted from the Directory and that Citland has agreed not to sell their tobacco product in the State of Delaware pending resolution of this matter.

     Therefore, this letter serves to notify you that although Citland, Ltd. will not be delisted as of the Effective Date previously stated, Citland's tobacco products may not be sold in the State of Delaware until further notice from this office.

     Should you have any questions, please contact this office.

                      Very truly yours,

                      C. Drue Chichi
                      Deputy Attorney General

CDC/erh

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| L.J. ZUCCA, INC., | : | |
| | : | |
| Plaintiff, | : | Civil Action No.: 1:07-cv-00002 |
| | : | |
| v. | : | |
| | : | Removed from Chancery Court |
| ALLEN BROS. WHOLESALE | : | New Castle County, Delaware |
| DISTRIBUTORS INC.; COOPER-BOOTH | : | C.A. No.  2572-N |
| WHOLESALE COMPANY; EBY-BROWN | : | |
| COMPANY LLC; and WESTERN SKIER, | : | JURY TRIAL DEMANDED |
| LTD. F/K/A KLEIN CANDY CO. LP, | : | |
| | : | |
| Defendants. | | |

### ORDER

AND NOW, this _____ day of _____, 2007, upon consideration of the

**Defendant Cooper-Booth's Motion for Partial Judgment on the Pleadings**[1] (the "Motion"),

and Plaintiff's Opposition thereto, and the Defendant's Reply in support of its Motion, it is

hereby ORDERED and DECREED that:

    (1)    The Motion is DENIED; and

    (2)    Count I of the Plaintiff's First Amended Verified Complaint is not preempted by

the Sherman Act.

                               BY THE COURT:

                               _____
                               Magistrate Judge Mary Pat Thynge

---

[1]    And joined by Allen Bros.

## CERTIFICATE OF SERVICE

I, Kimberly M. Large, Esquire, hereby certify that on February 22, 2007, I electronically

filed PLAINTIFF L.J. ZUCCA, INC'S OPPOSITION TO COOPER-BOOTH WHOLESALE

COMPANY'S MOTION FOR PARTIAL JUDGMENT ON THE PLEADINGS with the Clerk

of Court using CM/ECF which will send notification of such filing. A copy of the document was

served on the following counsel in the manner indicated:

<table>
<tr>
<td>

**VIA HAND DELIVERY**

David K. Sheppard, Esquire
1201 Market Street
Suite 800
Wilmington, DE  19801

</td>
<td>

**VIA REGULAR MAIL**

Stephen M. Orlofsky, Esquire
Kit Applegate, Esquire
210 Lake Drive East, Suite 200
Woodland Falls Corporate Park
Cherry Hill, NJ  08002

</td>
</tr>
<tr>
<td>

**VIA REGULAR MAIL**

Christopher M. Ferguson
Kostelanetz & Fink, LLP
530 Fifth Avenue
New York, New York 10036

</td>
<td>

**VIA REGULAR MAIL**

Michael J. Fioretti, Esquire
Law Offices of Chance & McCann
201 West Commerce Street
Bridgeton, New Jersey 08302

</td>
</tr>
<tr>
<td>

**VIA REGULAR MAIL**

Eric Rayz, Esquire
Kalikhman & Rayz, LLC
1051 County Line Road, Unit 102
Huntingdon Valley, PA 19006

</td>
<td>

**VIA HAND DELIVERY**

James Semple, Esquire
Morris James LLP
500 Delaware Avenue, Suite 1500
Wilmington, DE  19899

</td>
</tr>
</table>

**SAUL EWING LLP**

Kimberly M. Large (Bar # 4422)
222 Delaware Avenue, Suite 1200
P.O. Box 1266
Wilmington, DE  19899
(302) 421-6800
klarge@saul.com
Counsel for Plaintiff, L.J. Zucca, Inc.