## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

L.J. ZUCCA, INC.,                                :
                                                 :
                        Plaintiff,               :    C.A. No. 1:07-CV-2 (MPT)
                                                 :
          v.                                     :
                                                 :
ALLEN BROS. WHOLESALE                            :
DISTRIBUTORS INC. *et al.*,                      :
                                                 :
                        Defendants.              :    **ORAL ARGUMENT REQUESTED**
                                                 :

---

### DEFENDANT COOPER-BOOTH WHOLESALE COMPANY'S
### REPLY BRIEF IN SUPPORT OF MOTION FOR
### PARTIAL JUDGMENT ON THE PLEADINGS

---

**BLANK ROME LLP**
David K. Sheppard, Esquire
I.D. No. 4149
1201 Market Street, Suite 800
Wilmington, DE 19801
Phone: (302) 425-6400
Fax:    (302) 425-6464

and

Stephen M. Orlofsky, Esquire
Kit Applegate, Esquire
210 Lake Drive East, Suite 200
Woodland Falls Corporate Park
Cherry Hill, New Jersey 08002
Phone: (856) 779-3600
Fax:    (856) 779-7647

Attorneys for Defendant
Cooper-Booth Wholesale Company

Dated: March 8, 2007

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................................... 1

REPLY ARGUMENT ................................................................................................ 2

I.    The UCSA Condones Conduct That Violates The Sherman Act ............... 2

    A.    Regardless Of Its Choice Of "Buzz Words," Zucca Agrees That The UCSA Establishes Minimum Resale Prices .................... 2

    B.    The Sherman Act Prohibits Minimum Resale Price Maintenance ................................................................................ 3

II.    A Grant Of Private Regulatory Power, Not "Concerted Activity," Is The Hallmark Of A Hybrid Restraint .................................... 10

III.    The State Action Immunity Doctrine Does Not Save The UCSA From Preemption ....................................................................... 13

    A.    The State Supervision That Exists Under The UCSA Does Not Extend To The Setting Of Wholesalers' Presumptive Minimum Resale Prices ............................................................... 13

    B.    *Hoover* And Its Progeny Are Inapplicable.  Cooper-Booth Is Not Suing A State Actor For Antitrust Violations .................... 18

CONCLUSION ....................................................................................................... 20

110018.00602/30309496v.2

## <u>TABLE OF AUTHORITIES</u>

### CASES

*324 Liquor Corp. v. Duffy,*
  479 U.S. 335 (1987) ....................................................................2, 3, 4, 10, 13, 15

*A.D. Bedell Wholesale Company, Inc. v. Philip Morris Inc.,*
  263 F.3d 239 (3d Cir. 2001) ...........................................................13, 14, 15

*Associated General Contractors of Ca., Inc. v. California State Council of*
  *Carpenters,* 459 U.S. 519 (1983) ...........................................................8

*Associated Wholesalers, Inc. v. Commonwealth of Pa., Dep't of Revenue,*
  780 A.2d 759 (Pa. Commw. Ct. 2001) ...........................................................5, 19

*Baseline Liquors v. Circle K Corp.,*
  630 P.2d 38 (Ariz. Ct. App. 1981) ...........................................................5

*Brentwood Academy v. Tennessee Secondary School Athletic Assoc.,*
  442 F.3d 410 (6th Cir. 2006) ...........................................................19

*California Retail Liquor Dealers Associate v. Midcal Aluminum, Inc.,*
  445 U.S. 97 (1980) ...................................................6, 7, 10, 12, 13, 14, 17, 19

*Dr. Miles Medical Co. v. John D. Park & Sons Co.,*
  220 U.S. 373 (1911) ...........................................................2

*Fisher v. City of Berkeley,*
  473 U.S. 260 (1986) ...........................................................12, 13

*Freedom Holdings, Inc. v. Spitzer,*
  357 F.3d 205 (2d Cir. 2004) ...........................................................10

*FTC v. Ticor Title Insurance Company,*
  504 U.S. 621 (1992) ...........................................................16, 17, 18

*Hoover v. Ronwin,*
  466 U.S. 558 (1984) ...........................................................18, 19

*Kansas ex rel. Stephan v. Lamb,*
  1987 WL 12158 (D. Kan. Feb. 26, 1987) ...........................................................2

*Miller v. Hedlund,*
  813 F.2d 1344 (9th Cir. 1987) ...........................................................11, 12

ii

*Nebbia v. New York*,
  291 U.S. 502 (1934) ................................................................................. 4

*New Motor Vehicle Board v. Orrin W. Fox Co.*,
  439 U.S. 96 (1978) ........................................................................... 15, 16

*Parker v. Brown*,
  317 U.S. 341 (1943) ........................................................................... 4, 20

*Patrick v. Burget*,
  486 U.S. 94 (1988) ................................................................................. 18

*Rust v. Griggs*,
  113 S.W. 733 (Tenn. 1938) .................................................................... 5

