## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

L.J. ZUCCA, INC.                            :
                                            :
                    Plaintiff,              :    C.A. No. 1:07-CV-2 (JJF)
                                            :
        v.                                  :
                                            :
ALLEN BROS. WHOLESALE                       :
DISTRIBUTORS INC. *et al.*,                 :
                                            :
                    Defendants.             :
                                            :

---

## DEFENDANT COOPER-BOOTH WHOLESALE COMPANY'S
## REPLY BRIEF IN SUPPORT OF ITS MOTION FOR PARTIAL JUDGMENT
## ON THE PLEADINGS

---

**BLANK ROME LLP**
CHRISTINE S. AZAR, Esquire
I.D. No. 4170
1201 Market Street, Suite 800
Wilmington, DE 19801
Phone: (302) 425-6400
Fax      (302) 425-6464

and

Stephen M. Orlofsky, Esquire
Kit Applegate, Esquire
Woodland Falls Corporate Park
210 Lake Drive East, Suite 200
Cherry Hill, NJ 08002
Phone: (856) 779-3600
Fax:     (856) 779-7647

Attorneys for Defendant
Cooper-Booth Wholesale Company

Dated:  April 22, 2008

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................1

REPLY ARGUMENT .........................................................................................3

    I.     The UCSA Is Preempted By Section 1 Of The Sherman Act ..........................3

          A.     Step One:  The UCSA Requires Wholesalers To Use A
                 Common Formula To Calculate Their Minimum Resale Prices ..........3

          B.     Step Two:  The UCSA Is A Hybrid Restraint, Because It Does
                 Not Exclude All Private Price Setting Discretion In The
                 Calculation Of Wholesalers' Minimum Resale Prices. ........................8

          C.     Step Three:  The State of Delaware Does Not Have "Ultimate
                 Control" Over the Minimum Prices Charged By Wholesalers ...........12

    II.    There Is Nothing "Hypothetical" About Zucca's Lawsuit ..............................16

CONCLUSION ................................................................................................18

# TABLE OF AUTHORITIES

## CASES

*324 Liquor Corp. v. Duffy,*
479 U.S. 335 (1987) .......................................................................... 6, 15

*California Retail Liquor Dealers Association v. Midcal Aluminum, Inc.,*
445 U.S. 97 (1980) ............................................................................. 6, 16

*Fisher v. City of Berkeley,*
475 U.S. 260 (1986) ............................................................... 2, 9, 10, 11

*Forrest City Grocery Co. v. Tennessee Department of Revenue,*
917 S.W.2d 247 (Tenn. Ct. App. 1995) ................................................. 12

*Freedom Holdings, Inc. v. Spitzer,*
357 F.3d 205 (2d Cir. 2004) ................................................................ 1, 6

*Jetro Cash and Carry Enterprises, Inc. v. State of New York,*
605 N.Y.S.2d 538 (N.Y. App. Div. 1993) .............................................. 12

*Miller v. Hedlund,*
813 F.2d 1344 (9th Cir. 1987) ................................................................. 7

*National Society of Professional Engineers v. United States,*
435 U.S. 679 (1978) ................................................................................. 5

*Patrick v. Burget,*
486 U.S. 94 (1988) ..................................................................... 12, 13, 14

*Rice v. Norman Williams,*
458 U.S. 654, 661 (1982) ......................................................................... 7

*Taj Mahal Travel, Inc. v. Delta Airlines, Inc.,*
164 F.3d 186 (3d Cir. 1998) ................................................................... 17

*United States v. Socony-Vacuum Oil Co.,*
310 U.S. 150 (1940) ............................................................................. 1, 4

110018.00602/30329589v.2

**MISCELLANEOUS**

I Phillip E. Areeda and Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 217 (Rev. Ed. 1997) ......................... 6

I Phillip E. Areeda and Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 226 (Rev. Ed. 1997) ..................... 15

XIX Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 2022 (Rev. Ed. 1997) ..................... 4