*Sanders v. Lockyer*,
  365 F. Supp. 2d 1093 (N.D. Cal. 2005) ............................................... 19

*Snyder v. Massachusetts*,
  291 U.S. 97 (1934) ................................................................................. 5

## MISCELLANEOUS

I Phillip E. Areeda and Herbert Hovenkamp, *Antitrust Law: An Analysis of
  Antitrust Principles and Their Application* (Rev. Ed. 1997) ................ 11

*The Attorney General's National Committee to Study the Antitrust Laws* (1955) ............. 8

S. Rep. 94-466 (1975), *reprinted in* U.S.C.C.A.N. 1569 ................................. 8

## INTRODUCTION

The Delaware Unfair Cigarette Sales Act ("UCSA"), 6 Del. C. §§ 2601 – 2608, is preempted by Section 1 of the Sherman Act, 15 U.S.C. § 1.

First, the UCSA condones minimum resale price maintenance. Under the UCSA, wholesalers are prohibited from selling cigarettes at "less than cost to the wholesaler." Every element of the formula for determining "cost to the wholesaler" is based in some fashion on the cigarette manufacturer's invoice price. Consequently, all a cigarette manufacturer has to do is raise or lower its invoice price and it can raise or lower its wholesalers' minimum resale prices. This is a *per se* violation of the Sherman Act.

Second, the UCSA is a "hybrid" restraint. Contrary to Zucca's assertion, the Supreme Court's definition of a "hybrid" restraint does not require "concerted activity." A "hybrid" restraint is simply a statute where private actors are granted a degree of regulatory power in the setting of a statutorily imposed price restraint. Here, cigarette manufacturers possess such power.

Third, the state action immunity doctrine does not save the UCSA from preemption. The State does not "actively supervise" the conduct being challenged here: the setting of wholesalers' presumptive minimum resale prices. It does not set, review, or approve those minimum resale prices. It merely *enforces* the UCSA formula, leaving it to private parties to determine the numbers that are used in that formula.

Accordingly, the UCSA is preempted by the Sherman Act and judgment should be entered in Cooper-Booth's favor on Count I of Zucca's First Amended Verified Complaint.

1

# REPLY ARGUMENT

I.    **The UCSA Condones Conduct That Violates The Sherman Act.**

    A.    **Regardless Of Its Choice Of "Buzz Words," Zucca Agrees That The UCSA Establishes Minimum Resale Prices.**

Having accused Cooper-Booth of using "buzz words" in lieu of analysis (*see* Zucca Br. at 10), Zucca spends considerable time arguing that the UCSA is *not* a "price-fixing" statute, but rather a "sales below cost" or a "minimum markup" statute, and therefore is not a *per se* violation of the Sherman Act. *See* Zucca Br. at 5, 14-17.

Zucca already lost this argument in New Jersey. It lost because it is irrelevant what "buzz words" the Court or the parties affix to the statute. What is relevant is whether the UCSA condones minimum resale price maintenance.

There is no disagreement that it does. Zucca openly concedes that the UCSA establishes a minimum sales price for cigarettes. *See* Zucca Am. Compl. ¶ 9 ("The Act and its enabling regulations establish the minimum sales prices of cigarettes.").

Thus "buzz words" be damned, whether the UCSA is called a "price fixing" statute, a "sales below cost" statute, a "minimum markup" statute, or even, as was argued in New Jersey, a "walk like a duck" statute, makes no difference and misses the point. The point is that the UCSA establishes a minimum resale price for cigarettes. Minimum resale price maintenance is a *per se* violation of the Sherman Act. *See, e.g., Dr. Miles Med. Co. v. John D. Park & Sons Co.*, 220 U.S. 373, 407 (1911).

Indeed, the state statute that the United States Supreme Court held was preempted by the Sherman Act in *324 Liquor Corp. v. Duffy*, 479 U.S. 335 (1987), was itself termed a "minimum markup" statute. *See id.* at 349, 350. *See also Kansas ex rel. Stephan v.*

2

*Lamb*, 1987 WL 12158 at *2 (D. Kan. Feb. 26, 1987) ("The *minimum markup system* in use in Kansas allows private industry to set retail liquor prices. The systems mandates resale price maintenance, an activity that has long been regarded as a per se violation of the Sherman Act.") (emphasis added).

**B.    The Sherman Act Prohibits Minimum Resale Price Maintenance.**

Zucca reaches high and low to argue that the UCSA has pro-competitive effects that do not conflict with the Sherman Act. But Zucca's argument is just that, a reach.

**1.    Zucca Ignores *Duffy* And Mis-Cites *Midcal.***

Zucca ignores the Supreme Court's opinion in *Duffy*, a case that involved an analogous statute. The statute in *Duffy* prohibited liquor retailers from selling below "cost." *Duffy*, 479 U.S. at 339. "Cost" was defined as "the price of such item of liquor to the retailer plus twelve percentum of such price." *Id.* "Price" was defined as the wholesaler's "posted bottle price." *Id.* at 338-39. Thus, similar to the UCSA formula, retailers' minimum resale prices were determined in reference to their suppliers' "posted bottle price" plus a certain percentage markup. The Supreme Court had no problem concluding the result was that liquor wholesalers could set retailers' resale prices:

> The New York retail pricing system thus permits wholesalers to set retail prices, and retail markups, without regard to actual retail costs. . . . The effect of this complex of statutory provisions and regulations is to permit wholesalers to maintain retail prices at artificially high levels.