110018.00602/30329589v.2

## INTRODUCTION

Plaintiff L.J. Zucca, Inc.'s opposition brief ignores the three-step framework of the Sherman Act preemption analysis in favor of conflating the steps and confusing the analysis. Zucca's opposition argument is premised on the legally unsupportable ground that the cigarette wholesalers must have in fact "contracted, combined, or conspired" to fix the minimum resale prices of cigarettes in order for this Court to declare that the Delaware Unfair Cigarette Sales Act ("UCSA") is preempted by Section 1 of the Sherman Act. Proof of a "contract, combination, or conspiracy," however, is simply ***not required*** in a case arguing that a state statute is preempted by the federal Sherman Act. *See, e.g., Freedom Holdings, Inc. v. Spitzer*, 357 F.3d 205, 223 n.17 (2d Cir. 2004) ("[T]he Supreme Court has made it clear that an actual 'contract, combination or conspiracy' need not be shown for a state statute to be preempted by the Sherman Act."). In such cases, the state statute supplants the "contract, combination, or conspiracy."

Broken down and analyzed using the three steps articulated by the United States Supreme Court in its various Sherman Act preemption cases and set forth in Cooper-Booth's opening brief, there is but one conclusion: the UCSA is preempted by Section 1 of the Sherman Act. The three steps of the analysis are:

(1)   ***Does the UCSA mandate conduct that constitutes a per se violation of the Sherman Act?*** The answer is yes. The UCSA mandates that wholesalers use a common formula to determine the minimum price at which they may sell their cigarettes. Industrywide pricing of products by competitors in accordance with a common formula is horizontal price fixing and is a *per se* violation of the Sherman Act. *See United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 222 (1940) (Prices are fixed for purposes of the Sherman Act "if the range within which purchases or sales will be made is agreed upon, if the prices paid or charged are to be at a certain level or on ascending or descending scales, if they are to be uniform, *or if by various formulae they are related to the market prices.* They are fixed because they are agreed upon.").

1

(2)  ***Is the UCSA a "unilateral" or a "hybrid" restraint?***  The UCSA is a "hybrid" restraint, because the UCSA does not exclude all price setting discretion by private, third-party, market participants in the calculation of wholesalers' minimum resale prices.  *See, e.g., Fisher v. City of Berkeley*, 475 U.S. 260, 266 (1986).  As even Zucca concedes, the wholesalers' minimum prices are calculated under the UCSA using a formula that is based upon and subject to the cigarette manufacturers' invoice prices.

(3)  ***If a "hybrid" restraint, does the State of Delaware "actively supervise" the setting of wholesalers' minimum resale prices?***  The answer is no.  The State of Delaware does not set, review, or approve wholesalers' minimum resale prices.  It merely enforces the use of the UCSA's formula, and leaves it to private parties to determine the figures that are used in that formula.

Failing on the merits of the three-step analysis, Zucca argues as a last resort that the preemption issue is not justiciable, that it is "hypothetical."  There is nothing "hypothetical" about this lawsuit.  Zucca is suing the defendants for violating a state statute that defendants contend is preempted by federal law under the Supremacy Clause of the United States Constitution.  The preemption issue, therefore, is not a "hypothetical" but rather a "threshhold" issue that should and needs to be resolved before the parties undertake the time and expense of litigating the merits of Zucca's UCSA claims.

2

## REPLY ARGUMENT

**I.    The UCSA Is Preempted By Section 1 Of The Sherman Act.**

The Supreme Court case law sets forth three steps to the Sherman Act preemption

analysis.  We repeat the step-by-step analysis in order to establish the framework for deciding

this motion and to avoid the conflating of issues, purposeful or not, that plagues much of Zucca's

opposition brief.

> **A.    Step One:  The UCSA Requires Wholesalers To Use A Common Formula To Calculate Their Minimum Resale Prices.  That Is Horizontal Price Fixing And A *Per Se* Violation Of The Sherman Act.**

Zucca tries to make much out of the point that the wholesalers do not meet, discuss, and

agree on the minimum prices to charge under the UCSA for their cigarettes.  Zucca even

submitted an affidavit from its Vice President of Operations, Charles Leffler, where he states:

> Cigarette wholesalers have no ability, either individually or collectively, to
> affect the UCSA's statutory minimums.  The UCSA does not permit
> wholesalers to collectively set the statutory minimums.

Leffler Aff. ¶ 6.

Cooper-Booth agrees with Mr. Leffler's statement.  Under the UCSA, the wholesalers do

not collectively set their statutory minimum prices.  Cooper-Booth never alleged they did and

that is not the basis to Cooper-Booth's preemption argument.