*Id.* at 340. The Court went on to hold that the statute was "inconsistent with § 1 of the Sherman Act." *Id.* at 343.

3

But rather than distinguish *Duffy*, Zucca cites *Nebbia v. New York*, 291 U.S. 502 (1934), to argue that state regulation of prices is not "per se violative of the federal constitution." *See* Zucca Br. at 17. First, let's be clear. *Nebbia* is not a Sherman Act case. The legal issue in *Nebbia* was whether state price-fixing statutes violated the Equal Protection Clause of the Fourteenth Amendment. *See Nebbia*, 291 U.S. at 506-07. Second, there is no dispute that the States may, under appropriate circumstances, regulate and set prices without running afoul of the Sherman Act. This is what *Parker v. Brown*, 317 U.S. 341 (1943), stands for. The problem with the UCSA is that it fails to exclude or actively supervise private influences and control in the setting of wholesalers' minimum prices. As was explained in Cooper-Booth's opening brief, every component of the formula used to determine a wholesaler's presumptive minimum resale price is based upon the cigarette manufacturer's invoice price. Delaware does not regulate the manufacturer's invoice price. Consequently, manufacturers, by setting their invoice prices, can set the wholesalers' minimum resale prices.

This is what distinguishes *Nebbia* from this case. There, it was undisputed that the Milk Control Board established by the statute fixed the minimum and maximum retail prices to be charged. *Nebbia*, 291 U.S. at 507. But that is the precise issue here: whether the State, like the Milk Control Board in *Nebbia*, holds and exercises one hundred percent of the control and discretion in setting wholesalers' minimum resale prices for cigarettes.

Not only does Zucca ignore *Duffy*, however, but Zucca goes on to misinterpret a series of lower court opinions for the categorical imperative that the UCSA does not violate the Sherman Act. *See* Zucca Br. at 18-19.

4

For example, Zucca cites *Associated Wholesalers, Inc. v. Commonwealth of Pennsylvania, Dep't of Revenue*, 780 A.2d 759 (Pa. Commw. Ct. 2001), as holding that the Pennsylvania UCSA was "not in conflict and therefore not preempted by the Sherman Act." *See* Zucca Br. at 18. We read *Associated Wholesalers* looking for that holding. It's not there. What the court said is that "a *properly* applied below cost statute furthers the goals of the Sherman Anti-Trust Act." *Id.* at 765 (emphasis added). But that is precisely the issue here: Whether the UCSA is a "properly applied" statute that does not run afoul of the Sherman Act. As explained above, simply calling the UCSA a below-cost statute does not end the preemption analysis. This Court must still look behind its label and analyze the statute through the lens established by the Supreme Court and set forth by Cooper-Booth in its opening brief. *Associated Wholesalers* simply never addressed the preemption issue presented here (as is evidenced by the fact that the word "preemption" is not mentioned once in the opinion).

Zucca also cites *Baseline Liquors v. Circle K Corp.*, 630 P.2d 38 (Ariz. Ct. App. 1981), and *Rust v. Griggs*, 113 S.W. 733 (Tenn. 1938), as cases holding that statutes like the UCSA are not price-fixing statutes that violate the Sherman Act. *See* Zucca Br. at 19. Again, Zucca is being led astray by the "tyranny of labels." *See Snyder v. Massachusetts*, 291 U.S. 97, 114 (1934) (Cardozo, J.). Simply calling a statute a "below cost" or "minimum markup" statute does not mean the statute does not violate the Sherman Act.

At the end of the day, Zucca's reliance on these state court opinions is misplaced. As any first year law student knows, when given the choice between a United States Supreme Court opinion or a state court opinion on an issue of federal law, the Supreme

5

Court is the controlling authority.  But even then, the Supreme Court precedent must be interpreted correctly, which is the problem with Zucca's reliance on *Midcal*.

Zucca cites *Midcal* as "controlling" and supportive of its argument that the UCSA does not conflict with the Sherman Act.  *See* Zucca Br. at 20.  *Midcal* is controlling, but not in Zucca's favor.  The California statute in *Midcal* required wine producers to file fair trade contracts or price schedules with the State.  If a wine producer did not set prices through a fair trade contract, then the wholesalers had to post a resale price schedule for that producer's brands.  No state-licensed wine merchant could sell wine to a retailer at other than the posted price.  *California Retail Liquor Dealers Assoc. v. Midcal Aluminum, Inc.*, 445 U.S. 97, 99 (1980).  The Supreme Court found that "California's system for wine pricing plainly constitute[d] resale price maintenance in violation of the Sherman Act."  *Id.* at 103.  "The wine producer holds the power to prevent price competition by dictating the prices charged by wholesalers."  *Id.* at 103.