*Horizontal price fixing, however, is not limited to a group of competitors meeting in a*

*back room and agreeing on a fixed price for their goods.*  The Supreme Court has been clear

that the *per se* condemnation of horizontal price restraints includes agreements regarding *any*

*element of price*, including agreements to use a *common formula.*  As the leading antitrust

treatise states:

> *The per se rule generally governs not only explicit price fixing but also*
> *agreement to fix a "price element," which may include things such as*
> (a) terms of financing (¶b); (b) the "grace period" between delivery and
> the payment due date (which is simply a form of financing) (¶b); (c)
> discounts, including acceptance of discount coupons (¶c); (d) rebates (¶c);
> (e) *formulas to be used for determining the price, such as relative value*
> *scales and similar arrangements* (¶d); and willingness to entertain
> competitive bids (¶e).  In sum, "price element" is defined broadly to
> include any term of sale that can be regarded as affecting the price that the
> customer must pay or any mechanism such as a formula by which the
> price may be computed.

XIX Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 2022 at 168-69 (Rev. Ed. 1997).

*Cooper-Booth's contention, and the basic premise supporting its Sherman Act preemption argument, is that the UCSA violates the Sherman Act because it requires all wholesalers on an industrywide basis to use the same and common formula in calculating the minimum prices they may charge for their cigarettes.  The industrywide use of this common formula is price fixing.*

The Supreme Court's opinion in *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150 (1940), can be no clearer on this point.  Prices are fixed for purposes of the Sherman Act, concluded the Supreme Court, "if the range within which purchases or sales will be made is agreed upon, if the prices paid or charged are to be at a certain level or on ascending or descending scales, if they are to be uniform, *or if by various formulae they are related to the market prices*.  They are fixed because they are agreed upon."  *Id.* at 222 (emphasis added).

4

Here, the UCSA provides a statutory formula[1] that is to be used industrywide by wholesalers to determine their minimum resale prices. That is price fixing within the meaning of the federal antitrust laws, as it is the statutorily-mandated formula, not market forces, that determines the minimum prices a wholesaler may charge. *See, e.g.*, *National Society of Professional Engineers v. United States*, 435 U.S. 679, 692 (1978) ("Price is the 'central nervous system of the economy,' and an agreement that 'interfere[s] with the setting of price by free market forces' is illegal on its face."). Consequently, under the UCSA, the Wal-Marts of the world are to have the same minimum prices as the corner mom-and-pop shop, notwithstanding their economies of scale and lower overhead costs. Under *Socony*, there is no doubt that the UCSA and its minimum price formula constitutes a form of horizontal price fixing, which in turn is a *per se* violation of the Sherman Act.

1.      **In Sherman Act Preemption Cases, Proof Of An Actual "Agreement" Between The Wholesalers Need Not Be Shown. The UCSA Takes The Place Of The "Agreement."**

Zucca repeatedly argues that Cooper-Booth's preemption argument fails because it cannot show an agreement or conspiracy between the wholesalers in Delaware to use a common formula to price their cigarettes. Zucca writes:

---

[1] Analysis of the statutory formula is set out in Cooper-Booth's opening brief on pages 10 through 12. For ease of reference though, the UCSA prohibits wholesalers from selling cigarettes at less than "cost to the wholesaler." *See* 6 Del. C. § 2601. "Cost to the wholesaler," in turn, is defined as the sum of the "basic cost of cigarettes" and the "cost of doing business," which translates to the following formula:

"Basic Cost of Cigarettes"
+   "Cost of Doing Business"
"Cost to the Wholesaler"

*See* 6 Del. C. § 2602(4).

> [I]f a cartel of cigarette wholesalers in Delaware got together and agreed upon a formula that established the minimum prices they would all charge their customers, they would certainly be parties to a horizontal price-fix violative of the Sherman Act. But that is not what happened here, as it was the State of Delaware — not the cigarette wholesalers — that put into place a minimum price formula <u>and</u> dictated the elements to be used in the formula, which are elements over which cigarette wholesalers have no control.

Zucca Br. at 7.