The UCSA likewise *mandates* resale price maintenance and likewise violates the Sherman Act.  Again, every component of the UCSA formula is based upon the cigarette manufacturer's invoice price.  Consequently, like the wine producers in *Midcal*, the cigarette manufacturers hold the power to prevent price competition.  All a cigarette manufacturer has to do is raise or lower its invoice price and it can raise or lower its wholesalers' presumptive minimum resale prices.

**2.    Zucca's "No Case Law Is Good Case Law" Stance Does Not Mean The UCSA Is Safe From Sherman Act Preemption.**

Taking a "no case law is good case law" approach, Zucca argues that "[i]t is telling that Cooper-Booth cannot cite to any instance in which a state UCSA has been

deemed preempted by the Courts of that jurisdiction." *See* Zucca Br. at 14. (Of course,

Zucca overlooks the fact that there is now Judge McDonnell's decision in New Jersey.)

History explains why. The Delaware UCSA was enacted over fifty years ago. At

that time, the federal Miller-Tydings Act of 1937 made an exception to the Sherman Act

for State statutes, like the UCSA, that sanctioned resale price maintenance. As the

Supreme Court recounted in *Midcal*:

> For many years . . . the Miller-Tydings Act of 1937 permitted
> States to authorize resale price maintenance. 50 Stat. 693. The
> goal of that statute was to allow the States to protect small retail
> establishments that Congress thought might otherwise be driven
> from the marketplace by large-volume discounters. But in 1975
> that congressional permission was rescinded. The Consumer
> Goods Pricing Act of 1975, 89 Stat. 801, repealed the Miller-
> Tydings Act and related legislation.

*Midcal*, 445 U.S. at 102.

Truth be told, the existence of these statutes was long a point of contention with

federal antitrust officials. The U.S. Attorney General said they were "deplorable" and

"symboliz[ed] a radical departure from National antitrust policy":

> On balance, we regard the Federal statutory exemption of "Fair
> Trade" pricing as an unwarranted compromise of the basic tenets
> of National antitrust policy. We recognize that the legislatures of
> 45 states have at some time accorded official sanction to "Fair
> Trade" pricing; that the Congress twice deferred to state
> enactments by creating federal "Fair Trade" exemptions from
> antitrust prohibitions; and that without federal immunization "Fair
> Trade" pricing, as a practical matter, cannot survive. Nevertheless,
> the throttling of price competition in the process of distribution that
> attends "Fair Trade" pricing is, in our opinion, a deplorable yet
> inevitable concomitant of federal exemptive laws. Moreover,
> whatever may be the underlying legislative intent, any operative
> "Fair Trade" system facilitates horizontal price-fixing efforts on
> the manufacturing and each succeeding distribution level. . . .

*The Attorney General's National Committee to Study the Antitrust Laws* 154 (1955).

Twenty years later when Congress passed the Consumer Goods Pricing Act of 1975, the Senate spared no words in calling the statutes "legalized price-fixing":

> The purpose of the proposed legislation is to repeal Federal antitrust exemptions which permit States to enact fair trade laws. Such laws allow manufacturers to require retailers to resell at a price set by the manufacturer. These laws are, in fact, legalized price-fixing. They permit competing retailers to have identical prices and thus eliminate price competition between them. Repeal of the fair trade laws should result in a lowering of consumer prices.

S. Rep. 94-466, at 1 (1975), *reprinted in* U.S.C.C.A.N. 1569, 1569-70.

That Cooper-Booth cannot point to a case where another State's UCSA has been preempted, does not mean that the UCSA is safe from preemption. The New Jersey UCSA is on the brink, and the Delaware UCSA differs in no material respect.

### 3. The Supposedly "Pro-Competitive" Attributes Of The UCSA Are The Very Attributes That The Sherman Act Prohibits.

As a final hurrah against preemption, Zucca argues that "the legislative purpose of the UCSA is to <u>prevent</u> unfair competition, not to restrain it." *See* Zucca Br. at 10. The UCSA does this, Zucca writes, by "creat[ing] a level playing field in the sale of cigarettes so that all retail and wholesalers of cigarettes can fairly compete." *See* Zucca Br. at 17. It allows "small sellers to compete with big ones." *See* Zucca Br. at 17.

While this is a valiant purpose, the UCSA goes about it in a way that contravenes a fundamental tenet of federal antitrust law. The Sherman Act was "enacted to assure customers the benefits of <u>price competition</u>." *Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 538 (1983) (emphasis added). The UCSA stymies price competition.

8

Statutes like the UCSA date back to the Great Depression. They were meant to protect small retailers with high overhead costs from large retailers who, because of their efficiencies, could sell the same goods at lower prices. They do this by establishing minimum resale prices. Small mom-and-pop shops are thereby protected from being run out of business by the likes of Wal-Mart, because Wal-Mart is prohibited from passing its cost savings on to consumers through lower prices.