Zucca's "agreement" argument has been foreclosed by the United States Supreme Court's decisions in *California Retail Liquor Dealers Association v. Midcal Aluminum, Inc.*, 445 U.S. 97 (1980), and *324 Liquor Corp. v. Duffy*, 479 U.S. 335 (1987). There was **no** proof of an "agreement" in those cases either, but the Supreme Court still found the state statutes preempted. The dealers in those cases were merely abiding by their state statutes and selling at the statutorily prescribed price. Yet in both cases, the Supreme Court still found that the state statutes were preempted by the Sherman Act absent any proof of an "agreement" between the dealers to fix prices. With respect to *Midcal*, the leading antitrust treatise explains why:

> [T]he California statute was preempted by federal antitrust law, and the reason was clear: although not requiring an "agreement" as such, it brought about the same marketplace result as illegal resale price maintenance agreements.

I Phillip E. Areeda and Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 217 at 307 (Rev. Ed. 1997).

The rule of law derived from these cases is that "the Supreme Court has made it clear that an actual 'contract, combination or conspiracy' need not be shown for a state statute to be preempted by the Sherman Act." *Freedom Holdings, Inc. v. Spitzer*, 357 F.3d 205, 223 n.17 (2d Cir. 2004). ***The state statute takes the place of the "contract, combination or conspiracy" and***

6

is preempted because "it places irresistible pressure on a private party to violate the antitrust laws in order to comply with the statute." *Rice v. Norman Williams*, 458 U.S. 654, 661 (1982).

"The mere fact that each wholesaler complies unilaterally with the regulations does not save an impermissible pricing scheme from an antitrust challenge." *Miller v. Hedlund*, 813 F.2d 1344, 1350 (9th Cir. 1987). In *Miller*, retailers challenged Oregon's "post-and-hold" liquor pricing laws. Oregon and the other appellees made the same argument in that case that Zucca has made here: that "the wholesalers merely act unilaterally in response to the requirements of the regulations and that there is no agreement or concerted activity of any sort between them" to fix prices. *Id.* at 1349. The Ninth Circuit rejected the argument as an oversimplification:

> The appellees' treatment of this difficult issue oversimplifies it. ***While it is true that there is no agreement or concerted activity among the wholesalers, it can not be ignored that the challenged regulations facilitate the exchange of price information and require adherence to the publicly posted prices. In other words, the state compels activity that would otherwise be a per se violation of the Sherman Act.*** It is the presence of state compulsion that requires a more refined analysis than the one presented by the appellees. Simply ending the analysis because of a lack of concerted activity among the wholesalers fails to take into account the presence and effect of the state's involvement in the matter.

*Id.* at 1349 (emphasis added).

The Ninth Circuit reviewed the Supreme Court's opinions in *Schwegmann*, *Fisher*, and *Midcal* and concluded that "[t]he mere fact that each wholesaler complies unilaterally with the regulations does not save an impermissible pricing scheme from an antitrust challenge." *Id.* at 1350. It noted that in *Schwegmann* "non-contracting retailers were compelled to comply unilaterally with a state authorized pricing scheme, but the absence of concerted activity among the retailers was not a bar to a finding of a Sherman Act violation." *Id.* at 1351.

7

Accordingly, proof of an agreement or concerted activity by and between the cigarette wholesalers is not a prerequisite to finding the UCSA preempted by the Sherman Act.

**B.     Step Two:  The UCSA Is A Hybrid Restraint, Because It Does Not Exclude All Private Price Setting Discretion In The Calculation Of Wholesalers' Minimum Resale Prices.**

As Cooper-Booth noted in its opening brief, it is not enough for the UCSA to condone conduct that constitutes a *per se* violation of the Sherman Act.  The UCSA must also be what the United States Supreme Court has described as a "hybrid restraint."  In its opening brief, Cooper-Booth reviewed the four Supreme Court opinions that addressed the issue of "unilateral" versus "hybrid" restraints and demonstrated that the deciding factor in all four of those cases that caused the Supreme Court to categorize a state statute as either a "unilateral" restraint or a "hybrid" restraint was ***whether the State set the actual dollar amount of the price restraint imposed by the statute to the exclusion of all private control.***  Stated differently, a state statute that both (1) *imposes* a price restraint and (2) *sets* the actual dollar amount of that price restraint is a unilateral restraint.  A statute that simply *imposes* a price restraint but leaves it to private parties to *set* the actual dollar amount of the price restraint is a "hybrid" restraint.