Zucca's retort is that the UCSA establishes only a *presumptive* minimum resale price and that the Wal-Marts of the world may always petition the State to establish a lower "cost of doing business" and thus a lower "cost to the wholesaler" (*i.e.*, minimum resale price). But why would they do that? There is no economic incentive. If every retailer, small or large, is compelled to sell at the presumptive minimum price, then competitive free market forces are kept at bay and profit margins are all but guaranteed. Filing a petition to establish a lower cost of doing business only results in a reduced profit margin. Assume the "basic cost of cigarettes" is $5.00. Using the presumptive "cost of doing business" (5% of the "basic cost of cigarettes), the minimum resale price would be $5.25:

$$
\begin{array}{l}
\$5.00 \ (\text{``Basic Cost of Cigarettes''}) \\
\underline{+ \quad \$0.25 \ (\text{``Cost of doing business'' (5\% of the ``Basic Cost of Cigarettes'')}} \\
\$5.25 \ (\text{``Cost to the Wholesaler''})
\end{array}
$$

Now assume the wholesaler filed a petition and successfully proved a lower "cost of doing business" of 4%, his new minimum resale price would be $5.20:

$$
\begin{array}{l}
\$5.00 \ (\text{``Basic Cost of Cigarettes''}) \\
\underline{+ \quad \$0.20 \ (\text{``Cost of doing business'' (4\% of the ``Basic Cost of Cigarettes'')}} \\
\$5.20 \ (\text{``Cost to the Wholesaler''})
\end{array}
$$

9

Why would a wholesaler go through the time and expense to sell cigarettes at $5.20 and earn a $0.20 profit from his efforts, when he and his competitors can sell the same cigarettes at the presumptive price of $5.25 and earn a $0.25 profit? The UCSA does not encourage price competition. It keeps it at bay, which is why Zucca is fighting to keep the statute on the books.

## II.     A Grant Of Private Regulatory Power, Not "Concerted Activity," Is The Hallmark Of A Hybrid Restraint.

Zucca misstates or simply does not understand the hybrid/unilateral restraint analysis. In every single brief it has ever filed on the issue, Zucca ignores the case law that Cooper-Booth cites and argues that the UCSA does not compel or authorize "concerted activity," and so therefore, the UCSA must be a "unilateral" as opposed to a "hybrid" restraint. For the umpteenth time, this is not the test.

There does not need to be an actual agreement (*i.e.*, concerted activity) between the cigarette manufacturers and the cigarette wholesalers to fix minimum resale prices in order for the UCSA to be preempted by the Sherman Act. "[T]he Supreme Court has made it clear that an actual 'contract, combination or conspiracy' need not be shown for a state statute to be preempted by the Sherman Act." *Freedom Holdings, Inc. v. Spitzer*, 357 F.3d 205, 223 n.17 (2d Cir. 2004). *Midcal* and *Duffy* are perfect and binding examples where the Supreme Court found state statutes preempted by the Sherman Act even though there was no evidence of concerted activity. In both cases, the dealers were merely abiding by their state statutes and selling at the statutorily prescribed minimum resale price. Yet in both cases, the Supreme Court found the state statutes preempted by the Sherman Act. With respect to *Midcal*, the leading antitrust treatise explains why:

10

> [T]he California statute was preempted by federal antitrust law,
> and the reason was clear: although not requiring an 'agreement' as
> such, it brought about the same marketplace result as illegal resale
> price maintenance agreements.

I Phillip E. Areeda and Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 217 at 307 (Rev. Ed. 1997). Consequently, "[t]he mere fact that each wholesaler complies unilaterally with the regulations does not save an impermissible pricing scheme from an antitrust challenge." *Miller v. Hedlund*, 813 F.2d 1344, 1350 (9th Cir. 1987).

For example, in *Miller*, retailers challenged Oregon's "post-and-hold" liquor pricing laws. Wholesalers were required to post their prices ten days before their effective date, and any price decreases had to remain in effect for a certain period. Oregon and the other appellees argued the statute was a unilateral restraint because "the wholesalers merely act unilaterally in response to the requirements of the regulations and that there [was] no agreement or concerted activity of any sort between them" to fix prices. *Id.* at 1349. The Ninth Circuit rejected the argument as an oversimplification:

> The appellees' treatment of this difficult issue oversimplifies it.
> While it is true that there is no agreement or concerted activity
> among the wholesalers, it can not be ignored that the challenged
> regulations facilitate the exchange of price information and require
> adherence to the publicly posted prices. In other words, the state
> compels activity that would otherwise be a *per se* violation of the
> Sherman Act. It is the presence of state compulsion that requires a
> more refined analysis than the one presented by the appellees.
> Simply ending the analysis because of a lack of concerted activity
> among the wholesalers fails to take into account the presence and
> effect of the state's involvement in the matter.

*Id.* at 1349.