Zucca argues in response that Cooper-Booth's analysis is flawed because "it relies entirely on manufacturer conduct, now wholesaler conduct."  *See* Zucca Br. at 10.  According to Zucca, "in assessing whether conduct is unilateral or hybrid, the only relevant conduct is the conduct of the parties that are supposedly making antitrust mischief by restraining trade."  *See* Zucca Br. at 10.  Here, Zucca contends, that means the only relevant conduct is that of the wholesalers, not the manufacturers.

110018.00602/30329589v.2

Zucca is itself wrong because *the focus of the unilateral/hybrid analysis is on the State, not the private actors (be it the wholesalers or the manufacturers), and whether the State both imposes the price restraint and sets the actual dollar amount of the price restraint such that the State has displaced all price setting discretion by private actors.*

The Supreme Court's opinion in *Fisher v. City of Berkeley*, 475 U.S. 260 (1986), proves Zucca's argument false. *Fisher*, like this case, involved a law that was challenged as being a horizontal price restraint. The City of Berkeley enacted a rent stabilization ordinance that required landlords to adhere to prescribed rent ceilings that were set by the City. *Id.* at 262-63. A group of landlords sued the City of Berkeley, contending the ordinance was a *per se* price fixing violation. *See id.* at 263.

The Supreme Court acknowledged that the ordinance maintained maximum retail prices in the housing market in much the same way as an agreement among benevolent landlords to stabilize rents at reasonable levels for the benefit of tenants and that such an agreement would be a *per se* unlawful horizontal restraint. *See id.* at 266. (Thus satisfying step one of the three-step analysis.) *But what prevented the Supreme Court from finding the ordinance preempted by the Sherman Act <u>was the fact that the dollar amount of the rent ceilings were set by the City of Berkeley to the exclusion of all private control.</u>*

The actual rent ceilings — not simply a formula for calculating them — were set by the City of Berkeley. The presence of genuine and *exclusive* public control by the City of Berkeley over the determination of the actual dollar amount of the rent ceilings is what made the ordinance a unilateral restraint and saved it from preemption. As the Supreme Court explained:

> What distinguishes the operation of Berkeley's Ordinance from the
> activities of a benevolent landlords' cartel is not that the Ordinance will

9

> necessarily have a different economic effect, but that the rent ceilings imposed by the Ordinance and maintained by the Rent Stabilization Board have been *unilaterally imposed by government upon landlords to the exclusion of private control.* . . .

*Id.* at 266 (emphasis).

In making that determination, the Supreme Court did not — to use Zucca's terminology — focus solely on the conduct of the alleged "antitrust mischiefs" (*i.e.*, the landlords). The Court noted the implications of the tenants' conduct as well. But again, because the City of Berkeley was vested with complete and exclusive discretion in the setting of the actual dollar amount of the landlords' rent ceilings, the ordinance was saved from preemption:

> While the Ordinance does give tenants — certainly a group of interested private parties — some power to trigger enforcement of its provisions, *it places complete control over maximum rent levels exclusively in the hands of the Rent Stabilization Board.* . . .

*Id.* at 269 (emphasis added).

The same cannot be said with the UCSA. While Zucca criticizes Cooper-Booth for focusing on the cigarette manufacturers' involvement in the setting of the dollar amount of the cigarette wholesalers' minimum prices, ***the purpose of this was to show the <u>complete absence</u> of any involvement by the State of Delaware in determining what those final minimum prices should be.***

The UCSA requires wholesalers to use a common formula to price their goods, but ***the UCSA does not exclude all private influence from the determination of what those final prices should be.*** It is this fact that makes this case ***unlike*** *Fisher*. If the actual dollar amount of the wholesalers' minimum prices under the UCSA were set by the State of Delaware, and not based upon and subject to the discretion of the manufacturers' invoices prices, then the UCSA would

10

be like the rent ceiling ordinance in *Fisher*. But rather than retaining exclusive control over the setting of wholesalers' minimum prices, UCSA cedes pricing discretion to the cigarette manufacturers. This is what makes *Fisher* factually inapposite. The City of Berkley dictated the actual dollar amount of the landlords' rent ceilings, whereas the UCSA requires wholesalers to charge no less than a certain price calculated using a formula that is based upon the manufacturers' invoice price. It is as if, rather than imposing the dollar amount of the rent ceiling, the City of Berkeley instead passed an ordinance requiring landlords to charge rents of no more (or in the case of the UCSA, no less) than a certain multiple of their monthly mortgage payments. The result is that a third-party, *and not the government exclusively,* has a direct say in determining the dollar amount of the statutorily-imposed price restraint.