11

The Ninth Circuit reviewed the Supreme Court's opinions in *Schwegmann*,

*Fisher*, and *Midcal* and concluded that "[t]he mere fact that each wholesaler complies

unilaterally with the regulations does not save an impermissible pricing scheme from an

antitrust challenge." *Id.* at 1350. It noted that in *Schwegmann* "non-contracting retailers

were compelled to comply unilaterally with a state authorized pricing scheme, but the

absence of concerted activity among the retailers was not a bar to a finding of a Sherman

Act violation." *Id.* at 1351. The decisive factor that made the statute a hybrid restraint,

was that under the statutory scheme private parties, not the State, set the actual prices:

> *Schwegmann* and *Midcal* show that Oregon's actions are not
> unilateral. ***The regulations constitute a "hybrid" restraint***
> ***because, as in those two cases, Oregon allows private parties to***
> ***set the prices*** and does not review the reasonableness of those
> prices. It follows that this case is unlike the purely public restraint
> of Berkeley's regulatory scheme [in *Fisher*] which removed the
> power to set rents from the landlords.

*Id.* at 1351 (emphasis added).

This is what led Judge McDonnell to conclude that the New Jersey UCSA was a

hybrid restraint. As Zucca is fond of citing, she did write that "[t]he UCSA does not

authorize or compel private parties to enter contracts or combinations to fix prices in

violation of § 1 of the Sherman Act." *See* Zucca Br., Ex 1 at 6. But then in response to a

Motion for Reconsideration that Zucca wishes it never made, she correctly concluded and

clarified that this was irrelevant to the hybrid/unilateral restraint analysis. The deciding

factor was whether the State or private parties set the prices imposed by the UCSA.

Private parties did, and thus the UCSA was a "hybrid" restraint:

> [T]he UCSA requires application of a percentage mark-up to the
> invoice price of cigarettes. In each of these three cases, a third

> party and not the state set the base price to which the state-mandated percentage was applied.  Thus, the UCSA is a hybrid restraint unlike the unilateral restraint described in *Fisher v. City of Berkeley*, 473 U.S. 260 (1986).

Op. at 1-2, Feb. 6, 2007 (attached as Exhibit 2 to Zucca's Brief).  This is entirely consistent with the Supreme Court's definition of a hybrid restraint:  "Where 'private actors are . . . granted 'a degree of private regulatory power' . . . the regulatory scheme may be attacked under § 1' as a 'hybrid' restraint."  *Duffy*, 479 U.S. at 345 n.8.

"Concerted activity" is thus not a requirement, but the prism through which the statute is to be viewed in determining whether it is a "unilateral" or a "hybrid" restraint.  Under a unilateral restraint, there is no risk of concerted action.  The price restraint is both imposed and calculated by the State.  By contrast, under a hybrid restraint, there is a risk of concerted action.  The statute imposes the price restraint, but leaves it to private parties to calculate it.  In this light, it is clear that the UCSA is a hybrid restraint, because cigarette manufacturers play a role in setting wholesalers' minimum resale prices.

**III.    The State Action Immunity Doctrine Does Not Save The UCSA From Preemption.**

**A.    The State Supervision That Exists Under The UCSA Does Not Extend To The Setting Of Wholesalers' Presumptive Minimum Resale Prices.**

Not just any State supervision will satisfy *Midcal*'s "active supervision" requirement.  As the Third Circuit made clear in *A.D. Bedell Wholesale Company, Inc. v. Philip Morris Inc.*, 263 F.3d 239 (3d Cir. 2001), it is **the conduct that violates the Sherman Act that must be "actively supervised."**  The plaintiffs claimed there that the tobacco Multistate Settlement Agreement created an output cartel.  In determining whether *Parker* immunity applied, the Third Circuit noted that the States actively

13

monitored the tobacco companies' conduct under several portions of the Multistate

Settlement Agreement, but not just any "active supervision" would suffice. The "active

supervision" had to be of the conduct alleged to violate the antitrust laws:

> [W]e are not convinced that the States satisfy *Midcal*'s "active
> supervision" prong. This is because the States' supervision does
> not reach the parts of the Multistate Settlement Agreement that are
> the source of the antitrust injury. It is conduct that violates the
> antitrust laws that states must "actively supervise" in order for
> *Parker* immunity to attach.

*Id.* at 262.

The Third Circuit reviewed *Midcal* and concluded that "only when the state

approves and actively supervises the *results* of the anticompetitive scheme does *Parker*

immunity attach." *Id.* at 264. That was not the case with the Multistate Settlement

Agreement. Although certain provisions actively regulated the tobacco companies'

conduct, none regulated the conduct that was being challenged as anticompetitive:

> The States here are actively involved in the maintenance of the
> scheme, but they lack oversight or authority over the tobacco
> manufacturers' prices and production levels. These decisions are
> left entirely to the private actors. . . . The Multistate Settlement
> Agreement imposes no restrictions on pricing or provisions to
> temper the effect of the output cartel. Under this set of facts, there
> is insufficient evidence of active supervision of the allegedly
> anticompetitive restraints to satisfy this prong of *Midcal*.