    The difference between the UCSA and *Fisher*, therefore, is that while both the rent ordinance in *Fisher* and the UCSA impose a price restraint, what made the ordinance in *Fisher* a "unilateral restraint" is that it went one step further and established the actual dollar amount of that price restraint to the exclusion of any private, third-party, price-setting discretion, whereas the UCSA merely establishes a formula that is subject to, and indeed is built upon, the price-setting discretion of a private, third party, market participant. This is what makes the UCSA a hybrid, rather than a unilateral, restraint, because under the UCSA the State of Delaware does not have complete and exclusive control in the setting of the actual dollar amount of the wholesalers' minimum prices. The UCSA sets the formula, but is does not set the numbers that are used in that formula.

110018.00602/30329589v.2

**C.     Step Three:  The State of Delaware Does Not Have "Ultimate Control" Over the Minimum Prices Charged By Wholesalers.  Consequently, There Is No "Active Supervision."**

As was explained in Cooper-Booth's opening brief, even if a state statute condones conduct that would otherwise be a *per se* violation of the Sherman Act and is a "hybrid," rather than a "unilateral," restraint, it may nevertheless be saved from Sherman Act preemption if the state "actively supervises" the resulting anticompetitive conduct.

There have been a number of United States Supreme Court opinions on the issue of "active supervision."  And on issues of federal law, the United States Supreme Court has the final word.  Zucca, however, fails to make reference to any United States Supreme Court case law on the issue in favor of citing intermediate appellate-level state court cases.  *See* Zucca Br. at 14-15.  Specifically, Zucca cites *Jetro Cash and Carry Enterprises, Inc. v. State of New York*, 605 N.Y.S.2d 538 (N.Y. App. Div. 1993), and *Forrest City Grocery Co. v. Tennessee Department of Revenue*, 917 S.W.2d 247 (Tenn. Ct. App. 1995), to argue by way of parentheticals that "active supervision" is present under the UCSA scheme.

Zucca's "parenthetical analysis" of *Jetro* and *Forrest City* simply cannot be squared with the facts of this case and the United States Supreme Court's opinion in *Patrick v. Burget*, 486 U.S. 94 (1988).

The United States Supreme Court's decision in *Patrick* makes clear that "active supervision" requires nothing less than ***"ultimate control"*** by the State of Delaware over the setting of wholesalers' minimum resale prices.  Without "ultimate control," there can be no "active supervision."

12

In *Patrick*, the plaintiff, a doctor in Oregon, declined the invitation of a group of physicians to join their clinic — the only clinic in the town— and instead began a competing medical practice. Thereafter, plaintiff experienced difficulties in his professional dealings with the group, culminating in their initiation of and participation in peer-review proceedings to terminate his privileges at the town's only hospital. The plaintiff filed suit, alleging that the defendants had violated the Sherman Act by initiating and participating in the peer-review proceedings in order to reduce competition from his practice.

The defendants argued that they were immune from Sherman Act liability because the peer-review proceedings fell within the state-action exemption. Because it was required and established by statute, the defendants contended that the State of Oregon "actively supervised" the peer review process. *See id.* at 101. The Supreme Court disagreed. "The mere presence of state involvement or monitoring," the Supreme Court said, "did not suffice." *Id.* at 101. Rather, "the active supervision requirement mandates that the State exercise ***ultimate control*** over the challenged anticompetitive conduct." *Id.* at 101 (emphasis added). As the Supreme Court stated:

> The active supervision prong of the *Midcal* test requires that state officials have and exercise power to review particular anticompetitive acts of private parties and disapprove those that fail to accord with state policy. Absent such a program of supervision, there is no realistic assurance that a private party's anticompetitive conduct promotes state policy, rather than merely the party's individual interests.