*Id.* at 264-65.

The same holds true here. Although Zucca highlights instances of state

supervision under the UCSA, that supervision does not extend to the conduct being

challenged: the setting of wholesalers' presumptive minimum resale prices. The UCSA

formula for calculating wholesalers' presumptive minimum resale prices is defined in

terms of the cigarette manufacturer's invoice price:

14

"Basic Cost of Cigarettes" (Manufacturer's Invoice Price)
+    "Cost of Doing Business" (5% of the "Basic Cost of Cigarettes" (Manufacturer's Invoice Price))
Wholesaler's Minimum Resale Price

Zucca does not dispute this.  Zucca also does not dispute that the State does not regulate cigarette manufacturers' invoice prices.  Because the State does not regulate cigarette manufacturers' invoice prices and because the presumptive minimum resale prices are based on the manufacturers' invoice prices, the result is that the cigarette manufacturers set the wholesalers' minimum resale prices.

Zucca responds that, because wholesalers may petition the State to establish a lower or higher minimum resale price, this is "active supervision" and makes this case unlike *Duffy* and more like *New Motor*.  Zucca's reading of those cases is wrong.

In *Duffy*, the statute required liquor retailers to charge 112% of the wholesaler's "posted bottle price," regardless of their actual costs.  Wholesalers could consequently dictate the retailers' minimum resale prices.  The Supreme Court found there was no "active supervision" of the wholesalers' posted bottle prices and invalidated the statute. *See id.* at 345.  Zucca argues the UCSA "cures the evils that invalidated the statute" in *Duffy*, because the "UCSA sets forth a specific framework within which retailers or wholesalers *may* reduce or increase the minimum prices depending on direct proof of cost."  Zucca Br. at 29. (emphasis added).  That is, unlike *Duffy* where the sellers' costs were not a factor in setting their resale prices, the UCSA provides a mechanism where costs *may* be considered such that sellers' minimum resale prices are not fixed solely by reference to their suppliers' invoice prices.

15

The Achilles tendon in Zucca's argument is the word "may." Wholesalers *may* come forward, they *may* present evidence of their costs, and they *may* establish a price other than the presumptive one set by the UCSA. ***But there is nothing in the UCSA that*** ***requires*** *them to do so.*

It is this voluntary nature of the UCSA's regulation of wholesalers' minimum resale prices that distinguishes this case from *New Motor*. The statute in that case required state approval ***before*** opening or relocating an automobile dealership if an existing dealer objected. *See New Motor Vehicle Board v. Orrin W. Fox Co.*, 439 U.S. 96, 102-03 (1978). It was upheld under *Parker* because, as Zucca recites, "[t]he State had an active role in displacing 'unfettered business freedom in the matter of the establishment and relocation of automobile dealerships.'" Zucca Br. at 30 (*quoting New Motor*, 439 U.S. at 109). Stated differently, the State played an active role by ruling upon requests ***before*** the establishment and relocation of automobile dealerships. By contrast, UCSA does not require the State to review or approve cigarette manufacturers' invoice prices or wholesalers' presumptive minimum resale prices ***before*** they go into effect. As Zucca acknowledges, the State only reviews the prices of wholesalers who voluntarily file a petition to establish a minimum price other than the presumptive one required by the UCSA. This is not "active supervision." This is **"*reactive* supervision,"** and then only for those wholesalers that choose to come forward to file petitions with the State.

"Active supervision" requires no less than *actual, in fact, and affirmative supervision.* The Supreme Court made this clear in *FTC v. Ticor Title Insurance Company*, 504 U.S. 621 (1992), yet another Supreme Court case that Zucca ignores.

16

In that case, the FTC filed a complaint against six title insurance companies, alleging price fixing in the fees they charged for title searches and title examinations. *Id.* at 625. The title insurance companies argued they were entitled to state action immunity as articulated in *Midcal* because the fees they charged were approved by the appropriate State agencies. *Id.* at 629. Each of the States used what was called the "negative option" system to approve rate filings. *Id.* at 630. The rating bureaus filed rates for title searches and title examinations with the State, and the rates became effective unless the State rejected them within a specified period. *Id.* The Third Circuit held for the title insurance companies, finding that "the existence of a state regulatory program, if staffed, funded, and empowered by law, satisfied the requirement of active supervision." *Id.* at 632.

The Supreme Court reversed the Third Circuit. *Id.* at 632. "*Actual state involvement*, not deference to private price-fixing arrangements under the general auspices of state law, is the precondition for immunity from federal law." *Id.* at 634 (emphasis added). It noted that "the purpose of the active supervision inquiry is not to determine whether the State has met some normative standard, such as efficiency, in its regulatory practices. Its purpose is to determine whether the State has exercised sufficient independent judgment and control so that the details of the rates or prices have been established as a product of deliberate state intervention, not simply by agreement among private parties." *Id.* at 634-35. The "negative option" system, where States could veto, but did not set the rates or prices, was not "active supervision":

> Where prices or rates are set as an initial matter by private parties, subject only to a veto if the State chooses to exercise it, the party claiming the immunity must show that state officials have undertaken the necessary steps to determine the specifics of the

> price-fixing or rate-setting scheme. The mere potential for state
> supervision is not an adequate substitute for a decision by the
> State.