*Id.*

Oregon's statutory scheme did not meet that standard, the Supreme Court concluded. Although it established the peer-review process, nothing in the statute gave the State the power to review and overturn peer-review decisions. Without "ultimate authority" over those decisions,

13

and regardless of what other activities the State undertook, there could be no "active

supervision" the Supreme Court said:

> This statutory scheme does not establish a state program of active
> supervision over peer-review decisions. ***The Health Division's statutory
> authority over peer review relates only to a hospital's procedures; that
> authority does not encompass the actual decisions made by hospital
> peer-review committees.*** The restraint challenged in this case . . . consists
> not in the procedures used to terminate hospital privileges, but in the
> termination of privileges itself. ***The State does not actively supervise this
> restraint unless a state official has and exercises ultimate authority*** over
> ***private privilege determinations.*** Oregon law does not give the Health
> Division this authority: under the statutory scheme, the Health Division
> has no power to review private peer-review decisions and overturn a
> decision that fails to accord with state policy. ***Thus, the activities of the
> Health Division under Oregon law cannot satisfy the active supervision
> requirement of the state-action doctrine.***

*Id.* at 102 (emphasis added).

The State of Delaware similarly lacks "ultimate control" under the UCSA. The UCSA

establishes a formula for calculating wholesalers' presumptive minimum resale prices for

cigarettes and vests authority in the State of Delaware with enforcing that formula. Every

element of that formula, however, is based upon the cigarette manufacturers' invoice prices. The

problem with basing the formula on the cigarette manufacturers' invoice prices is that, under the

UCSA, the State of Delaware does not have any veto power, let alone any say, over the invoice

prices that the cigarette manufacturers may charge and the resulting wholesaler minimum prices.

Without that veto power, the State of Delaware does not have "ultimate control" over the

setting of wholesalers' minimum resale prices; the cigarette manufacturers, by raising and

lowering their invoices prices, can control their wholesalers' minimum prices.

Although not fully developed, Zucca in a footnote in its brief seems to allude that this

case falls within a possible "active supervision" exception mentioned in footnote 6 in the

Supreme Court's opinion in *324 Liquor Corp. v. Duffy*, 479 U.S. 335 (1987). In footnote 6, the

Supreme Court left undecided whether a true minimum markup statute — a statute that requires

wholesalers or retailers to markup the price of goods by a certain percentage based on their

*actual costs* — would satisfy the "active supervision" requirement. *See id.* at 344, n.6. The

thought is that, if "actual costs" are used, then there would be nothing to supervise because there

would be no private price setting discretion. By using *actual* rather than statutorily-prescribed

*presumed* cost figures, a manufacturer or wholesaler would not have unfettered discretion over

his resellers' minimum sale prices, because each reseller has different *actual* operating costs,

which in turn would result in a different minimum sale price for each reseller. *See, e.g.,* I Phillip

E. Areeda and Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their*

*Application* ¶ 226 at 493 (Rev. Ed. 1997).

The point is academic here, however, because the UCSA does not use "actual costs" in

calculating wholesalers' minimum resale prices. Rather, like the statute in *Duffy*, the UCSA uses

a system of "presumed costs," which again are based upon and calculated as a percentage of the

cigarette manufacturer's invoice price. *See* 6 Del. C. § 2602(1). Consequently, like the statute in

*Duffy*, there is no abatement of private price-setting discretion under the UCSA and no "active

supervision" of that price-setting discretion.

The UCSA simply provides no mechanism for "active supervision" by the State of

Delaware. The State of Delaware merely enforces the use of the formula, but it does not have or

exercise "ultimate control" over the resulting prices. That is not "active supervision." As the

Supreme Court said in analyzing a similar statute:

> The State simply authorizes price setting and enforces the prices
> established by private parties. The State neither establishes prices nor

15

> reviews the reasonableness of the price schedules . . . . The State does
> not monitor market conditions or engage in any "pointed reexamination"
> of the program. The national policy in favor of competition cannot be
> thwarted by casting such a gauzy cloak of state involvement over what is
> ostensibly a private price-fixing arrangement.

*California Retail Liquor Dealers Assoc. v. Midcal Aluminum, Inc.*, 445 U.S. 97, 105-06 (1980).

When all is said and done, Zucca does not dispute that the UCSA purports to allow private

market participants — with no supervision or input by the State of Delaware — to set the

wholesalers' minimum prices. That, simply put, cannot be squared with the national policy

expressed by the Sherman Act. The UCSA, therefore, must be found preempted by Section 1 of

the Sherman Act.