*Id.* at 638. There had to be actual supervision *in fact* for state action immunity to attach:

> In the absence of active supervision *in fact,* there can be no state
> action immunity for what [are] otherwise private-fixing
> agreements.

*Id.* (emphasis added).

This is not done under the UCSA. Delaware does not *affirmatively* and *in fact* set, review, or approve wholesalers' presumptive minimum resale prices. It merely *enforces* the formula, leaving it to private parties to set the numbers that are used in that formula.

That a few wholesalers may have, as Zucca contends, filed petitions and had their non-presumptive minimum prices reviewed and approved by the State does not save the UCSA with respect to all those wholesalers that have chosen not to. This is the UCSA's weakness. It is reactive, not proactive. It "actively supervises" only those wholesalers that choose to come forward. As to those that use the presumptive rate, there is no supervision. "Absent such a program of supervision, there is no realistic assurance that a private party's anticompetitive conduct promotes state policy, rather than merely the party's individual interests." *Patrick v. Burget*, 486 U.S. 94, 101 (1988). Accordingly, the UCSA is not saved from preemption by the state action immunity doctrine.

**B.    *Hoover* And Its Progeny Are Inapplicable.  Cooper-Booth Is Not Suing A State Actor For Antitrust Violations.**

Zucca also argues that the acts of the legislature are immune from attack as "concerted activity" that violates the Sherman Act. *See* Zucca Br. at 22, 25-26. Zucca is correct. "[W]hen a state legislature adopts legislation, its actions constitute those of the

18

State and ipso facto are exempt from the operation of the antitrust laws." *Hoover v. Ronwin*, 466 U.S. 558, 567-68 (1984).  That is the very essence of the *Parker* immunity doctrine.  But simply because the legislature as a body is immune does not mean its legislation and the private parties who act in accordance with it are immune as well.

What Zucca does not understand is that the question of *Parker* immunity is analyzed differently depending on whether the actor is a *state* actor or a *private* actor.  The first is entitled to automatic immunity, and the second only if he or she satisfies the two-step *Midcal* analysis.  *See Brentwood Academy v. Tennessee Secondary School Athletic Assoc.*, 442 F.3d 410, 441 (6th Cir. 2006).

Accordingly, what Zucca overlooks in the cases it cites is that the defendants being sued were ***state actors.***  In *Hoover*, the Supreme Court affirmed the dismissal of a lawsuit asserting Sherman Act claims relating to an allegedly anticompetitive bar admission program where, although the program was administered by a committee of private attorneys, it was conceded they were "state officers."  *Hoover*, 466 U.S. at 572.  Similarly, in *Sanders*, the California Attorney General was being sued in his *official capacity* for violating the Sherman Act by entering into the Master Settlement Agreement with the tobacco companies.  *Sanders v. Lockyer*, 365 F. Supp. 2d 1093, 1097 (N.D. Cal. 2005).  As a state actor, the court found he was automatically immune from Sherman Act liability.  Finally, *Associated Wholesalers* was yet another case where a state actor, the Pennsylvania Department of Revenue, was the defendant.  *See Associated Wholesalers*, 780 A.2d 760-61.

19

Cooper-Booth is not suing a *state actor* for liability under the Sherman Act. The issue of *state actor* immunity, therefore, does not apply in this case. What is at issue is *private* conduct. And as the Supreme Court made clear long ago, "a state does not give immunity to those who violate the Sherman Act by authorizing them to violate it, or by declaring that their action is lawful." *Parker*, 317 U.S. at 351.

## CONCLUSION

For all of the foregoing reasons, Defendant Cooper-Booth Wholesale Company's Motion for Partial Judgment on the Pleadings to dismiss Plaintiff L.J. Zucca, Inc.'s claims brought in Count I of the First Amended Verified Complaint for violations of the Delaware Unfair Cigarette Sales Act, 6 Del. C. §§ 2601 – 2608, should be granted.

Respectfully submitted,

BLANK ROME LLP

Dated: March 8, 2007

David K. Sheppard, Esquire (I.D. No. 4149)
1201 Market Street, Suite 800
Wilmington, DE 19801
Phone: (302) 425-6400
Fax      (302) 425-6464

and

Stephen M. Orlofsky, Esquire
Kit Applegate, Esquire
210 Lake Drive East, Suite 200
Woodland Falls Corporate Park
Cherry Hill, New Jersey 08002
Phone: (856) 779-3600
Fax:     (856) 779-7647

Attorneys for Defendant
Cooper-Booth Wholesale Company

20