## II.    There Is Nothing "Hypothetical" About Zucca's Lawsuit. The Preemption Issue Is Ripe For Decision.

With all due respect, Zucca's justiciability argument is without merit. According to

Zucca, no federal court in this nation should ever hear a motion based on an affirmative defense

until a verdict is returned. To put Zucca's illogic in perspective, if Zucca's argument were

accepted, courts would never rule on a statute of limitations or qualified immunity defense unless

and until the plaintiff established liability against the defendant. Zucca's argument, if adopted,

would require the parties and the Court to put all meritorious defenses on the back burner and

spend their time, money, and resources litigating a case under a state statute that may very well

be preempted by federal law. That argument finds no support in law or logic.

The Federal Rules of Civil Procedure do not require Cooper-Booth or the Court to go

through the time and expense of a trial for Zucca to prove liability before considering Cooper-

Booth's affirmative defense. For purposes of a Rule 12(c) motion, Zucca's well-pleaded

allegations, including the allegation that Cooper-Booth violated the UCSA, are accepted as true.

*See, e.g., Taj Mahal Travel, Inc. v. Delta Airlines, Inc.*, 164 F.3d 186, 189 (3d Cir. 1998).  The

purpose is to give Zucca every conceivable benefit of doubt fact-wise, and determine whether —

accepting Zucca's facts as true — there is a *viable legal basis* for recovery.

   Zucca nonetheless contends that the preemption issue is "hypothetical" unless and until it

can prove Cooper-Booth actually violated the UCSA.  There is nothing "hypothetical" about the

issue before the Court.  Zucca has sued Cooper-Booth for violating the UCSA.  Cooper-Booth

contends the UCSA is preempted by the Sherman Act.  Accordingly, the preemption issue is a

threshold issue.  If the UCSA is preempted, then under the Supremacy Clause of the United

States Constitution this lawsuit disappears.

17

## CONCLUSION

For all of the foregoing reasons, Defendant Cooper-Booth Wholesale Company's Motion for Partial Judgment on the Pleadings to dismiss Plaintiff L.J. Zucca, Inc.'s claims asserted in Count I of the First Amended Verified Complaint for violations of the Delaware Unfair Cigarette Sales Act, 6 Del. C. §§ 2601 – 2608, should be **GRANTED.**  Pursuant to the Supremacy Clause in Article VI of the United States Constitution, the UCSA is preempted by Section 1 of the Sherman Act.  Count I of Plaintiff L.J. Zucca, Inc.'s Amended Complaint, therefore, should be **DISMISSED.**

Respectfully submitted,

**BLANK ROME LLP**

Dated: April 22, 2008

_____

Christine S. Azar, Esquire (I.D. No. 4170)
1201 Market Street, Suite 800
Wilmington, DE 19801
Phone: (302) 425-6400
Fax      (302) 425-6464

and

Stephen M. Orlofsky, Esquire
Kit Applegate, Esquire
Woodland Falls Corporate Park
210 Lake Drive East, Suite 200
Cherry Hill, NJ 08002
Phone: (856) 779-3600
Fax:    (856) 779-7647

Attorneys for Defendant
Cooper-Booth Wholesale Company

18

## CERTIFICATE OF SERVICE

I, Christine S. Azar, Esquire, certify that on April 22, 2008, I served a copy of **Defendant**

**Cooper-Booth Company's Reply Brief in Support of Its Motion for Partial Judgment on**

**the Pleadings** upon the following counsel in the manner indicated below:

## VIA ELECTRONIC SERVICE

Michael F. Bonkowski
Kimberly M. Large, Esquire
Saul Ewing LLP
222 Delaware Ave., Suite 1200
P.O. Box 1266
Wilmington, DE 19899
Attorneys for Plaintiff
L.J. Zucca, Inc.

James W. Semple, Esquire
MORRIS JAMES LLP
500 Delaware Avenue, Suite 1500
PO Box 2306
Wilmington, DE 19899
Attorneys for Defendant
Allen Bros. Wholesale Distributors, Inc.

David E. Brand, Esquire
PRICKETT, JONES & ELLIOTT, P.A.
1310 King Street
Wilmington, DE 19899
Attorneys for Defendant
Eby-Brown Company, LLC

David S. Eagle, Esquire
KLEHR, HARRISON, HARVEY,
BRANZBURG & ELLERS, LLP
919 Market Street, Suite 1000
Wilmington, DE 19801
Attorneys for Defendant
Western Skier, Ltd. f/k/a Klein Candy Co., LP

_____
Christine S. Azar
I.D. No. 4170

110018.00602/30329589v.2